O

# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

SARA SAFARI and PEYMON
    KHAGHANI, on behalf of themselves
    and all others similarly situated, and
FARM FORWARD, on behalf of the
    general public,

        Plaintiffs,

    v.

WHOLE FOODS MARKET SERVICES,
    INC., a Delaware corporation,
WHOLE FOODS MARKET
    CALIFORNIA, INC., a California
    corporation,
MRS. GOOCH'S NATURAL FOOD
    MARKETS, INC., doing business as
    Whole Foods Market, a California
    Corporation,

        Defendants.

Case No. 8:22-cv-01562-JWH-KES

**ORDER REGARDING
DEFENDANTS' MOTION TO
DISMISS [ECF No. 46]**

Before the Court is the motion of Defendants Whole Foods Market Services, Inc.; Whole Foods Market California, Inc.; and Mrs. Gooch's Natural Food Markets, Inc. (collectively, "Whole Foods") to dismiss the First Amended Complaint of Plaintiffs Sara Safari, Peymon Khaghani, and Farm Forward.[1]  The Court conducted a hearing on the Motion in April 2023.  After considering the papers filed in support and in opposition,[2] as well as the arguments of counsel at the hearing, the Court orders that the Motion is **GRANTED in part** and **DENIED in part**, for the reasons set forth herein.

# I. BACKGROUND

## A.    Facts

Plaintiffs assert a putative consumer fraud class action, alleging that Whole Foods made material misrepresentations and omissions regarding the absence of antibiotics in the beef that it sells.[3]  Plaintiffs claim that although Whole Foods advertises its beef with the slogan "No Antibiotics, Ever," independent laboratory testing has detected traces of antibiotics and pharmaceutical residue in the beef products that Whole Foods sells.[4]

### 1.    Individual Plaintiffs—Safari and Khaghani

Safari is a resident of Tustin, California.  She claims that she purchased beef from Whole Foods' stores in that city.[5]  Khaghani is also a resident of Tustin, and he asserts that he purchased beef from Whole Foods' stores in both Tustin and San Francisco.[6]  Both Safari and Khaghani allege that they relied upon Whole Foods' advertising that its beef was antibiotic-free and that they would not have purchased Whole Foods' beef—or at least they would not have paid a premium for that beef—had they known that Whole Foods' beef products were derived from cattle raised with antibiotics.[7]

---

[1]    Defs.' Mot. to Dismiss Pls.' First Am. Compl. (the "Motion") [ECF No. 46].

[2]    The Court considered the documents of record in this action, including following papers: (1) First Am. Compl. (the "Amended Complaint") (including its attachments) [ECF No. 35]; (2) Motion (including its attachments); (3) Pl.'s Opp'n to the Motion (the "Opposition") [ECF No. 48]; (4) Defs.' Reply in Supp. of the Motion (the "Reply") [ECF No. 50]; (5) Defs.' Suppl. Brief in Supp. of Motion ("Defendants' Supplemental Brief") [ECF No. 55]; and (6) Pls.' Suppl. Brief in Supp. of Opposition ("Plaintiffs' Supplemental Brief") [ECF No. 57].

[3]    Amended Complaint ¶ 1.

[4]    *Id.* at ¶¶ 1 & 58.

[5]    *Id.* at ¶¶ 9 & 11.

[6]    *Id.* at ¶¶ 16 & 18.

[7]    *Id.* at ¶¶ 13, 15, 19, & 22.

### 2.    Organizational Plaintiff—Farm Forward

Farm Forward alleges that it is an IRS § 501(c)(3) tax-exempt national public interest animal protection organization with its principal place of business in Portland, Oregon.[8]  Farm Forward claims that its mission is to end factory farming and that it has 60,000 supporters worldwide.[9]

### 3.    Whole Foods' Antibiotic-Free Marketing Campaign

Plaintiffs contend that Whole Foods has advertised its beef under slogans such as "No antibiotics or added growth hormones, ever" since 2002.[10]  As a part of that marketing campaign, Whole Foods also labeled its beef as "Animal Welfare Certified," which is a label developed by non-party Global Animal Partnership ("GAP").[11]  GAP is a standards-setting group for farmed animals, and a GAP certification on a food product means that the animals from which the product was derived were "raised without the use of antibiotics[.]"  GAP was formed by Whole Foods' CEO in 2007, and Farm Forward was a member of GAP's Board of Directors from GAP's inception until 2020.[12]  Plaintiffs claim that Whole Foods was integral to the creation of GAP and to its standards and that Whole Foods continues to exert influence over GAP.[13]

### 4.    Whole Foods' Beef and Antibiotics Testing

Plaintiffs assert that Whole Foods' beef products are not reliably antibiotics-free, because independent testing has shown traces of antibiotics and other pharmaceuticals in beef sold by Whole Foods.[14]  Specifically, in 2021 and 2022, Farm Forward tested samples of meat purchased at six different Whole Foods locations in San Francisco, Virginia, Chicago, and Salt Lake City that revealed the presence of pharmaceutical residue.[15]  Farm Forward tested the meat products using two different independent laboratories, and one of those laboratories allegedly detected antibiotics in a beef product

---

[8]    *Id.* at ¶ 23.

[9]    *Id.*

[10]   *Id.* at ¶ 36.

[11]   *Id.* at ¶ 50.

[12]   *Id.* at ¶ 51.

[13]   *Id.* at ¶ 52.

[14]   *Id.* at ¶ 58.

[15]   *Id.* at ¶ 59 (Plaintiffs do not reveal the city in Virginia from which Farm Forward obtained samples of Whole Foods' beef products).

marketed as "GAP Step 4" and "USDA Certified Organic" at a Whole Foods' store in San Francisco.[16]

Another laboratory found antiparasitic pharmaceuticals in five beef products purchased from Whole Foods' stores in Salt Lake City and Chicago, all of which were marketed as GAP-certified.[17]  Plaintiffs claim that those lab results were consistent with other tests performed on purported "antibiotic-free" cattle by other organizations.[18] Farm Forward asserts that it notified Whole Foods of its lab results in April 2022 and that Whole Foods knew of deficiencies in GAP's testing procedures for antibiotics in beef dating back to 2017.[19]

### 5.   Alleged Harms Caused by Whole Foods' Advertising

Plaintiffs contend that Whole Foods charged a premium price for its falsely labeled beef.  For example, Whole Foods' filet mignon product sold for as much as $31.99 per pound, whereas other grocers sold similar products not labeled as "antibiotic-free" for only $24.99 per pound.[20]  Plaintiffs desired "antibiotic-free" beef, so they purchased Whole Foods' products at a premium price that they would not have paid had they known that Whole Foods' beef contained antibiotics.

Additionally, Farm Forward asserts that, misled by Whole Foods' false advertising, Farm Forward expended resources to encourage consumers to purchase Whole Foods' beef.[21]  Farm Forward was also forced to spend money to investigate Whole Foods' antibiotic-free claims and to inform the public about the truth behind those false claims.[22]  Farm Forward maintains that those efforts "drained resources" from its other activities opposing factory farming and that Whole Foods' false advertising campaign harmed Farm Forward's mission to end factory farming.[23]  Farm Forward claims that it was duped into serving on GAP's board and that it mistakenly promoted Whole Foods' meats as "better choices" through a web-based consumer guide.[24]

---

[16]     *Id.* at ¶ 60.

[17]     *Id.* at ¶ 61.

[18]     *Id.* at ¶ 62.

[19]     *Id.* at ¶¶ 66 & 70.

[20]     *Id.* at ¶ 76.

[21]     *Id.* at ¶ 80.

[22]     *Id.*

[23]     *Id.*

[24]     *Id.* at ¶ 83.

Farm Forward also avers that it suffered financial losses as a result of Whole Foods' improper actions and that it devoted significant staff time and organizational resources to address Whole Foods' false advertising.[25] Those expenditures included at least $80,000 in purchasing Whole Foods' products, shipping those products to testing laboratories, and paying laboratory-testing fees.[26] Farm Forward alleges that in addition to the resources that it expended on its information campaign, it also had to reallocate resources from other initiatives to address its Whole Foods investigation.[27] As part of its public awareness campaign, Farm Forward spent $12,000 on a consumer survey concerning Whole Foods and its meat advertising claims.[28] If Farm Forward had not undertaken the corrective initiatives described above, it claims that it would have suffered reputational injuries with its supporters.[29]

## B.   Procedural History

Plaintiffs commenced this action in August 2022, and they filed their operative Amended Complaint in November 2022.  Plaintiffs assert the following seven claims for relief:

- Violation of the Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750 *et seq.* (by Individual Plaintiffs on behalf of the Class);
- Violation of the Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200 *et seq.* (by all Plaintiffs);
- Violation of the False Advertising Law ("FAL"), Cal. Bus. & Prof. Code §§ 17500 *et seq.* (by all Plaintiffs);
- Breach of Express Warranty, Cal. Com. Code § 2313 (by Individual Plaintiffs on behalf of the Class);
- Unjust Enrichment (by Individual Plaintiffs on behalf of the Class);
- Fraudulent Concealment (by all Plaintiffs); and
- Intentional Misrepresentation (by Individual Plaintiffs on behalf of the Class).

Whole Foods filed the instant Motion in January 2023, seeking to dismiss the Amended Complaint under Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.  In March 2023, the Court directed the parties to provide supplemental

---

[25]    *Id.* at ¶ 88.

[26]    *Id.* at ¶ 89.

[27]    *Id.* at ¶ 92.

[28]    *Id.* at ¶ 93.

[29]    *Id.* at ¶ 94.

briefing on the issue of Article III standing.[30]  The Court conducted a hearing the next
month and took the Motion under submission.[31]

## II.  LEGAL STANDARD

### A.    Rule 12(b)(1)—Lack of Subject-Matter Jurisdiction

As the party seeking to invoke the federal court's jurisdiction, the plaintiff has the
burden of alleging facts sufficient to prove that it has Article III standing.  *See Lujan v.
Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992).  When the plaintiff lacks standing,
Rule 12(b)(1) allows the defendant to move to dismiss the claims against it for lack of
subject-matter jurisdiction.  *See* Fed. R. Civ. P. 12(b)(1).  A plaintiff bears the burden of
demonstrating standing "for each claim" and "for each form of relief" that it seeks.
*DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342, 352 (2006) (internal citations and
quotations omitted).  A court should dismiss an action when the face of the complaint
does not demonstrate a basis for the claimant's standing.  *See Warren v. Fox Family
Worldwide, Inc.*, 328 F.3d 1136, 1139 (9th Cir. 2003); Fed. R. Civ. P. 8(a) & 12(b)(1).

"Under Rule 12(b)(1), a defendant may challenge the plaintiff's jurisdictional
allegations in one of two ways."  *Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014).  A
***facial*** attack accepts the plaintiff's allegations as true but asserts that they "are
insufficient on their face to invoke federal jurisdiction."  *Id.* (quoting *Safe Air for Everyone
v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004)).  The court resolves a facial attack "as it
would a motion to dismiss under Rule 12(b)(6)":  in accepting the plaintiff's allegations as
true and drawing all reasonable inferences in her favor, the court determines "whether
the allegations are sufficient as a legal matter to invoke the court's jurisdiction."  *Id.*

In contrast, a ***factual*** attack contests "the truth of the plaintiff's factual
allegations," typically by introducing evidence outside the pleadings.  *Id.*  "When the
defendant raises a factual attack, the plaintiff must support her jurisdictional allegations
with 'competent proof,' under the same evidentiary standard that governs in the
summary judgment context."  *Id.* (internal citation omitted).  The plaintiff bears the
burden of proving—by a preponderance of the evidence—that she meets each of the
requirements for subject-matter jurisdiction, with one caveat: if the existence of
jurisdiction turns on "disputed factual issues," then the court itself may resolve those
factual disputes.  *Id.*

---

[30]    *See* Order Directing Supp. Briefing Concerning Article III Standing [ECF No. 54].

[31]    *See* Minute Order [ECF No. 59].

### B.      Rule 12(b)(6)—Failure to State a Claim

A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the claims asserted in a complaint.  *See Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001).  In ruling on a Rule 12(b)(6) motion, "[a]ll allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party."  *Am. Family Ass'n v. City & County of San Francisco*, 277 F.3d 1114, 1120 (9th Cir. 2002).  Although a complaint attacked by a Rule 12(b)(6) motion "does not need detailed factual allegations," the plaintiff must provide "more than labels and conclusions."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

To state a plausible claim for relief, the complaint "must contain sufficient allegations of underlying facts" to support its legal conclusions.  *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011).  "Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact) . . . ."  *Twombly*, 550 U.S. at 555 (citations and footnote omitted).  Accordingly, to survive a motion to dismiss, a complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face," which means that the plaintiff must plead sufficient factual content to "allow[] the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted).  A complaint must contain "well-pleaded facts" from which the Court can "infer more than the mere possibility of misconduct."  *Id.* at 679.

### C.      Rule 15(a)—Leave to Amend

A district court "should freely give leave when justice so requires." Fed. R. Civ. P. 15(a).  The purpose underlying the liberal amendment policy is to "facilitate decision on the merits, rather than on the pleadings or technicalities."  *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000).  Therefore, leave to amend should be granted unless the Court determines "that the pleading could not possibly be cured by the allegation of other facts."  *Id.* (quoting *Doe v. United States*, 8 F.3d 494, 497 (9th Cir. 1995)).

## III.  ANALYSIS

Whole Foods moves to dismiss the claims of all three Plaintiffs for lack of standing. Additionally, Whole Foods moves to dismiss Plaintiffs' fraud-based claims for failure to plead with particularity and moves to dismiss Plaintiffs' breach of warranty and unjust enrichment claims for failure to state a claim.  The Court will address each argument in turn.

## A.      Article III Standing

The Supreme Court clarified the requirements of Article III standing in *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190 (2021), directing that the Constitution confines federal power to the resolution of "Cases" and "Controversies" and that those requirements demand that a party must have a personal stake in the case. *Id.* at 2203 (citation omitted). "For there to be a case or controversy under Article III, the plaintiff must have a 'personal stake' in the case—in other words, standing." *Id.* (citation and quotation omitted). Furthermore, "[r]equiring a plaintiff to demonstrate a concrete and particularized injury caused by the defendant and redressable by the court ensures that federal courts decide only 'the rights of individuals[]' . . . and that federal courts exercise 'their proper function in a limited and separated government.'" *Id.* (internal citations and quotations omitted). "In sum, under Article III, a federal court may resolve only 'a real controversy with real impact on real persons.'" *Id.* (citing *American Legion v. American Humanist Assn.*, 139 S. Ct. 2067, 2103 (2019)).

"At an 'irreducible constitutional minimum,' standing requires the party asserting the existence of federal court jurisdiction to establish three elements: (1) an injury in fact that is (a) concrete and particularized and (b) actual or imminent; (2) causation; and (3) a likelihood that a favorable decision will redress the injury." *Wolfson v. Brammer*, 616 F.3d 1045, 1056 (9th Cir. 2010) (citing *Lujan*, 504 U.S. at 560-61). Further, only injuries that have a close relationship to harms traditionally recognized "as providing a basis for a lawsuit in American courts" may be considered "concrete for purposes of Article III[]." *TransUnion*, 141 S. Ct. at 2204 (citing *Spokeo v. Robins*, 578 U.S. 330, 341 (2016)). The Supreme Court instructs that judges should look to "history and tradition" as a "guide to the types of cases that Article III empowers federal courts to consider." *Id.* (citing *Sprint Communications Co. v. APCC Services, Inc.*, 554 U.S. 269, 274 (2008)).

The history-and-tradition inquiry "asks whether plaintiffs have identified a close historical or common-law analogue for their asserted injury." *Id.* Article III standing "does not require an exact duplicate in American history and tradition[,]" but it is "not an open-ended invitation for federal courts to loosen Article III based on contemporary, evolving beliefs about what kinds of suits should be heard in federal courts." *Id.* "[C]ertain harms readily qualify as concrete injuries under Article III[,]" including "traditional tangible harms, such as physical harms and monetary harms." *Id.* "Various intangible harms can also be concrete. Chief among them are injuries with a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts." *Id.* (citing *Spokeo*, 578 U.S. at 340-41). "Article III standing requires a concrete injury even in the context of a statutory violation." *Spokeo*, 578 U.S. at 341.

1.    **Individual Plaintiffs' Standing**

a.    **Safari**

Safari claims that she was injured by Whole Foods when she purchased beef from Whole Foods "at a premium price" and that she later learned that Whole Foods misrepresented that beef as being antibiotic-free.[32]  Safari pleads that she purchased beef only from a Whole Foods store in Tustin, California, however, and nowhere in the Amended Complaint does she allege that the beef that she purchased actually contained antibiotics.[33]  Furthermore, Plaintiffs tested beef samples only from Whole Foods' stores in San Francisco, Chicago, Salt Lake City, and Virginia—and not Tustin—and Plaintiffs do not plead that the supply chain providing beef to Whole Foods' Tustin store received products from the same source as any of the other locations.[34]

Safari advances two theories of economic injury:  (1) she paid a premium for antibiotic-free beef when compared to lower prices for similar beef that was not advertised as antibiotic-free; and (2) she purchased beef from Whole Foods only because she assumed that *all* Whole Foods beef was antibiotic-free.[35]  Plaintiffs compare the price of Whole Foods' filet mignon at $31.00 per pound with that of the same cut at a Safeway store, without antibiotic-free labeling, at $24.99 per pound, to demonstrate their overpayment for the deceptively labeled beef.[36]

Under *TransUnion*, Safari's overpayment for falsely labeled antibiotic-free beef would be a concrete tangible injury relating to monetary harm.  *TransUnion*, 141 S. Ct. at 2204.  Here, though, Safari fails to state a claim sufficient for Article III standing because she does not plead that the beef that she purchased in Tustin came from the same beef supply chains used by Whole Foods' where testing showed traces of antibiotics in cattle.  Plaintiffs do not claim that *all* Whole Foods' beef samples tested positive for antibiotics; to the contrary, only certain samples from specific locations tested positive for antibiotics.[37]  Elsewhere in the Amended Complaint, Plaintiffs identify reports of third-party antibiotics testing on specific slaughterhouses that produced GAP-certified beef, with the following results:

---

[32]    *Id.* at ¶¶ 13 & 14.

[33]    *Id.* at ¶ 11.

[34]    *Id.* at ¶ 59.

[35]    *Id.* at ¶¶ 13-15.

[36]    *Id.* at ¶ 76.

[37]    *Id.* at ¶¶ 59-61.

- 42% of feed yards providing "raised without antibiotics" cattle had at least one animal test positive for antibiotics;
- 15% of the "raised without antibiotics" cattle processed at the slaughterhouse came from a lot that tested positive for antibiotics; and
- 26% of the GAP-certified cattle came from a lot where at least one animal tested positive for antibiotics.[38]

Although Safari need not allege that *all* Whole Foods' beef is antibiotic-free for Whole Foods' claim of "no antibiotics, ever" to be false, Safari must plead facts that the beef that she purchased was *at least* derived from a supply chain tainted with antibiotics use.

Plaintiffs cite two authorities in support of their Opposition, but in both instances Plaintiffs misinterpret the standing requirements for economic injuries, and they ignore those courts' emphasis on the supply chain in question. In *McCoy v. Nestle USA, Inc*, 173 F. Supp. 3d 954 (N.D. Cal. 2016), *aff'd sub nom. McCoy v. Nestle USA, Inc.*, 730 F. App'x 462 (9th Cir. 2018), a court in the Northern District of California considered a motion to dismiss claims relating to Nestlé's use of child slave labor within its chocolate supply chain. Although the *McCoy* court ultimately dismissed the plaintiff's action for failure to state a claim under the CLRA, UCL, and FAL, *id.* at 972, the court held that the plaintiff met Article III's standing requirements. While Nestlé argued that the plaintiff did not allege that the specific chocolate products that she purchased were made from cocoa produced with child slave labor and, therefore, that she could not allege an actual and particularized injury, the court concluded that standing requirements were met because the plaintiff "would have either not purchased or paid less for Nestlé's products if she had known that the *supply chain* involved the labor abuses at issue, regardless of where the cocoa in a particular chocolate bar originated." *Id.* at 962 (emphasis in original). The supply chain was important because Nestlé "[could] not trace the cocoa used in a particular Nestlé chocolate product to a specific plantation, and there is thus no way to know what labor practices were used in its production." *Id.* The court also noted: "[W]hen, as here, 'Plaintiffs contend that class members paid more for [a product] than they otherwise would have paid, or bought it when they otherwise would not have done so' they have suffered an Article III injury in fact." *Id.* at 963 (citing *Hinojos v. Kohl's Corp.*, 718 F.3d 1098, 1104 (9th Cir. 2013)).

As a preliminary matter, *McCoy* predated both *TransUnion* and *Spokeo*, and, consequently, it did not undertake the same Article III standing analysis as directed by those Supreme Court cases. But even under *McCoy*'s analysis regarding the purchased chocolate, Safari would fail to state a sufficient injury in the instant action. Safari does not

---

[38]    *Id.* at ¶ 62.

allege that the beef that she purchased came from the same supply chain that contained cattle tainted with antibiotic use, and nothing within the Amended Complaint indicates that the Tustin Whole Foods store shared a supply chain with any of the locations that tested positive for antibiotics.[39]

Further distinguishing the instant action from *McCoy*, unlike Nestlé's chocolate products—where the supply chain for chocolate products involving child slave labor was indistinguishable from Nestlé's other products—here, Plaintiffs found through laboratory testing that specific beef products at specific locations tested positive for traces of antibiotics.[40]  None of those tests showed antibiotic use at Whole Foods' Tustin store, nor did Plaintiffs plead any facts that the Tustin store relied on the same supply chain as Whole Foods' stores with beef products that may have used antibiotics.  Although Safari alleges that ***other*** Whole Foods' locations used supply chains that may have included antibiotics use at upstream feed yards and slaughterhouses,[41] the Amended Complaint does not allege that those beef products were supplied to Whole Foods' Tustin store.

Plaintiffs also cite another child slave labor case:  *Hodsdon v. Mars, Inc.*, 162 F. Supp. 3d 1016 (N.D. Cal. 2016), *aff'd*, 891 F.3d 857 (9th Cir. 2018).  That court similarly dismissed the plaintiff's CLRA, UCL, and FAL claims, but it held that the plaintiff had Article III standing because class members "would not have purchased Mars Chocolate Products or paid as much for them" had they known "that cocoa harvested by children and forced laborers were in the *supply chain*[.]"  *Id.* at 1022 (emphasis in original).  Although *Hodson* also predated *TransUnion* and *Spokeo*, Safari still fails to meet the standing requirement articulated in *Hodson* because she does not allege that the supply chain for the Tustin Whole Foods store included antibiotic use or that any of the upstream feed yards or slaughterhouses exposed its cattle to antibiotics.

In its Supplemental Brief, Plaintiffs cite two additional authorities in which district courts held that plaintiffs asserting claims against distributors of dolphin-safe tuna products had standing for various California consumer claims.  *See Wright v. Costco Wholesale Corp.*, 2023 WL 210936 (N.D. Cal. Jan. 17, 2023); *Henriquez v. ALDI Inc.*, 2023 WL 2559200 (C.D. Cal. Feb. 7, 2023).  Although Plaintiffs aver that those two cases are post-*TransUnion* examples of courts upholding standing for claims similar to their own, both cases are distinguishable regarding the manner in which the plaintiffs were exposed to the supply chains in question.  In *Wright*, the plaintiffs alleged that Costco falsely advertised its ***supply chain*** and misrepresented its "promises that the products are '100% Traceable from Sea to Shelf,'" and plaintiffs also alleged that "Costco and its suppliers

---

[39]     *Id.* at ¶ 11.

[40]     *Id.* at ¶¶ 59-61.

[41]     *Id.* at ¶ 62.

are 'not able to trace their tuna "100%" from sea to shelf because of data issues, supply chain complexities, and even human error.'" *Wright*, 2023 WL 210936, at *2.

In *Henriquez*, the plaintiffs made similar claims against defendant ALDI concerning the retailer's tuna-fishing practices, alleging that "ALDI's tuna is 'sourced from fisheries that utilize unsustainable fishing methods, longline and purse seine, that are known to harm and kill dolphins.'" *Henriquez*, 2023 WL 2559200, at *2. The plaintiffs in *Henriquez* specifically alleged that "[o]f the eight fisheries that provide ALDI with albacore tuna, none have received a 'well managed' sustainability rating from the [Ocean Disclosure Project]" and that ALDI falsely advertised that its "Dolphin Safe" representations exceeded the requirements of the Dolphin Protection Consumer Information Act. *Id.*

Unlike Safari, the plaintiffs in *Wright* and *Henriquez* specifically alleged that their purchased tuna was sourced from supply chains that involved fishing methods that were unsafe for dolphins and other sea life. Here, Safari does not allege that Whole Foods' Tustin store misrepresented its supply chain, nor does she claim that all beef suppliers to that store showed traces of antibiotics in their cattle.

Moreover, to the extent that Safari alleges that she overpaid for beef because Whole Foods misrepresented its use of antibiotics across ***all*** supply chains, this claim fails for two reasons. First, Plaintiffs specifically described their monetary injury. Comparing Whole Foods' filet mignon to that of Safeway, which Safeway did not market as antibiotic-free, Plaintiffs would have paid approximately $6 per pound more for Whole Foods' beef.[42] Unless Safari can sufficiently plead that her beef was produced by a supply chain tainted by antibiotic use, she fails to state a claim that she overpaid. Put differently, if Safari actually purchased beef that was raised without antibiotic use in its supply chain, then she paid for exactly what Whole Foods advertised:  antibiotics-free beef.

Second, to the extent that Safari alleges an economic injury because Whole Foods sold antibiotics-tainted beef to other customers in other locations, that claim is not viable post-*TransUnion*. That alleged injury would no longer be a tangible economic injury, but, instead, it is an intangible claim untethered to the history and tradition of cases typically heard by Article III courts.[43]  *See TransUnion*, 141 S. Ct. at 2204. Safari need not show

---

[42]     *Id.* at ¶ 76.

[43]     In other legal contexts in which courts are required to evaluate historical analogs of modern laws, the Supreme Court has directed that "'[i]n our adversarial system of adjudication, we follow the principle of party presentation.' Courts are thus entitled to decide a case based on the historical record compiled by the parties." *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2130 n.6 (2022) (internal citation omitted). Here, Plaintiffs did not identify any

that her specific beef purchase was tainted by antibiotics, but, for standing purposes, she must at least allege that the supply chain servicing her store contained upstream antibiotics-related contamination.  That requirement comports with the rule that a plaintiff must claim a "concrete" injury and that "[a] 'concrete' injury must be '*de facto*'; that is, it must actually exist."  *Spokeo*, 578 U.S. at 340.

For Safari to claim an injury based solely on Whole Foods' sale of antibiotic-tainted beef to other customers at other stores would be akin to seeking the general enforcement of California's consumer remedies and "compliance with regulatory law (and, of course, to obtain some money via the statutory damages)."  *TransUnion*, 141 S. Ct. at 2206 (citation and quotation omitted).  Such a claim is too close to what courts deem a "generalized grievance," where a plaintiff asserts a claim without any specific harm to herself.  *See Novak v. United States*, 795 F.3d 1012, 1018 (9th Cir. 2015) ("Because a generalized grievance is not a particularized injury, a suit alleging only generalized grievances fails for lack of standing.").  Although Plaintiffs may value stores that sell antibiotics-free beef, "Article III requires more than a desire to vindicate value interests."  *Diamond v. Charles*, 476 U.S. 54, 66 (1986).

Safari cannot claim a concrete injury based upon her expectation that Whole Foods' antibiotic-free claims applied to meat that she did not purchase, because she received exactly what she bargained for when she paid the $6 per pound premium.  To the contrary, allowing Safari to sue on behalf of others would run afoul of what the Supreme Court warns against:  "Article III grants federal courts the power to redress harms that defendants cause plaintiffs, not a freewheeling power to hold defendants accountable for legal infractions."  *TransUnion*, 141 S. Ct at 2205; *see also Phan v. Sargento Foods, Inc.*, 2021 WL 2224260, at *4 (N.D. Cal. June 2, 2021) (ruling that the plaintiff lacked standing because she did not allege that she purchased antibiotics-tainted product, and "[i]n the absence of that additional allegation, the Court concludes that Plaintiff has no standing to claim that the 'No Antibiotics*' label was misleading."); *Pels v. Keurig Dr. Pepper, Inc.*, 2019 WL 5813422, at *5 (N.D. Cal. Nov. 7, 2019) (dismissing the plaintiff's action for lack of standing, despite tests showing that the defendant's water products exceeded permittable arsenic levels, because the plaintiff failed to allege a particularized injury by not pleading that he actually purchased contaminated water products).  Accordingly, Safari's claims are **DISMISSED** for lack of standing, **with leave to amend**.

_____

historical injury beyond monetary overpayment, nor did Plaintiffs cite any intangible non-monetary injuries relating to Whole Foods' advertisements of "no antibiotics, ever."

### b.    Khaghani

In contrast with Safari, Khaghani avers that he purchased beef from multiple Whole Foods stores in Northern California, including in San Francisco where Whole Foods' beef tested positive for traces of antibiotics residue.[44]  Because Khaghani sufficiently pleads a monetary injury arising from the premium that he paid for antibiotics-free beef, at this stage of the litigation he has standing.  Furthermore, Khaghani also maintains standing under the UCL and FAL because "when a consumer purchases merchandise on the basis of false price information, and when the consumer alleges that he would not have made the purchase but for the misrepresentation, he has standing to sue under the UCL and FAL because he has suffered an economic injury." *Hinojos v. Kohl's Corp.*, 718 F.3d 1098, 1107 (9th Cir. 2013), *as amended on denial of reh'g and reh'g en banc* (July 8, 2013).  Khaghani also maintains standing under the CLRA, because "any plaintiff who has standing under the UCL's and FAL's 'lost money or property' requirement will . . . have suffered 'any damage' for purposes of establishing CLRA standing." *Id.* at 1108.  Accordingly, the Motion is **DENIED** with regard to Khaghani's standing.

### 2.    Organizational Standing

Plaintiff Farm Forward asserts organizational standing for its claims against Whole Foods, alleging that Whole Foods' false advertisements frustrated Farm Forward's mission and caused it to expend resources to combat Whole Foods' actions.[45] Organizational standing stems from the Supreme Court's decision in *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982), in which the plaintiffs filed a class action against the defendants, who were allegedly engaged in "racial steering."[46] *Id.* at 367.  One plaintiff was a nonprofit organization that provided counseling and referral services to black renters.  That plaintiff claimed that the defendants' actions frustrated its mission, "with a consequent drain on resources." *Id.* at 369.  Although the plaintiff organization "brought suit against petitioners both as a representative of its members and on its own behalf," the Court did not evaluate the organization's representative standing, but instead decided whether the organization had "standing in its own right." *Id.* at 378.

---

[44]    Amended Complaint ¶¶ 18 & 60.

[45]    Opposition 12:15-19.

[46]    "'[R]acial steering' is a 'practice by which real estate brokers and agents preserve and encourage patterns of racial segregation in available housing by steering members of racial and ethnic groups to buildings occupied primarily by members of such racial and ethnic groups and away from buildings and neighborhoods inhabited primarily by members of other races or groups.'" *Havens Realty*, 455 U.S. at 366 n.1 (citation omitted).

The Court in *Havens Realty* resolved the question of organizational standing in one short paragraph in favor of the plaintiff, and concluded that if an organization's mission was impaired by a defendant's actions, "[s]uch concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources— constitutes far more than simply a setback to the organization's abstract social interests." *Id.* at 379.  In keeping with *Havens Realty*, the Ninth Circuit has held that "'a diversion-of-resources injury is sufficient to establish organizational standing' for purposes of Article III if the organization shows that, independent of the litigation, the challenged 'policy frustrates the organization's goals and requires the organization to expend resources in representing clients they otherwise would spend in other ways.'" *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 765 (9th Cir. 2018) (internal citation and quotation omitted).

### a.    Diversion-of-Resources Theory

Here, Farm Forward fails to meet the Ninth Circuit's requirement for organizational standing through a diversion-of-resources theory.  "Organizations divert resources when they 'alter[ ] their resource allocation to combat the challenged practices,' but not when they go about their 'business as usual.'" *Friends of the Earth v. Sanderson Farms, Inc.*, 992 F.3d 939, 942 (9th Cir. 2021) (citing *Am. Diabetes Ass'n v. U.S. Dep't of the Army*, 938 F.3d 1147, 1154 (9th Cir. 2019)).  "Diversion of resources has been found when organizations 'expended additional resources that they would not otherwise have expended, and in ways that they would not have expended them.'" *Id.* (citation and quotation omitted).

The question, then, is whether Farm Forward's activities were "business as usual" and a continuation of existing advocacy, or whether they were an affirmative diversion of resources to combat Whole Foods' misrepresentations.  Regardless of Whole Foods' advertising, Farm Forward's mission has been "to end factory farming."[47] Although antibiotics use on livestock enables factory farming by permitting animals to be kept "alive in conditions that would otherwise stunt their growth and even kill them,"[48] Farm Forward also is concerned that "[t]he use of antibiotics is also indicative of animal mistreatment."[49]

---

[47]    Amended Complaint ¶¶ 2 & 23.

[48]    *Id.* at ¶ 34.

[49]    *Id.*

As part of its request for judicial notice, Whole Foods submitted two articles by Farm Forward concerning its campaign against Whole Foods and GAP.[50] Plaintiffs do not oppose Whole Foods' request for judicial notice of those two articles.  The first article states:

> Because GAP has shown a pattern of catering to the industry by welcoming modified factory farms into its program, we suspected that drugs may be present in the meat it certifies.  In 2017, Farm Forward used its position on GAP's board to push for antibiotic testing, but GAP's leadership refused. Because nobody is testing meat to verify claims made by meat producers, the only way to determine whether GAP is living up to its promises was to begin testing products ourselves.[51]

In their Opposition, Plaintiffs concede that because of Whole Foods' "refusal in 2017 to even explore an internal verification program" for antibiotics testing, "Farm Forward had to expose Whole Foods' deception to avoid harm to the organization."[52] Taken together with Farm Forward's admission that GAP's inclusion of "modified factory farms into its program" triggered Farm Forward's antibiotics testing program, the Court concludes that, for pleading purposes, Farm Forward's testing regime was "business as usual" and was merely a continuation of its organizational mission to end factory farming.  *C.f. Sabra v. Maricopa Cnty. Cmty. Coll. Dist.*, 44 F.4th 867, 880 (9th Cir. 2022) (finding organizational standing because the plaintiff "***went out of its way*** to develop a public-awareness campaign rebutting the information in [the defendant's] course and requiring a diversion of resources by contracting with a religious scholar)

---

[50]     *See* Defs.' Request for Judicial Notice ("Defendants' RJN") [ECF No. 46-2].  Plaintiffs did not oppose Whole Foods' request; indeed, Plaintiffs cited those articles for support in their Opposition.  *See* Opposition 16:23-17:22.  In deciding a motion to dismiss, courts generally look only to the face of the complaint and documents attached thereto. *See Van Buskirk v. Cable News Network, Inc.*, 284 F.3d 977, 980 (9th Cir.2002).  The Court may consider, however, materials that are subject to judicial notice under Rule 201 of the Federal Rules of Evidence. *See Gerritsen v. Warner Bros. Entertainment, Inc.*, 112 F. Supp. 3d 1101, 1020 (C.D. Cal. 2015).  Rule 201 permits judicial notice of facts that are "not subject to reasonable dispute" because they "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b).  The Ninth Circuit also applies the "incorporation by reference" doctrine.  *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005).  Under that doctrine, a court may "take into account documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the [plaintiff's] pleading."  *Id.* (internal citations and quotations omitted) (alteration in original).  Because Plaintiffs did not oppose Defendants' RJN, but instead argued only that Defendants misconstrued the articles, the Court **GRANTS** Defendants' RJN to the extent that these are genuine articles published by Farm Forward.

[51]     Defendant's RJN, Ex. 1 at 2.

[52]     Opposition 17:19-22.

(emphasis added).  Because Farm Forward's testing program was a continuation of its existing mission to end factory farming, it fails to meet the Ninth Circuit's requirement for organizational standing.

### b.    Reputational Injury and Financial Harm Theory

Farm Forward also claims that it suffered "reputational and financial harm" from promoting Whole Foods' falsely advertised antibiotics-free meat.[53]  Farm Forward avers that it "donated thousands of hours of its time" to working with Whole Foods and that had Farm Forward not expended resources on investigating and exposing Whole Foods, it would have "lost the support of both the public and the highest welfare farmers and ranchers[.]"[54]

In *TransUnion*, the Court describes reputational harm as a concrete intangible harm that has traditionally been recognized by American courts.  *Id.*  The Court cited *Meese v. Keene*, 481 U.S. 465 (1987), as instructive for how courts have evaluated claims for reputational harm.  In *Meese*, the plaintiff sought to enjoin a portion of the Foreign Agents Registration Act of 1938 that required films produced by foreign agents—there, the Canadian government—to be labeled as "political propaganda."  *Id.* at 469-70.  The plaintiff alleged that labeling his films as "political propaganda" was a reputational injury and that "if he were to exhibit the films while they bore such characterization, his personal, political, and professional reputation would suffer and his ability to obtain re-election and to practice his profession would be impaired."  *Id.* at 473.  The Court concluded that the plaintiff had standing because he "could not exhibit the films without incurring a risk of injury to his reputation and of an impairment of his political career."  *Id.* at 475.

Here, although Farm Forward raises an inchoate claim for reputational harm, the Amended Complaint fails to plead sufficient facts for a concrete injury.  Farm Forward contends that "[h]ad [it] not investigated and exposed Whole Foods' false meat advertising claims," it would have "lost the support of both the public and the highest welfare farmers and ranchers, many of whom had expressed frustration with Whole Foods, and frustration with Farm Forward for their ongoing support of GAP."[55]

Multiple problems arise from Farm Forward's conclusory allegation of reputational harm.  First, Farm Forward does not identify what injuries would result from the alleged reputational harm.  Would Farm Forward receive fewer donations?  Would

---

[53]    Opposition 14:15-18.

[54]    *Id.* at 13:19-20 & 14:13-15.

[55]    Amended Complaint ¶ 94.

farmers and ranchers no longer coordinate with Farm Forward to end factory farming? The Amended Complaint is silent on the actual injuries. Second, while it is possible that Farm Forward's reputation would have been harmed if it was exposed as unwittingly promoting antibiotics-laden beef, here Farm Forward claims to have ***exposed*** Whole Foods through Farm Forward's own investigations and public awareness campaign.[56] If anything, those actions would logically enhance Farm Forward's reputation with its supporters and the public.

With respect to Farm Forward's claims that it "experienced financial loss" by expending resources to investigate and expose Whole Foods,[57] those expenditures did not result from an injury by Whole Foods, but, instead, Farm Forward undertook those efforts in keeping with its mission to end factory farming. Although the Supreme Court has noted that "the need to take such affirmative steps to avoid the risk of harm to [] reputation constitutes a cognizable injury," *Meese*, 481 U.S. at 475, those actions are no longer traceable to Whole Foods' conduct when Farm Forward "had a similar incentive to engage in many of the countermeasures that [it is] now taking." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 417 (2013); *accord Nat'l Ass'n of Home Builders v. U.S. Fish & Wildlife Serv.*, 786 F.3d 1050, 1054 (D.C. Cir. 2015) ("[A]s to volitional expenditures, [the plaintiffs] cannot show injury by 'inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending.'") (quoting *Clapper*, 568 at 416).

### c.   Analysis Under *TransUnion*

The Supreme Court's decision in *TransUnion* calls into question the circumstances under which courts may properly grant organizational standing. Courts within other circuits have recognized that "[c]aselaw for organizational standing is not a model of clarity," *Ctr. for Responsible Sci. v. Gottlieb*, 311 F. Supp. 3d 5, 9 (D.D.C. 2018), and judges within this Circuit have similarly acknowledged that "our court's jurisprudence is at 'loggerheads' with Supreme Court precedent." *Sabra v. Maricopa Cnty. Cmty. Coll. Dist.*, 44 F.4th 867, 895 (9th Cir. 2022) (Van Dyke, J., concurring); *see also Fair Hous. Council of San Fernando Valley v. Roommate.com, LLC*, 666 F.3d 1216, 1224 (9th Cir. 2012) (Ikuta, J., dissenting) (writing separately "to express [] concern that our circuit's test for organizational standing cannot be reconciled with Supreme Court precedent").

In its Supplemental Brief, Plaintiffs argued that "[o]rganizational standing is constitutionally viable after Supreme Court's [*sic*] decision in *TransUnion*. The

---

[56]   *Id.* at ¶¶ 89-94.

[57]   *Id.* at ¶ 88.

*TransUnion* Court twice cited the four-decade old seminal case on organizational standing: *Havens Realty*[]."[58]  Simply put, Plaintiffs' assertion is not true—*Havens Realty* was twice cited in a ***dissent*** to *TransUnion*.  *See TransUnion*, 141 S. Ct. at 2218-21 (Thomas, J., dissenting) (quoting *Havens Realty*, 455 U.S. at 373-74).

The legal error in Plaintiffs' briefing punctuates this Court's concern with organizational standing doctrine post-*TransUnion*; *Havens Realty* was able to maintain its relevance only in Justice Thomas's dissent.  In contrast, the majority in *TransUnion* held that when evaluating "the concrete-harm requirement . . . courts should assess whether the alleged injury to the plaintiff has a 'close relationship' to a harm 'traditionally' recognized as providing a basis for a lawsuit in American courts."  *Id.* at 2204 (citing *Spokeo*, 578 U.S. at 341).  Here, neither mission frustration nor diversion of resources is a cause of action grounded in the "history and tradition" of the "types of cases that Article III empowers federal courts to consider," *id.* (citing *Sprint*, 554 U.S. at 269), nor do Plaintiffs offer any historical analogs to those types of cases.

For those reasons, because Farm Forward cannot establish standing under Article III, its claims are **DISMISSED with leave to amend**.

## B.    Fraud Claims

Whole Foods moves to dismiss Plaintiffs' claims for failing to plead fraud with particularity under Rule 9(b).  Because only Khaghani's claims have survived the pleading stage regarding standing, the Court will evaluate only his claims against Whole Foods under Rule 9(b).

The Federal Rules of Civil Procedure provide that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b).  "To avoid dismissal for inadequacy under Rule 9(b)," a "complaint [must] 'state the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentation.'" *Edwards v. Marin Park, Inc.*, 356 F.3d 1058, 1066 (9th Cir. 2004) (citation and quotation omitted).  "Conclusory allegations are insufficient, and the facts constituting the fraud must be alleged with specificity." *Yumul v. Smart Balance, Inc.*, 733 F. Supp. 2d 1117, 1122 (C.D. Cal. 2010). Further, "[i]t is well-settled that the Federal Rules of Civil Procedure apply in federal court, 'irrespective of the source of the subject matter jurisdiction, and irrespective of whether the substantive law at issue is state or federal.'"  *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1125 (9th Cir. 2009) (quoting *Vess v. Ciba–Geigy Corp. USA*, 317 F.3d 1097, 1102 (9th Cir. 2003)).

---

[58]    Plaintiffs' Supplemental Brief 11:19-22.

Here, Khaghani meets the requirements of Rule 9(b) by pleading that (1) he purchased beef from a Whole Foods store in San Francisco in 2020; (2) that beef was derived from a supply chain that was tainted by antibiotics use—contrary to Whole Foods' representations that its beef is antibiotics-free—and; (3) he relied upon Whole Foods' representations when he purchased the beef.[59]  *See Clancy v. Bromley Tea Co.*, 308 F.R.D. 564, 576 (N.D. Cal. 2013) (finding that "[t]hese allegations are sufficient to satisfy Plaintiff's obligations under Rule 9(b)").

## C.    Breach of Warranty & Unjust Enrichment Claims

Whole Foods also moves to dismiss Plaintiffs' breach of warranty and unjust enrichment claims.  Under California law, "[a]ny affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise."  Cal. Com. Code § 2313(1)(a).  Likewise, "[a]ny description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description."  Cal. Com. Code § 2313(1)(b); *see also Diamondstar Ent. Holdings, LLC v. THH, LLC*, 2022 WL 16951838 (C.D. Cal. Nov. 15, 2022) (same).  "It is not necessary to the creation of an express warranty that the seller use formal words such as 'warrant' or 'guarantee' or that he have a specific intention to make a warranty, but an affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty."  Cal. Com. Code § 2313(2).

Although Whole Foods contends that "the Individual Plaintiffs do not allege sufficient facts demonstrating that they purchased beef products raised using antibiotics[,]"[60] as explained above, Khaghani pleads his claims with sufficient particularity under Rule 9(b), and he alleges facts necessary to state a breach of warranty claim at this stage.  Further, Khaghani's allegation that Whole Foods falsely advertised its beef as antibiotics-free satisfies California's laws on express warranty.  *See In re Clorox Consumer Litig.*, 894 F. Supp. 2d 1224, 1235 (N.D. Cal. 2012) (finding that the plaintiffs stated a claim for breach of warranty where they "allege the specific contents of this warranty and that they reasonably relied on the warranty when they purchased [the product in question]").

Whole Foods argues that Khaghani's unjust enrichment claim should be dismissed because there is no stand-alone claim for unjust enrichment under California law.[61]

---

[59]    *Id.* at ¶ 18.

[60]    Motion 19:9-11.

[61]    *Id.* at 19:18-19.

"Courts consistently have held that unjust enrichment is not a proper cause of action under California law." *In re Toyota Motor Corp. Unintended Acceleration, Mktg., Sales Practices, & Prods. Liab. Litig.*, 754 F. Supp. 2d 1145, 1194 (C.D. Cal. 2010). "The phrase 'Unjust Enrichment' does not describe a theory of recovery, but an effect: the result of a failure to make restitution under circumstances where it is equitable to do so." *Melchior v. New Line Prods., Inc.*, 106 Cal. App. 4th 779, 793 (2003). "Unjust enrichment is a 'general principle, underlying various legal doctrines and remedies,' rather than a remedy itself." *Id.* (quoting *Dinosaur Dev., Inc. v. White*, 216 Cal. App. 3d 1310, 1315 (1989)). "It is synonymous with restitution." *Id.*

That said, Khaghani may plead unjust enrichment as a "quasi-contract claim seeking restitution." *Rutherford Holdings, LLC v. Plaza Del Rey*, 223 Cal. App. 4th 221, 231 (2014). "A claim for restitution is permitted even if the party inconsistently pleads a breach of contract claim that alleges the existence of an enforceable agreement." *Id.* (citing *Klein v. Chevron U.S.A., Inc.*, 202 Cal. App. 4th 1342, 1389 (2012), *as modified on denial of reh'g* (Feb. 24, 2012)). Accordingly, Khaghani's claim for unjust enrichment survives the pleading stage.

## IV.  DISPOSITION

For the foregoing reasons, the Court hereby **ORDERS** as follows:

1.      Whole Foods' request for judicial notice is **GRANTED**.

2.      Whole Foods' Motion to dismiss is **GRANTED in part** and **DENIED in part**, as follows:

        a.      the Motion is **GRANTED** in that the claims for relief asserted by Safari and Farm Forward are **DISMISSED with leave to amend.**

        b.      the Motion is **DENIED** with respect to Khaghani's claims for relief.

3.      Safari and Farm Forward are **DIRECTED** to file an amended pleading, if at all, no later than August 11, 2023.  If Safari and Farm Forward choose to file an amended pleading, then they are also **DIRECTED** to file contemporaneously therewith a Notice of Revisions to First Amended Complaint that provides the Court with a redline version that shows the amendments.  If Safari and Farm Forward fail to file an amended pleading by August 11, 2023, then the Court will **DISMISS** Safari and Farm Forward's claims for relief **with prejudice**.

4.      Whole Foods is **DIRECTED** to file its response to Plaintiffs' operative pleading no later than September 1, 2023.

5.      The parties are **DIRECTED** to meet and confer forthwith regarding the impact of this ruling on the pending discovery motions and to be prepared to discuss the case schedule at the hearing on July 25, 2023, at 9:00 a.m.

**IT IS SO ORDERED.**

Dated:      July 24, 2023

John W. Holcomb
UNITED STATES DISTRICT JUDGE