**Blaxter | Blackman** LLP

David P. Adams
dadams@blaxterlaw.com
Main: 415.500.7700

601 Montgomery Street
Suite 1110
San Francisco, CA 94111

December 20, 2023

<u>**VIA EMAIL AND ECF**</u>

Hon. Karen E. Scott
Ronald Reagan Federal Building and United States Courthouse
Courtroom 6D
411 W. Fourth St.
Santa Ana, CA 92701
E-mail: KES_Chambers@cacd.uscourts.gov

Re:   *Sara Safari, et al. v. Whole Foods Market Services, Inc., et al.*
      <u>Central District of California, Case No. 8:22-CV-01562-JWH-KES</u>

Dear Judge Scott,

On December 5, 2023, plaintiffs Sara Safari, Peymon Khaghani ("Khaghani"; collectively, "Plaintiffs") and defendants Whole Foods Market Services, Inc. ("WFM Services"), Whole Foods Market California, Inc. ("WFM CA"), and Mrs. Gooch's Natural Food Markets, Inc.'s ("Mrs. Gooch's"; collectively "Defendants") argued two motions to compel brought by Defendants (ECF Nos. 99 and 111) and one by Plaintiffs (ECF No. 109) before this Court.

At the hearing, Judge Scott directed the parties to meet and confer regarding the form of any proposed orders, and, if necessary, submit competing versions of the orders for the Court to consider.  On December 7, 2023, Defendants provided Plaintiffs with draft proposed orders for review and comment.  Plaintiffs provided revisions to Defendants' draft proposed orders on December 14, 2023, and Defendants provided responsive redlines on December 15, 2023.  While the parties initially agreed to conclude their meet and confer and submit proposed orders by Monday December 18, 2023, Plaintiffs have not yet comment on, or agreed to, Defendants' most recent iterations of the proposed orders.  Instead, on Monday December 18, 2023, Plaintiffs' counsel stated, "If you would like to like to go ahead and submit your order without further conferral or discussion of your latest redlines and comments, please advise the Court that we do not agree that our conferral is complete but will separately submit an order as soon as is practicable."

Accordingly, in the interest of concluding this matter prior to the holidays and providing clarity to the parties as they work to comply with the Court's December 5, 2023 rulings, Defendants enclose their versions of the Proposed Orders on the parties' motions to compel. While Plaintiffs have still not provided Defendants with their final versions of the proposed orders, Defendants compare their versions of the proposed orders to the most recent drafts provided by Plaintiffs and discuss why Defendants' versions correctly track the Court's rulings from the bench at the December 5, 2023 hearing.  While there will likely be cosmetic differences between the parties' contrasting proposed orders,

# Blaxter | Blackman LLP

Defendants limited their discussion to points of substantive disagreement only. For ease of references, the transcript from the December 5, 2023 hearing is attached hereto as **Exhibit A** (referred to herein as the "Transcript").

Docket 99 - Defendants' Motion to Compel Plaintiff Peymon Khaghani to Provide Further Amended Responses and Production of Document to Defendants' Request for Production, Set One:

The parties dispute several points as to the proposed order granting Defendants' Motion to Compel Further Responses and Production of Documents to Request for Production, Set One.

First, Defendants' version of the proposed order includes language requiring Khaghani to withdraw objections to the relevance of credit card statements responsive to RFP Nos. 2 and 3 and to withdraw objections that identifying and producing documents responsive to RFP Nos. 5-10, 23, and 36 discloses attorney work product. Khaghani contends that he is entitled to still assert these objections, even though the Court ordered him to produce documents despite these objections. Defendants disagree. Allowing the objections to remain will make it unclear whether Khaghani has complied with the Court's order.

Second, Defendants proposed order specified that on or before January 5, 2024 Khaghani must produce any responsive documents to RFP Nos. 5-10, 23, and 36 "which have not already been produced."  This language is important because Khaghani's proposed revisions to the order left it unclear whether Khaghani was required to produce responsive documents which have not yet been produced. This language should be included in the order to ensure a full and timely production. If, as Khaghani appears to contend, all responsive documents have been produced, then this language does not prejudice Khaghani at all.

Docket 109 - Plaintiff Peymon Khaghani's Motion to Compel Defendant to Provide Further Responses to Khaghani's Requests for Production, Set One, and Requests for Admission, Sets One and Two:

The parties have several points of dispute as to the form of the order granting in part and denying in part Plaintiff's Motion to Compel Further Responses to Requests for Admission, Sets One and Two, and Requests for Production, Set One.

First, Defendants' version of the proposed order makes clear that Defendants shall provide amended responses to Plaintiff's Requests for Admission, Set Two that "specify who makes available Whole Foods Markets' beef for sale online, given Defendants' good

# Blaxter | Blackman LLP

faith interpretation of the phrase "makes available" that will be stated in the response." This added language tracks the Court's order on pages 46:11-47:13 of the Transcript.

Second, the portion of Defendants' proposed order denying Plaintiffs' Motion to Compel Requests for Production of Documents makes clear that the definition of beef products proposed by Defendants, and adopted by the Court, applies to all product and supplier specific discovery in this case. Plaintiff's most recent version of the proposed order, on the other hand, limited this definition only to discovery that uses the defined term "Beef Products." Adopting Plaintiffs' version of the order could potentially allow Plaintiffs to circumvent this Court's order by propounding discovery regarding specific suppliers and products and simply using a defined term other than "Beef Products." Defendants submit, therefore, that their version of the more closely tracks the spirit of the Court's ruling from the hearing. *See* Transcript, pp. 71:12-73:4.

Docket 111 - Defendants' Motion to Compel Plaintiff Peymon Khaghani to Provide Further Amended Responses Defendants' Interrogatories, Set Two:

The only substantive disagreement between the parties regarding Defendants' Motion to Compel Further Responses to Interrogatories, Set Two is whether the order should specify that Khaghani's amended responses include information possessed by his attorneys. Plaintiffs contend this language is improper and cite to pages 38:9-39:11 of the Transcript. However, this portion of the Transcript is taken out of context. One page later, the Court explained that, "What the court will do is order the Plaintiffs to -- well, the one Plaintiff to file or serve an amended response to interrogatories 8, 9, 10 and 11 that -- that is verified and provides information that is known both to Mr. Khaghani or his – his counsel." Transcript at, p. 40:4-8. Accordingly, Defendants submit that their proposed orders tracks the Court's rulings from the December 5, 2023 hearing and should be entered.

Very truly yours,

*/s/ David P. Adams*

David P. Adams for
Blaxter | Blackman LLP

cc: Brian Blackman, Esq.

# Blaxter | Blackman LLP

J.T. Wells Blaxter, Esq.
Gretchen Elsner, Esq.
Nadia H. Dahab, Esq.
David Sugerman, Esq.
Paige Tomaselli, Esq.

# Exhibit A

1       UNITED STATES DISTRICT COURT
        CENTRAL DISTRICT OF CALIFORNIA
2       SOUTHERN DIVISION – SANTA ANA

3

4  SARA SAFARI, ET AL.,    )
             )
5       Plaintiffs,   )
             )
6      vs.      )  Case No. 8:22-CV-01562-JWH-KES
             )
7  WHOLE FOODS MARKET, INC.,  )  Santa Ana, California
             )  December 5, 2023
8       Defendant.   )
  _____ _____ )
9

10

11       HEARING RE DISCOVERY MOTIONS

12    BEFORE THE HONORABLE KAREN E. SCOTT
       UNITED STATES MAGISTRATE JUDGE
13

14
  APPEARANCES:      See Next Page
15
  COURT REPORTER:    Recorded, Court Smart
16
  COURTROOM DEPUTY:  Jazmin Dorado
17
  TRANSCRIBER:     Dorothy Babykin
18              Courthouse Services
              1218 Valebrook Place
19              Glendora, California  91740
              (626) 963-0566
20

21

22

23  PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING.
  TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE.
24

25

1    APPEARANCES:

2    FOR PLAINTIFFS SARA SAFARI, ET AL.:

3    ELSNER LAW AND POLICY LLC
     BY:  GRETCHEN M. ELSNER
4           ATTORNEY AT LAW
     314 SOUTH GUADALUPE STREET
5    SANTA FE, NEW MEXICO  87501

6    GRIME LAW LLP
     BY:  PAIGE MICHELLE TOMASELLI
7           ATTORNEY AT LAW
     730 ARIZONA AVENUE
8    SANTA MONICA, CALIFORNIA  90401

9    SUGARMAN DAHAB
     BY:  DAVID F. SUGARMAN
10          ATTORNEY AT LAW
     707 SW WASHINGTON STREET
11   SUITE 600
     PORTLAND, OREGON  97205

12

13   FOR DEFENDANT WHOLE FOODS MARKET, INC.:

14   BLAXTER BLACKMAN LLP
     BY:  DAVID ADAMS
15          ATTORNEY AT LAW
     601 MONTGOMERY STREET
16   SUITE 1110
     SAN FRANCISCO, CALIFORNIA  94111

17

18

19

20

21

22

23

24

25

1                                I N D E X

2

    8:22-CV-01562-JWH-KES                        DECEMBER 5, 2023
3

    PROCEEDINGS:  HEARING RE DISCOVERY MOTIONS
4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| | |
|---|---|
| 1 | SANTA ANA, CALIFORNIA; DECEMBER 5, 2023 |
| 2 | THE CLERK:  PLEASE REMAIN SEATED AND COME TO ORDER. |
| 3 | THIS UNITED STATES DISTRICT COURT IS NOW IN SESSION.  THE |
| 4 | HONORABLE KAREN E. SCOTT, MAGISTRATE JUDGE, PRESIDING. |
| 5 | CALLING CASE NUMBER 8:22-CV-1562-JWH-KES, SARA SAFARI, ET |
| 6 | AL. VERSUS WHOLE FOODS MARKET SERVICE, INCORPORATED, ET AL. |
| 7 | COUNSEL, STATE -- PLEASE STATE YOUR APPEARANCES FOR |
| 8 | THE RECORD. |
| 9 | MS. TOMASELLI:  GOOD MORNING, YOUR HONOR. |
| 10 | PAIGE TOMASELLI ON BEHALF OF PLAINTIFFS. |
| 11 | AND HERE AT COUNSEL TABLE I HAVE WITH ME GRETCHEN |
| 12 | ELSNER AND DAVID SUGARMAN. |
| 13 | THE COURT:  GOOD MORNING. |
| 14 | MR. ADAMS:  GOOD MORNING, YOUR HONOR |
| 15 | DAVID ADAMS ON BEHALF OF DEFENDANTS. |
| 16 | THE COURT:  ALL RIGHT. |
| 17 | WE ARE HERE TO TALK ABOUT A NUMBER OF DISCOVERY |
| 18 | DISPUTES, THREE IN FACT. |
| 19 | THE FIRST ONE IS ON THE DOCKET AT NUMBER 99 WITH THE |
| 20 | SUPPLEMENTAL BRIEFS AT 101 AND 107. |
| 21 | THIS IS A MOTION BY THE DEFENDANTS.  THEY ARE SEEKING |
| 22 | PRODUCTION OF THE NAMED PLAINTIFF. |
| 23 | IS IT MR. KEHANI? |
| 24 | MS. TOMASELLI:  KHAGHANI. |
| 25 | THE COURT:  KHAGHANI. |

1        HIS CREDIT CARD STATEMENTS REGARDING MEAT PURCHASES.

2        AND THEN, ALSO, SEEKING TO COMPEL PRODUCTION OF

3   DOCUMENTS IN RESPONSE TO RFPS THAT ASK FOR DOCUMENTS THAT

4   SUPPORT VARIOUS CONTENTIONS.

5        LET ME START FIRST WITH THE CREDIT CARD ISSUE.

6        I THINK I SAW SOME REPRESENTATIONS IN HERE THAT THE

7   MOTION WAS PREMATURE, THAT PLAINTIFF HAD AGREED TO PRODUCE

8   SOME CREDIT CARD STATEMENTS BUT PERHAPS NOT EVERYTHING THAT

9   THE DEFENDANT WAS ASKING FOR.

10       WHAT IS THE STATUS OF THAT PRESENTLY?

11       MS. TOMASELLI:  YES, YOUR HONOR

12       PLAINTIFF HAS BEEN COLLECTING CREDIT CARD STATEMENTS.

13   IT'S FIVE CREDIT CARDS OVER A FOUR-YEAR PERIOD.

14       WE ARE JUST FINALLY IN RECEIPT OF A FINAL BATCH OF CREDIT

15   CARD STATEMENTS.  SOME OF THE CREDIT CARDS HE NO LONGER HAS

16   AND HAD TO ORDER THEM DIRECTLY FROM THE CREDIT CARD COMPANY.

17   AND WE'RE IN THE PROCESS OF REVIEWING THE CREDIT CARD

18   STATEMENTS NOW.

19       THE COURT:  AND WITH THAT REVIEW, WHAT DO YOU INTEND TO

20   DO?

21       MS. TOMASELLI:  PLAINTIFFS AGREED TO PRODUCE CREDIT

22   CARD TRANSACTIONS WITH WHOLE FOODS MARKET.

23       THE COURT:  AND, SO, YOUR INTENT WOULD BE TO REDACT OUT

24   OTHER TRANSACTIONS?

25       MS. TOMASELLI:  YES.  OUR INTENT IS TO REDACT OUT THE

1    OTHER TRANSACTIONS.

2            THE COURT:  AND I DON'T KNOW WHAT KIND OF INFORMATION

3    MIGHT BE ON THESE STATEMENTS, BUT IS THERE OTHER KIND OF

4    INFORMATION THAT YOU WOULD BE REDACTING OUT, SUCH AS THE

5    ACCOUNT NUMBER OR THE FINANCIAL TERMS OR PAYMENTS MADE AND

6    SO FORTH?

7            MS. TOMASELLI:  YES, YOUR HONOR.  WE BELIEVE THAT ALL OF

8    THAT IS IRRELEVANT.

9            THE COURT:  OKAY.

10           SO, TURNING THEN TO PLAINTIFFS – OR, I'M SORRY, TO DEFENSE

11   COUNSEL.  I UNDERSTAND THAT YOU ARE REQUESTING THAT THESE

12   STATEMENTS BE PRODUCED UNREDACTED.

13           AND I UNDERSTAND THE DISPUTE ABOUT WHETHER OTHER

14   RETAILERS OR RESTAURANTS THAT MAY HAVE SERVED BEEF PRODUCTS,

15   WHETHER THOSE LINE ITEMS ARE RELEVANT.

16           WITH REGARD TO THE ACCOUNT NUMBERS OR THE PAYMENTS

17   OR THE TERMS OR SO FORTH, NOT – NOT THE CHARGES, BUT WHETHER

18   OR NOT SOMEONE WAS PAYING THE MINIMUM OR PAYING OFF THEIR

19   BALANCE AND SO FORTH.

20           IS THAT SOMETHING THAT YOU'RE LOOKING FOR, OR DO YOU

21   AGREE THAT THAT REALLY IS NOT RELEVANT?

22           MR. ADAMS:  WE DON'T NEED ANCILLARY INFORMATION ABOUT

23   PAYING OFF OUTSTANDING BALANCES.

24           I DO, HOWEVER, THINK THAT WE WOULD NEED THE ENTIRE

25   TRANSACTION LIST PRODUCED FOR SEVERAL REASONS.

1    FIRST IS WE JUST -- THERE IS NO PRIVACY OBJECTION

2    ASSERTED AT THIS TIME.  IT WAS WITHDRAWN.  AS FAR AS I CAN SEE IT

3    WAS WAIVED.  EVEN IF ONE WAS ASSERTED, IT CAN BE ACCOUNTED FOR

4    WITH THE PARTIES' STIPULATED PROTECTIVE ORDER.

5    WE CITED CASE LAW IN A PAST FALSE ADVERTISING CASE

6    WHERE A COURT ORDERED A PLAINTIFF TO PRODUCE THEIR CREDIT CARD

7    HISTORY OVER THEIR OBJECTION REGARDING PRIVACY BECAUSE THERE

8    WAS A STIPULATED PROTECTIVE ORDER.

9    THAT CASE LAW WAS NOT ADDRESSED OR DISTINGUISHED IN

10   PLAINTIFFS' OPPOSITION TO OUR MOTION.  SO, WE THINK WE'RE ENTITLED

11   TO ALL OF THE TRANSACTIONS AND THAT NONE OF THEM SHOULD BE

12   REDACTED.

13   THE FEDERAL RULES REQUIRE THAT DOCUMENTS MUST BE

14   PRODUCED AS MAINTAINED IN THE COURSE OF BUSINESS.  AND IT

15   DOESN'T SAY ANYTHING ABOUT APPLYING UNILATERAL REDACTIONS FOR

16   PARTS OF A DOCUMENT THAT ARE RESPONSIVE AND PARTS OF A

17   DOCUMENT THAT ARE NOT.

18   SO, WE WANT THE ENTIRE CREDIT CARD STATEMENT IF THAT

19   STATEMENT REFLECTS RESPONSIVE INFORMATION.  WE BELIEVE THAT'S

20   WHAT WE'RE ENTITLED TO.

21   THE COURT:  SO, FOR EXAMPLE, IF SOMEBODY HAD CREDIT

22   CARD STATEMENTS FOR JANUARY, FEBRUARY AND MARCH, AND JANUARY

23   SHOWED SOME PURCHASES AT RESTAURANTS AND GROCERY STORES,

24   FEBRUARY DID NOT SHOW ANY TRANSACTIONS THAT THE PLAINTIFF IN

25   GOOD FAITH BELIEVED COULD POTENTIALLY INVOLVE MEAT PRODUCTS,

1     THEN, YOU WOULD SAY THAT YOU DON'T NEED THAT STATEMENT?

2          MR. ADAMS:  CORRECT.

3          THE COURT:  OKAY.

4          PLAINTIFFS, WHAT IS YOUR RESPONSE TO THE ARGUMENT THAT

5     THE PRIVACY OBJECTION WAS WITHDRAWN AND WAIVED?

6          MS. TOMASELLI:  YOUR HONOR, WE ASSERTED THE PRIVACY

7     OBJECTION INITIALLY IN OUR RESPONSES.  AND DURING MEET AND

8     CONFER EFFORTS DEFENDANTS ASKED THAT WE WITHDRAW THE

9     PRIVACY OBJECTION PURSUANT TO THE PROTECTIVE ORDER.  AND WE

10    DIDN'T INTEND TO WITHDRAW THE PRIVACY OBJECTION ENTIRELY.  WE

11    JUST AGREED THAT THE STIPULATED PROTECTIVE ORDER WOULD

12    PROTECT CONFIDENTIALITY.

13         BUT OUR ARGUMENT IS – IS MORE THAN THAT.  THERE ARE --

14    ALL OF THE TRANSACTIONS ON THE CREDIT CARD STATEMENTS

15    REGARDING, FOR EXAMPLE, YOU KNOW, WHERE MR. KHAGHANI WENT TO

16    A GYM OR WHAT MOVIES HE PURCHASED OR WHAT HE DOES IN HIS

17    PERSONAL LIFE, ALL OF THAT IS PRIVATE INFORMATION.

18         AND, SO, THE DEFENDANTS ARE ASKING FOR, YOU KNOW,

19    IRRELEVANT CREDIT CARD STATEMENTS WITH  -- WITH LOADS OF, YOU

20    KNOW, PRIVATE INFORMATION ON IT FOR ESSENTIALLY NO -- NO REASON.

21         SO, ALL THAT THE CREDIT CARD STATEMENTS COULD POSSIBLY

22    SHOW IS WHERE MR. KHAGHANI SHOPPED.  THEY WON'T SHOW WHAT HE

23    PURCHASED.

24         THE COURT:  WELL, BUT ISN'T -- ISN'T THE DEFENDANT'S POINT

25    THAT IF – IF, YOU KNOW, IT SHOWS THAT HE BOUGHT DINNER AT BLACK

1    ANGUS, AND IT SHOWS THAT HE BOUGHT DINNER AT MC DONALD'S  -- IT'S

2    TRUE HE MIGHT HAVE BOUGHT CHICKEN MC NUGGETS.  BUT IT GIVES THE

3    DEFENDANTS POTENTIALLY AN OPPORTUNITY TO ASK QUESTIONS TO TRY

4    AND EXPLORE MR. KHAGHANI'S VIEWPOINTS ON WHAT TYPE OF BEEF HE

5    PREFERS TO CONSUME AND WHETHER HIS ACTIONS MATCH UP WITH HIS

6    STATEMENTS.

7              ARE YOU CONTESTING THAT AS A GROUND FOR RELEVANCY

8    FOR – FOR THIS LINE OF INQUIRY?

9              MS. TOMASELLI:  WE'RE CONTESTING  -- THERE'S LESS INVASIVE

10   WAYS FOR DEFENDANTS TO GO ABOUT OBTAINING THE INFORMATION

11   ABOUT WHERE MR. KHAGHANI PURCHASES DINNER OR WHERE HE SHOPS.

12             THEY -- IT'S  -- IT'S NOT REQUIRED THAT THEY OBTAIN THE

13   CREDIT CARD STATEMENTS WITH EVERY SINGLE PURCHASE THAT

14   MR. KHAGHANI MADE IN APRIL OF 2019 IN ORDER TO DO SO.

15             THE COURT:   IS THE -- YOU KNOW, SOMETIMES WHEN PEOPLE

16   ARE FACED WITH DOCUMENTS THAT CONTAIN INFORMATION THAT

17   EVERYBODY AGREES IS IRRELEVANT LIKE HIS GYM MEMBERSHIP

18   CHARGES, SOMETIMES THE ARGUMENT IS THAT IT'S JUST A LOT OF WORK

19   FOR PLAINTIFFS TO GO THROUGH AND REDACT IT.

20             AND SOMETIMES THE ARGUMENT IS NO, IT REALLY DOES SHOW

21   SOMETHING THAT HE DOESN'T WANT DISCLOSED TO THE WORLD.

22             IN THE EVENT OF A GYM MEMBERSHIP, RIGHT -- THAT STRIKES

23   ME AS MORE THE FORMER AND NOT THE LATTER.

24             IS THIS  -- IS THIS REALLY AN ISSUE ABOUT BURDEN AND

25   REDACTION OR IF  -- IF THE INFORMATION, FOR EXAMPLE, WAS HANDED

1   OVER TO COUNSEL FOR THE OTHER SIDE UNDER THE PROTECTIVE ORDER

2   -- WHICH MEANS THAT IT, YOU KNOW, CAN'T BE DISCLOSED EXCEPT FOR

3   THOSE AVENUES THAT ARE DESCRIBED IN THE PROTECTIVE ORDER  --

4   AND THERE WAS A FURTHER PROVISION THAT SAID IF ANYONE IS GOING

5   TO USE ONE OF THESE STATEMENTS AS AN EXHIBIT, EVERYTHING  --

6   EVERY LINE ITEM EXCEPT THE LINE ITEM THAT IS BEING SUBMITTED FOR

7   EVIDENTIARY VALUE NEEDS TO BE REDACTED.

8           AND, SO, THE REDACTION COULD SORT OF HAPPEN IN THE BACK

9   END.

10          WOULD THAT ADDRESS SOME OF YOUR CONCERNS?

11          MS. TOMASELLI:  SO, THE ARGUMENT IS TWO-FOLD, YOUR

12   HONOR, AS YOU POINT OUT.

13          FIRST OF ALL, THERE IS THE BURDEN OF REDACTION.  IF THESE

14   DOCUMENTS ARE PRODUCED, THEY WILL BE PRODUCED PURSUANT TO

15   THE STIPULATED PROTECTIVE ORDER.  AND ANYTHING THAT IS USED AS

16   AN EXHIBIT WOULD HAVE TO BE REDACTED.

17          ALL OF THE DOCUMENTS THAT COME FROM THE BANK DIRECTLY

18   ARE ENCRYPTED.  SO, REDACTING IS NOT A SIMPLE PROCESS.  IT WOULD

19   INVOLVE PRINTING AND HAND REDACTION FOR THOUSANDS OF PAGES OF

20   DOCUMENTS.

21          BUT ALSO IT HAS A CHILLING EFFECT ON  -- ON INDIVIDUAL

22   PLAINTIFFS TO HAVE TO PRODUCE THEIR CREDIT CARD STATEMENTS.

23          FOR SOMEBODY TO BE A CLASS REPRESENTATIVE, IT -- IT

24   CREATES AN OPPORTUNITY FOR DEFENDANTS TO INTIMIDATE

25   DEFENDANTS  -- OR, SORRY, INTIMIDATE INDIVIDUAL PLAINTIFFS INTO NOT

1    WANTING TO PARTICIPATE BECAUSE THEIR ENTIRE LIFE IS GOING TO BE

2    ON VIEW.

3             THE COURT:  I MEAN MY  -- AS I'M LISTENING TO THIS, HERE'S MY

4    INCLINATION.  AND I GET ALL THAT THE PARTIES TELLING IS THEY THINK

5    THAT THIS IS NOT FEASIBLE.

6             IT SEEMS TO ME THAT THE DOCUMENTS COULD BE PRODUCED

7    PURSUANT TO THE PROTECTIVE ORDER.

8             AND THAT IF PLAINTIFF RECALLS CERTAIN KINDS OF PURCHASES

9    THAT ARE NOT JUST IRRELEVANT LIKE GYM MEMBERSHIP BUT ARE

10   PARTICULARLY SENSITIVE LIKE YOU PAID FOR SOME SORT OF MEDICAL

11   TREATMENT OR HE PAID FOR HIS CHILD TO BE IN REHAB OR SOMETHING

12   LIKE THAT, AND HE WANTS TO REDACT THEM AND THEN PROVIDE

13   SOMETHING THAT LOOKS LIKE -- YOU KNOW, I'M NOT IMAGINING THAT

14   THERE WOULD BE A LOT OF THOSE.  I WOULD THINK THAT, YOU KNOW,

15   MAYBE THERE'S TEN MAYBE.  I DON'T KNOW.  I DON'T KNOW THE

16   CIRCUMSTANCES OF THIS GENTLEMAN'S LIFE.

17            BUT THAT'S NOT AN ARGUMENT THAT I  -- THAT I SAW

18   HIGHLIGHTED IN THE PAPERS  -- THAT IT SEEMS LIKE IT WOULD BE

19   POTENTIALLY NOT AN UNRULY NUMBER.  AND THAT A LOG SIMILAR TO A

20   PRIVILEGE LOG COULD BE PROVIDED THAT SAYS, LOOK, WE REDACTED

21   THIS LINE ITEM BECAUSE OF MEDICAL SENSITIVITY.  WE REDACTED THIS

22   ITEM  -- LINE ITEM BECAUSE OF FAMILY SENSITIVITY – THAT THAT WOULD

23   ADDRESS NOT HANDING OVER THE VERY MOST SENSITIVE STUFF WHILE

24   AT THE SAME TIME NOT HAVING ANYBODY WORRY ABOUT THE GYM OR

25   THE MOVIES OR THE OTHER THINGS THAT SIMPLY AREN'T GOING TO TELL

1    ANYBODY ANYTHING IMPORTANT ABOUT THE PLAINTIFF.

2              AND THEN I WOULD ALSO IMPOSE ON THE BACK END  -- THAT IS,

3    THE DEFENDANT WANTS TO USE ONE OF THESE THINGS AS AN EXHIBIT

4    LATER ON, THEN, IT'S GOING TO BE FILED WITH THE COURT EVEN UNDER

5    SEAL, OR MAYBE NOT UNDER SEAL, DEPENDING ON WHAT THE OTHER

6    FACTS ARE ABOUT THE SENSITIVITY OF THE DOCUMENT -- THAT THOSE

7    IRRELEVANT LINE ITEMS WOULD BE REDACTED SO THAT ONLY THE

8    RELEVANT INFORMATION WOULD REMAIN.

9              THAT STRIKES ME AS STRIKING A BALANCE HERE THAT ALLOWS

10   PLAINTIFF TO PROTECT HIS MOST SENSITIVE INFORMATION BUT DOESN'T

11   IMPOSE AN UNDUE BURDEN ON PLAINTIFF IN TERMS OF REVIEWING AND

12   REDACTING LOTS AND LOTS OF LINE ITEMS AND YET, YOU KNOW, KEEPS

13   THE RECORD -- THINGS THAT ARE PUBLISHED IN THE COURT TO ONLY THE

14   THINGS THAT ARE RELEVANT TO THE LAWSUIT.

15             MS. TOMASELLI:  YOUR HONOR, COULD I ASK A QUESTION,

16   PLEASE.

17             THE COURT:  SURE.

18             MS. TOMASELLI:  SO FOR  -- OF THE 240 OR SO CREDIT CARD

19   STATEMENTS THAT WE CURRENTLY HAVE, YOU WANT PLAINTIFFS TO GO

20   THROUGH AND FIND THE STATEMENTS THAT HAVE WHOLE FOODS

21   TRANSACTIONS IN THEM AND PRODUCE THOSE.  AND IF THERE'S

22   SENSITIVE INFORMATION IN THOSE, THAT WOULD BE OBJECTIONABLE,

23   PRIVATE INFORMATION TO THE -- TO THE PARTY?

24             THE COURT  NO.  NO.  I'M EXPANDING THIS BEYOND WHOLE

25   FOODS.

1       I DO THINK THAT INFORMATION ABOUT, YOU KNOW, WHETHER

2   HE BOUGHT BEEF AT A RANCH OR WHETHER HE HAD, YOU KNOW,

3   FREQUENTLY DINED AT PARTICULAR RESTAURANTS COULD VERY WELL --

4   AT LEAST FOR PURPOSES OF DISCOVERY -- BE THINGS THAT WOULD BE

5   RELEVANT TO, YOU KNOW, THE DEFENSES THAT THE DEFENDANT IS

6   RAISING ABOUT MATERIALITY, BEHAVIORS OF TYPICAL CONSUMERS,

7   POTENTIALLY RELEVANT TO HIS SUITABILITY AS A CLASS

8   REPRESENTATIVE.

9       AND, SO, YOU KNOW, VIEWING DISCOVERY FROM THAT WIDE

10  LENS, I DO THINK THAT THAT'S -- THOSE OTHER TRANSACTIONS ARE

11  RELEVANT.

12      I DO THINK THOUGH THAT YOU CAN ASK THE PLAINTIFF – I DON'T

13  THINK IT'S A MATTER OF AN ATTORNEY SITTING DOWN AND GOING

14  THROUGH EACH LINE ITEM, BUT YOU CAN ASK THE PLAINTIFF, YOU KNOW,

15  WHAT SORTS OF THINGS DID YOU PUT ON YOUR CREDIT CARD THAT

16  MIGHT BE VERY SENSITIVE -- THINGS THAT MIGHT BE EMBARRASSING OR

17  PRIVATE BEYOND JUST, YOU KNOW, THE FACT THAT I SHOP HERE OR

18  THERE.

19      I WOULD THINK THAT HE WOULD BE ABLE TO REMEMBER SOME

20  OF THAT AND MIGHT BE ABLE TO POINT YOU IN THE RIGHT DIRECTION SO

21  THAT YOU DON'T HAVE TO SIT AND SCRUTINIZE EVERY LINE ITEM FOR

22  THOSE KINDS OF CHARGES.

23      MS. TOMASELLI:  OKAY.  SO, JUST TO CLARIFY.

24      IT'S EVERY RESTAURANT OR RETAILER THAT COULD POSSIBLY

25  HAVE SOLD BEEF FROM A WALMART TO A TARGET TO -- I DON'T KNOW  --

1    YOU KNOW, ANY – ANYTHING FROM A FARMER'S MARKET, ANYTHING THAT

2    COULD POSSIBLY HAVE SOLD BEEF.  AND THEN ASK THE PLAINTIFF DID

3    YOU BUY BEEF HERE.

4              THE COURT:  YEAH.  WHAT I WOULD SAY IS IF YOU RUN ACROSS

5    A CREDIT CARD STATEMENT,  AND THE ONLY CHARGE ON IT IS FOR HOME

6    DEPOT, IT'S REALLY UP TO YOU.  DO YOU WANT TO WITHHOLD IT OR DO

7    YOU WANT TO PROVIDE IT.

8              AND I WILL LET THE OTHER SIDE SORT OF SIFT THROUGH IT.  NO

9    ONE IS GOING TO BLAME YOU IF YOU ARE OVER INCLUSIVE ON THINGS

10   THAT DON'T MATTER AND NOT PARTICULARLY SENSITIVE..

11             MS. TOMASELLI:  OKAY.

12             AND, SO, FOR ALL OF THE OTHER STATEMENTS  -- SORRY, FOR

13   ALL OF THE OTHER TRANSACTIONS, IT WILL BE STILL ESTABLISHING

14   SOMETHING ABOUT MR. KHAGHANI'S CHARACTER EVEN THOUGH THEY

15   MIGHT NOT NECESSARILY BE PRIVATE.

16             SO, WHAT HE DOES ON A DAILY BASIS AND ALL OF THAT -- AND

17   THAT WOULD BE FAIR GAME.

18             THE COURT:  WELL, I GUESS I'M NOT SURE HOW IT AFFECTS HIS

19   CHARACTER THAT HE SHOPS AT HOME DEPOT.

20             MS. TOMASELLI:  YOU KNOW, FOR EXAMPLE, MAYBE HE SHOPS

21   AT HOME DEPOT EVERY DAY OR MAYBE HE HAS A SHOPPING PROBLEM.

22             WOULD THAT AFFECT HIS CHARACTER?  IT'S POSSIBLE.

23             THE COURT:  I GUESS I DON'T REALLY SEE THAT.

24              I MEAN, I GET IT -- WHAT I  -- THE TYPES OF THINGS THAT I CAN

25   IMAGINE ARE THINGS LIKE BUYING MARIJUANA.  IF HE WANTS TO REDACT

1   THAT, HE CAN REDACT THAT.

2          IF HE'S, YOU KNOW, IN COUNSELING FOR SOMETHING, AND HE'S

3   PAYING FOR THAT, HE CAN REDACT THAT.  SO, ANYTHING MEDICAL

4   RELATED TO HIM AND HIS FAMILY.

5          MS. TOMASELLI:  AND THEN ANYTHING RELATED TO HIS PRIVATE

6   LIFE AS WELL.

7          THE COURT:  IF  -- IF HE IS  -- IF HE IS  -- YEAH, I GOT

8   SUBSCRIPTIONS TO  ADULT ENTERTAINMENT  --

9          MS. TOMASELLI:  THE  --

10          THE COURT:   -- OR SOMETHING LIKE THAT.  SURE.  YOU CAN

11   REDACT THAT.

12          MS. TOMASELLI:  OKAY.  OKAY.

13          AND, SO, JUST TO  -- JUST TO MAKE SURE I'M CLEAR, SO IT'S ALL

14   RESTAURANTS AND RETAILERS THAT COULD POTENTIALLY SELL A MEAT

15   PRODUCT.

16          AND IT'S IF HE PURCHASED MEAT THERE OR JUST THE RETAILER

17   ITSELF?

18          FOR EXAMPLE, IF HE GOES TO TARGET, AND HIS PRIMARY

19   REASON FOR GOING TO TARGET IS BECAUSE THEY HAVE A REALLY GOOD

20   PRICE ON LE CROIX, AND HE SAYS I ONLY BUY LE CROIX AT TARGET.  DO

21   WE  --

22          THE COURT:  I THINK THAT'S FINE.  I THINK YOU CAN JUST  --

23   JUST LIKE ANY OTHER SORT OF DISCOVERY.  YOU RELY ON YOUR CLIENT

24   TO TELL YOU HOW THEIR DOCUMENTS ARE ORGANIZED.

25          MS. TOMASELLI:  OKAY.

1          THE COURT:  AND IF IT IS SOMEONE WHO NEVER BUYS

2    GROCERIES AT TARGET EVEN THOUGH TARGET SELLS GROCERIES, AND

3    HE WANTS TO EXCLUDE TARGET CHARGES AS A RESULT, THAT'S FINE.

4          MS. TOMASELLI:  OKAY.  ALL RIGHT.

5          MR. ADAMS:  I WOULD LIKE TO CLARIFY ONE POINT.

6          WE'VE KIND OF VACILLATED BETWEEN TALKING ABOUT OTHER

7    RETAILERS AND RESTAURANTS THAT SELL BEEF OR MEAT.

8          THE REQUEST FOR PRODUCTION SAYS MEAT NOT BEEF.

9          AND I THINK THAT IT – I JUST WANTED TO BE ON THE RECORD

10   THAT THAT'S WHAT'S GOING TO BE RESPONSIVE HERE.

11         THE COURT:  SO, I MEAN, IF HE BUYS A THANKSGIVING TURKEY

12   FROM A TURKEY FARM EVERY YEAR, YOU WANT TO KNOW ABOUT THAT?

13         MR. ADAMS:  UH-HMM.

14         THE COURT:  AND WHY IS THAT?

15         MR. ADAMS:  WELL, BECAUSE THE ANTIBIOTIC STATEMENTS AND

16   WHETHER OR NOT HE'S RELYING ON THEM AND WHETHER OR NOT HE

17   CARES ABOUT ANTIBIOTIC STATEMENTS IN GENERAL WOULD APPLY TO

18   ANY SORT OF MEAT NOT JUST BEEF.

19         THE COURT:  I GUESS I'M LESS PERSUADED BY THAT.

20         MR. ADAMS:  AND  --

21         THE COURT:  AND I WAS THINKING BEEF.  I WASN'T THINKING

22   SUSHI AND THAT KIND OF THING.

23         MR. ADAMS:  WEL, FOR A LITTLE CONTEXT  --

24         THE COURT:  OKAY.

25         MR. ADAMS:  -- ON OUR SIDE OF THE DISCOVERY FENCE,

1      PLAINTIFF HAS REQUESTED DOCUMENTS ABOUT ALL OF WHOLE FOODS,

2      YOU KNOW, PROCEDURES FOR VETTING ANTIBIOTICS IN MEAT

3      GENERALLY.

4              AND I THINK THAT IF WE'RE GOING TO BE DOING IT ON ONE SIDE,

5      WE SHOULD BE DOING IT ON THE OTHER.

6              AND I THINK ANY STATEMENT ABOUT CHICKEN OR TURKEY THAT

7      SAYS, ANTIBIOTIC FREE OR WE NEVER USE ANTIBIOTICS.

8              AND IF HE GOES AND BUYS CHICKEN THAT SAYS WE NEVER USE

9      ANTIBIOTICS.  AND WE DON'T CARE.  I THINK THAT'S VERY PROBATIVE AS

10     TO WHETHER OR NOT HE CONSIDERS A NO ANTIBIOTIC STATEMENT TO BE

11     MATERIAL IN THE PURCHASE OF BEEF FROM ANOTHER RETAILER.

12             THE COURT:  PLAINTIFFS' COUNSEL, DO YOU WANT TO RESPOND

13     TO THAT?

14             MS. TOMASELLI:  WELL, YES, YOUR HONOR.

15             IF WE'RE GOING TO MAKE A UNIVERSAL RULE THAT MEAT IS

16     WHAT IS RELEVANT HERE, THEN, IT WOULD HAVE TO APPLY TO BOTH

17     PARTIES.

18             SO, YOU KNOW, PLAINTIFFS DID ASK FOR WHOLE FOODS'

19     POLICIES REGARDING ANTIBIOTICS IN MEAT.

20             AND BECAUSE THERE COULD BE A DIFFERENT POLICY FOR BEEF

21     THAN THERE IS CHICKEN, BUT THE ADVERTISING ITSELF, IT APPLIES TO

22     ALL MEAT.

23             WHOLE FOODS ISN'T SAYING THAT WE HAVE NO ANTIBIOTICS

24     EVER IN BEEF, BUT WE SOMETIMES HAVE ANTIBIOTICS IN CHICKEN.

25     THEY'RE ADVERTISING THESE UNIVERSAL TO ALL MEAT PRODUCTS.

1          MR. ADAMS;  WELL, THAT'S A --

2          THE COURT:  I GUESS THE  -- I DON'T KNOW.  IT SEEMS TO ME

3    EXTRAORDINARILY UNLIKELY -- I GAVE AN EXAMPLE OF A TURKEY FARM

4    FOR THANKSGIVING.  BUT THAT'S A VERY LIMITED EXAMPLE.

5          IT SEEMS TO ME EXTRAORDINARILY UNLIKELY THAT ONE WOULD

6    PATRONIZE A STORE THAT SELLS MEAT.  AND IT WOULD ONLY SELL BEEF

7    OR IT WOULD ONLY SELL CHICKEN.

8          SO, THIS SEEMS A BIT OF AN ACADEMIC EXERCISE.  IT SEEMS

9    LIKE BY INCLUDING ON THE PLAINTIFFS' SIDE THAT WHAT'S RESPONSIVE

10   IS ANYONE WHO SELLS MEAT.  IT'S REALLY BECAUSE OF THE POTENTIAL

11   THAT THEY SELL BEEF AND THAT HE BOUGHT BEEF THERE.

12         WE CAN DEAL WITH IT.  THERE'S GOING TO BE  OTHER

13   QUESTIONS ABOUT THAT LATER.

14         BUT I HAVE A HARD TIME IMAGINING A RETAILER THAT COULD BE

15   EXCLUDED ON THE BASIS OF THEY ONLY SELL A PARTICULAR TYPE OF

16   MEAT THAT ISN'T – NOT BEEF.

17         MR. ADAMS:  SURE.

18         THE COURT:  SO, LET'S JUST KEEP IT AT MEAT.

19         MS. TOMASELLI:  OKAY.

20         (PAUSE IN PROCEEDINGS.)

21         THE COURT:  THE NEXT ASPECT OF THIS MOTION HAS TO DO

22   WITH THE REQUEST FOR DOCUMENTS THAT SUPPORT CERTAIN

23   CONTENTIONS IN THE COMPLAINT.

24         AND, YOU KNOW, THERE'S -- IT LOOKS LIKE THERE'S AN

25   OBJECTION, THAT THIS WOULD DISCLOSE ATTORNEY-CLIENT

1   INFORMATION OR ATTORNEY WORK PRODUCT  -- I THINK WAS ACTUALLY

2   THE OBJECTION.

3          YOU KNOW, FROM THE COURT'S POINT OF VIEW, WHAT IS

4   TYPICAL IS FOLKS WHO COME IN WITH CERTAIN KINDS OF CLAIMS.  YOU

5   KNOW, IT'S USUALLY IN THE INITIAL DISCLOSURES EVEN BEFORE THEY

6   GET AN RFP FROM THE OTHER SIDE WHERE THEY'LL SAY, LOOK, THESE

7   ARE ALL THE DOCUMENTS THAT SUPPORT OUR CONTENTIONS.  THESE

8   ARE THE DOCUMENTS THAT WE'RE GOING TO RELY ON AT TRIAL OR AT A

9   MOTION FOR SUMMARY JUDGMENT STAGE AND THAT -- YOU KNOW, IN ONE

10  WAY OR ANOTHER, ALL THAT STUFF NEEDS TO BE PRODUCED SO THAT

11  THE DEFENDANTS UNDERSTAND WHAT YOU'RE RELYING ON.

12          I SAW THAT THERE WAS SOME ARGUMENT ABOUT, WELL, IF YOU

13  COULD JUST REWORD THE RFPS THAN WE PRODUCE THINGS.

14          I DON'T KNOW NOW WHERE THOSE NEGOTIATIONS STAND.  BUT,

15  YOU KNOW, ULTIMATELY -- I GUESS MAYBE YOU CAN TELL ME IF THIS IS

16  MORE A DISPUTE OVER HOW THE WRITTEN ANSWERS TO THE RFPS ARE

17  PHRASED OR IF IT REALLY IS ABOUT WHAT DOCUMENTS YOU HAVE TO

18  PRODUCE.

19          BECAUSE IT WOULD SEEM FAIRLY SELF-EVIDENT TO THE COURT

20  THAT IF THE DOCUMENTS THAT SUPPORT YOUR CONTENTIONS THAT

21  YOU'RE GOING TO RELY ON, YOU NEED TO PRODUCE THEM.

22          MS. TOMASELLI:  YEAH.  NO, ABSOLUTELY, YOUR HONOR.

23          WELL, FIRST OF ALL, AT THIS POINT WE'VE PRODUCED OVER A

24  THOUSAND DOCUMENTS THAT SUPPORT OUR CONTENTIONS.

25          THE DOCUMENTS THAT I UNDERSTAND THE REQUEST TO BE

1    RELATING TO WE PRODUCED AFTER THE LAST HEARING.  SO, IF YOU

2    RECALL, WE WERE TALKING ABOUT THE TESTING DATA FROM THE

3    PREVIOUS PLAINTIFF FARM FORWARD.  AND YOU GAVE US TWO OPTIONS,

4    WHETHER TO ASK THEM TO PROPOUND A SPECIFIC DISCOVERY REQUEST

5    OR JUST TO INFORMALLY PRODUCE IT.

6              WE INFORMALLY PRODUCED THE DOCUMENTS.

7              AND, SO  -- AND THEN ALSO DEFENDANTS HAVE SUBPOENAED

8    THE TESTING DATA SPECIFICALLY FROM THE TESTING COMPANIES.  SO

9    NOW ALL PARTIES ARE IN POSSESSION OF ALL OF THE DOCUMENTS.

10             SO, IT'S REALLY UNCLEAR TO US WHAT ADDITIONAL

11   INFORMATION DEFENDANTS ARE LOOKING FOR AT THIS POINT THAT WE

12   DON'T ALREADY HAVE.

13             THE COURT:  ALL RIGHT.

14             WELL, THEN, LET ME -- LET ME TURN TO DEFENSE COUNSEL.

15             IS IT AN AMENDED RESPONSE TO THE WRITTEN RFPS THAT YOU

16   WERE LOOKING FOR AT THIS POINT AND SOME ASSURANCE THAT THE

17   DOCUMENTS THAT HAD BEEN PRODUCED ARE EVERYTHING THAT THE

18   PLAINTIFFS ARE PRESENTLY AWARE OF.

19             MR. ADAMS:  YOU KNOW, IT'S  -- NO, I  -- SORRY.

20             SO, FIRST OFF, THERE'S A COUPLE OF THINGS WE NEED TO KIND

21   OF GO BACK AND CORRECT.

22             SO, WE'RE NOT JUST LOOKING FOR  -- WE PROPOUNDED

23   CONTENTION REQUESTS FOR PRODUCTION.  NOT JUST SEEKING

24   DOCUMENTS SUPPORTING THEIR CONTENTION THAT OUR BEEF

25   CONTAINED ANTIBIOTICS OR PHARMACEUTICALS FROM, YOU KNOW, THEIR

1    TESTING.

2           THAT IS REALLY IMPORTANT, AND WE'RE GOING TO GO BACK TO

3    THAT FOR A SECOND.

4           WE ALSO REQUESTED DOCUMENTS SUPPORTING THEIR

5    CONTENTION THAT WHOLE FOODS BEEF WAS RAISED IN FACTORY FARM

6    CONDITIONS OR CROWDED AND UNSANITARY CONDITIONS, OR THAT WE

7    FAILED TO INSURE THE TRUTH OF OUR ANTIBIOTIC STATEMENTS, OR THAT

8    WE CHARGE A PRICE PREMIUM, OR THAT WE KNEW THESE STATEMENTS

9    ARE FALSE OR MISLEADING.

10          SO, THIS IS A FAR BIGGER BODY OF DOCUMENTS THAN JUST

11   TESTING DATA.

12          AND AS TO TESTING DATA, IT'S NOT WHOLE FOODS' BURDEN TO

13   GO AND SUBPOENA THIRD PARTIES.  WE DID THIS BECAUSE OF

14   PLAINTIFFS' INTRANSIGENCE TO FULFILL THEIR FUNDAMENTAL DUTY IN

15   DISCOVERY, WHICH IS PRODUCE THE DOCUMENTS SUPPORTING THEIR

16   CLAIMS.

17          WHICH I AGREE.  WE'VE BEEN SITTING IN THIS LITIGATION FOR

18   ALMOST A YEAR NOW AND WE PROPOUNDED THESE REQUESTS AT THE

19   BEGINNING OF SUMMER.  AND I STILL DON'T HAVE ANY DOCUMENTS FROM

20   PLAINTIFF TELLING US WHAT DOCUMENTS  -- OR EXCUSE ME, WHAT

21   PRODUCTS TESTED POSITIVE THAT THEY'RE – THIS IS  -- PRODUCTS THAT

22   TESTED POSITIVE THAT THEY PURCHASED FROM WHOLE FOODS THAT

23   SUPPORT THEIR ALLEGATIONS IN THESE COMPLAINTS.

24          AND THIS IS THE FUNDAMENTAL BUILDING BLOCK OF THEIR

25   ENTIRE CASE IS THAT THEY PURCHASED BEEF PRODUCTS FROM WHOLE

1     FOODS AND THEY TESTED THEM.  AND THEY FOUND THAT THEY CONTAIN

2     ANTIBIOTICS.  AND WE'RE STILL IN THE DARK ABOUT THAT.

3          NOW, PLAINTIFF CLAIMS THAT WE GOT THIS INFORMATION FROM

4     A THIRD PARTY.  WE SUBPOENAED THE THIRD PARTY.  WE'RE STILL

5     ENTITLED TO KNOW WHAT PLAINTIFF HAS AND WHAT PLAINTIFF BELIEVES

6     SUPPORTS THEIR ALLEGATIONS.

7          THIS IS REALLY IMPORTANT STUFF BECAUSE WE NEED TO BUILD

8     OUR CASE IN RESPONSE TO PLAINTIFFS' CASE.  AND WE ARE STILL IN THE

9     DARK ABOUT WHAT DOCUMENTS SUPPORT PLAINTIFFS' CASE MONTHS

10    AND MONTHS INTO THIS.

11         THE COURT:  SO, FOR EXAMPLE, IF I'M HEARING YOU

12    CORRECTLY, YOU SAID THAT THERE WAS AN ALLEGATION THAT THE

13    ANIMALS EVENTUALLY SOLD AS MEAT AT WHOLE FOODS ARE RAISED IN

14    THEIR FACTORY FARM CONDITIONS AND YOU'RE LOOKING FOR --

15         WELL, WHAT DOCUMENTS SUPPORT THAT?

16         MR. ADAMS:  YEP.

17         THE COURT:  AND YOU'VE REVIEWED THE DOCUMENTS THAT

18    PLAINTIFFS HAVE PROVIDED, AND YOU DON'T SEE ANY DOCUMENTS THAT

19    SUPPORT THAT.

20         MR. ADAMS:  WELL, PLAINTIFF HASN'T IDENTIFIED WHAT

21    DOCUMENTS IN THEIR PRODUCTION ARE RESPONSIVE TO WHICH RFP.

22         I DON'T BELIEVE THEY HAVE.  SO, WE'RE KIND OF IN THE DARK

23    ON THAT.

24         AND ALTHOUGH THEY HAVE PRODUCED WHAT THEY CLAIM TO

25    BE THOUSANDS OF PAGES OF DOCUMENTS, THESE ARE ALL THE SCREEN

1      SHOTS OF -- WELL, EXCUSE ME.  A LOT OF THEM ARE JUST SCREEN

2      SHOTS OF THE LABELS AND RECEIPTS FOR THE DOCUMENTS THAT THEY

3      CLAIM THEY PURCHASED AND TESTED.

4              WE'RE STILL IN THE DARK ABOUT WHICH ONES TESTED

5      POSITIVE.

6              AND ALTHOUGH PLAINTIFFS' COUNSEL INFORMALLY TOLD US

7      WHICH ONES TESTED POSITIVE, THAT'S NOT ADMISSIBLE EVIDENCE.  LIKE,

8      WE'RE NOT HERE LOOKING FOR, YOU KNOW, SCROLL BACK OF THE

9      NAPKIN INFORMATION FROM OPPOSING COUNSEL.  WE'RE LOOKING FOR

10     POTENTIAL EVIDENCE SO THAT WE CAN DEFEND OURSELVES IN THIS

11     CASE.  AND WE DON'T HAVE IT RIGHT NOW.

12             AND I DON'T UNDER- – AND MORE IMPORTANTLY, PLAINTIFFS'

13     CASE LAW SUPPORTING THEIR SPURIOUS WORK PRODUCT CONTENTIONS,

14     NONE OF IT IS ON POINT.  NONE OF IT DEALS WITH A CONTENTION

15     REQUEST FOR PRODUCTION IN DISCOVERY.  IT ALL DEALS WITH OTHER

16     FACTUALLY DISTINCT CONTEXT WHERE ATTORNEYS ARE ABLE TO

17     WITHHOLD THEIR WORK PRODUCT.

18             WHEREAS IF YOU LOOK AT THE CASE LAW WE CITE, ALL OF IT

19     DEALS WITH AS YOU SAID THE RATHER ROUTINE PROCESS OF

20     IDENTIFYING AND PRODUCING DOCUMENTS THAT SUPPORT A PARTY'S

21     CONTENTIONS.

22             SO, I DON'T THINK THEY REALLY HAVE A LEGAL LEG TO STAND

23     ON HERE.  AND WE'RE ENTITLED TO THESE DOCUMENTS.  AND WE'VE

24     BEEN WAITING FOR THEM FOR A LONG TIME.

25             THE COURT:  AND, AGAIN, I GUESS I WAS TRYING TO

1    UNDERSTAND THAT THERE'S A DIFFERENCE BETWEEN THE WRITTEN

2    RESPONSES AND THE DOCUMENT PRODUCTION.

3         IF I'M LOOKING AT THE WRITTEN RESPONSES THAT ARE COPIED

4    INTO THE MOVING PAPERS  -- MY UNDERSTANDING IS THAT FOR EACH OF

5    THESE THE PLAINTIFF RESPONDED WITH OBJECTIONS AND DID NOT MAKE

6    A REPRESENTATION ABOUT WHETHER DOCUMENTS WOULD BE

7    PRODUCED, HAD THEM PRODUCED, COULDN'T BE FOUND, AND SO FORTH.

8         IS THAT RIGHT?

9         MS. TOMASELLI:  YES.  AND WE ARE WILLING TO AMEND THE

10   WRITTEN RESPONSES.

11        BUT MR. ADAMS IS MISREPRESENTING WHAT WE HAVE

12   PRODUCED.  WE PRODUCED THE UPC CODE OF THE STORE LOCATION,

13   THE ADDRESS OF THE LOCATION, AND THE INTERNAL IDENTIFIER FROM

14   THE PERSON WHO TESTED THE PRODUCT THAT WAS POSITIVE.  AND IT'S

15   NOT CLEAR TO US WHAT ADDITIONAL INFORMATION THAT MR. – THAT

16   DEFENDANTS ARE ASKING FOR.

17        WE DID PRODUCE THE DOCUMENTS AND WE CAN PROVIDE THE

18   BATES NUMBER HERE.  MS. ELSNER IS LOOKING IT UP.

19        THE COURT:  WELL, HOW ABOUT WE DO THIS.  THE COURT WILL

20   DIRECT THAT THE PLAINTIFFS PROVIDE AMENDED RESPONSES TO THESE

21   RFPS.

22        THE AMENDED RESPONSES SHOULD STATE WHETHER

23   DOCUMENTS RESPONSIVE TO THE CATEGORY HAVE BEEN FOUND OR NOT.

24   AND IF THEY HAVE BEEN FOUND, AND THERE'S BATES NUMBERS

25   ASSOCIATED WITH IT, THEY CAN SPECIFY THAT.

1        IF THEY HAVEN'T BEEN FOUND  -- YOU KNOW, THERE SHOULD BE

2    SOME THINGS THAT WHEN THE DEFENDANT GETS DONE READING THE

3    ANSWER THEY UNDERSTAND IF YOU ARE SAYING, WELL, WE'VE

4    UNDERTAKEN A REASONABLE SEARCH AND WE FOUND NOTHING.  AND

5    THAT'S THE BEST WE CAN DO.

6        OR, YOU KNOW, A LOT OF TIMES PEOPLE WILL ANSWER RFPS BY

7    SAYING, WELL, WE'VE UNDERTAKEN A REASONABLE SEARCH, BUT

8    THERE'S STILL A FEW MORE PLACES WE NEED TO LOOK.  AND WE'LL

9    SUPPLEMENT AFTER THAT.

10        I DON'T KNOW WHAT YOUR RESPONSES WILL BE.  YOU'VE

11    CERTAINLY HAD A LONG TIME TO LOOK FOR THESE SORTS OF THINGS.

12    SO, I WOULD THINK THAT THERE WOULDN'T BE A WE STILL NEED MORE

13    TIME TO FIND THEM SORT OF RESPONSE.

14        BUT THERE NEEDS TO BE A RESPONSE THAT CLEARLY STATES

15    THERE'S NOTHING IN RESPONSE TO THIS CATEGORY OR THERE'S

16    SOMETHING IN RESPONSE TO THIS CATEGORY.

17        AND IF THERE'S SOMETHING IN RESPONSE TO THE CATEGORY

18    TO IDENTIFY WHAT IT IS.

19        MS. TOMASELLI: RIGHT.

20        AND JUST TO BE CLEAR, YOUR HONOR, THAT'S THE ONLY

21    DOCUMENTS THAT ARE CURRENTLY IN PLAINTIFFS OR PLAINTIFFS'

22    COUNSEL POSSESSION, CUSTODY OR CONTROL.  BECAUSE WE DON'T

23    HAVE  -- YOU KNOW, WE DON'T HAVE ACCESS TO EVERY DOCUMENT THAT

24    EXISTS IN THE UNIVERSE  --

25        THE COURT:  RIGHT.  NO.  WE'RE NOT EXPECTING YOU TO, YOU

1    KNOW, GO OUT AND DO THIRD-PARTY RESEARCH.

2            MS. TOMASELLI:  YEP.

3            THE COURT:  OF COURSE IF YOU ACQUIRE THIRD-PARTY

4    RESEARCH AND YOU INTEND TO RELY ON IT, YOU'RE GOING TO HAVE TO

5    PRODUCE THAT.

6            MS. TOMASELLI:  THAT'S A POINT, YEAH.

7            MR. ADAMS:  AND, SO, TO BE CLEAR, YOUR HONOR, IF I MAY.

8            SO, THIS NEW COMPLIANCE STATEMENT, THEY'RE GOING TO

9    STATE WHAT THEY PRODUCED AND WHAT THEY HAVE YET TO DO.  AND IF

10   THEY FIND THE TESTING INFORMATION THAT SUPPORTS THEIR CLAIMS IN

11   THEIR POSSESSION, THEY HAVE TO PRODUCE IT.

12           CORRECT?

13           THE COURT:  YES.  SO IMPLIED IN DOING AN AMENDED WRITTEN

14   RESPONSE IS THAT IF IN THE COURSE OF DOING THAT, YOU DETERMINE

15   THAT THERE ARE RESPONSIVE DOCUMENTS THAT ARE NOT BEING

16   WITHHELD ON THE BASIS OF PRIVILEGE, THEN, THEY'D BE PRODUCED.

17           IF THEY ARE BEING WITHHELD ON THE BASIS OF PRIVILEGE,

18   THEY'LL BE ON A PRIVILEGE LOG.

19           MS. TOMASELLI:  RIGHT.

20           MR. ADAMS:  OKAY.

21           AND ARE – DO WE  -- IS IT POSSIBLE TO GET A RULING ON THIS

22   PRIVILEGE ISSUE OF WORK-PRODUCT PRIVILEGE AND WHETHER IT

23   APPLIES TO THESE RESPONSES?

24           THE COURT:  IF THE ARGUMENT IS THAT IDENTIFYING, YOU

25   KNOW, BATES NUMBERS OF CATEGORIES BECAUSE THEY GENERALLY  -- I

1    GUESS  -- LET ME BACK UP AND SAY IT THIS WAY.

2          THERE ARE CERTAIN KINDS OF CONTENTIONS THAT ARE VERY

3    NARROWLY DRAWN.  AND BASED ON A LAWYER'S EXPERTISE -- AND

4    THEY'RE ALMOST MORE AKIN TO EXPERT OPINIONS.  AND I THINK SOME OF

5    THESE TYPES OF OBJECTIONS MAY WORK BETTER IN THAT CONTEXT.

6          HERE WHERE THIS IS A NAMED PLAINTIFF.  HE'S TRYING TO

7    PROSECUTE A CLASS ACTION.  AND THE DEFENDANT IS TRYING TO

8    UNDERSTAND, YOU KNOW, WHAT IS IT THAT MAKES YOU THINK WE'VE

9    DONE THESES WRONG-DOINGS THAT IS ALLEGED IN YOUR COMPLAINT.

10    THAT HAVING SOMEONE IDENTIFY, WELL, HERE ARE THE DOCUMENTS

11    THAT CONVINCED US THAT YOU'VE ENGAGED IN WRONG-DOING.

12          THAT'S NOT AN ATTORNEY WORK-PRODUCT ISSUE.

13          MR. ADAMS:  SURE.

14          MS. TOMASELLI:  AND TO BE CLEAR, YOUR HONOR, WE

15    RECENTLY PRODUCED ALL OF THE DOCUMENTS THAT MR. KHAGHANI

16    HIMSELF RELIED ON TO COME TO THE CONCLUSION THAT WHOLE FOODS

17    HAS COMMITTED WRONG-DOING.  AND ALL OF THOSE SUPPORTING

18    DOCUMENTS.

19          AND THEN ON SEPTEMBER 21ST WE PRODUCED I THINK IT WAS

20    OUR THIRD SET OF PRODUCTION WITH THE TESTING DATA LISTING THE

21    UPC  CODE, THE STORE, THE LAB, THE ANIMAL THAT WAS TESTED, THE

22    PRODUCER OF OUR BRAND THAT WAS TESTED.  AND THAT'S AT

23    PLAINTIFFS 676.

24          SO, THOSE THINGS HAVE BEEN PRODUCED.  AND WE WILL

25    DEFINITELY AMEND OUR RESPONSES TO INDICATE THE BATES NUMBERS

1       OF WHERE THINGS CAN BE FOUND, WHAT WE HAVE PRODUCED.

2              IF THERE'S SOMETHING WE'RE STILL LOOKING FOR, WE CAN

3       INDICATE THAT AS WELL.

4              THE COURT: OKAY.

5              MR. ADAMS: OKAY. I -- MAY I ONE FURTHER QUESTION, YOUR

6       HONOR.

7              I'M STILL IN THE DARK WHETHER OR NOT PLAINTIFFS' COUNSEL

8       HAS THE TESTING INFORMATION THAT THEY GOT FROM THE THIRD

9       PARTIES THEY RETAINED TO TEST THESE DOCUMENTS. AND THEY GOT

10      CORRESPONDENCE. THEY GOT RESULTS, DATA ANALYSIS SAYING THESE

11      ARE THE PRODUCTS THAT TESTED POSITIVE.

12             WE STILL DO NOT HAVE THAT FROM THE PLAINTIFFS. THAT'S

13      WHAT WE ARE LOOKING FOR. WE DON'T NEED A SPREADSHEET SHOWING

14      WHAT YOU TESTED. WE NEED THE DATA SHOWING WHAT THE TEST

15      RESULTS SAID AND WHAT WAS NEGATIVE FOR ANTIBIOTICS, WHAT WAS

16      POSITIVE, WHAT WAS NEGATIVE FOR PHARMACEUTICALS AND WHAT WAS

17      POSITIVE.

18             THAT'S WHAT WE ARE LOOKING FOR WITH RESPECT TO THE

19      FIRST TWO CONTENTION INTERROGATORIES REGARDING TESTING.

20             MS. TOMASELLI: YOUR HONOR, MAY I RESPOND, PLEASE?

21             THE COURT: RIGHT. YES. GO AHEAD.

22             MS. TOMASELLI: YES, TO BE CLEAR. PLAINTIFFS' ATTORNEYS

23      DID NOT TEST ANYTHING. WE DIDN'T COMMISSION TESTING. AND WE

24      DIDN'T CONDUCT THE TESTING. THIRD PARTIES CONDUCTED THE

25      TESTING.

1          SO, WE ONLY HAVE THE ATTORNEYS, WHAT WAS IN THE

2    POSSESSION THAT WAS GIVEN TO US BY THIRD PARTIES OR WHAT WE

3    SUBPOENAED OURSELVES FROM THIRD PARTIES.

4          SO, THE SUGGESTION THAT PLAINTIFFS' ATTORNEYS HAVE

5    TESTED  -- HAD GONE OUT AND CONDUCTED A TESTING PROGRAM IS

6    INACCURATE.  AND --

7          THE COURT:  AND LET ME JUST BE CERTAIN I UNDERSTAND

8    THAT.

9          THERE ARE THIRD PARTIES AND THEN THERE ARE THIRD

10   PARTIES.

11          ARE YOU TALKING ABOUT SOMEONE WHO IS, YOU KNOW,

12   RETAINED BY COUNSEL?  ACTING AT THE DIRECTION OF COUNSEL?

13          MS. TOMASELLI:  NO.

14          THE COURT:  NO.  OKAY.

15          SO, YOU LEARNED ABOUT THESE THIRD PARTIES HOW?

16          MS. TOMASELLI:  SO, THERE'S  -- THERE'S TWO BUCKETS OF

17   TESTING, YOUR HONOR.  THERE IS THE TESTING THAT WAS DONE BY

18   FARM FORWARD THAT WAS PREVIOUSLY A PLAINTIFF.

19          WE LEARNED ABOUT THIS TESTING FROM FARM FORWARD.

20   THEY CONTACTED US.  AND WE TALKED ABOUT IT.

21          AND THAT TESTING DATA, SOME OF WHICH WE'VE ALREADY

22   PRODUCED, THAT WAS PART OF THE LAST HEARING AND THE

23   DISCUSSION.

24          AND THEN THERE IS A MUCH LARGER STUDY THAT WAS DONE

25   COMPLETELY INDEPENDENTLY OF PLAINTIFFS, PLAINTIFFS' COUNSEL BY

1    THE THIRD PARTY FOOD I.D.

2              THAT TESTING WAS PROVIDED TO BOTH PLAINTIFFS AND

3    DEFENDANTS IN DECEMBER OF LAST YEAR.  SO, ONE YEAR AGO.

4              WE HAVE HAD THIS INFORMATION FOR A YEAR.

5              AND WE SUBPOENAED THAT INFORMATION.

6              DEFENDANTS HAVE HAD IT.  AND WE'VE ALSO HAD A DEPOSITION

7    OF A 30(B)(6) DEPOSITION OF THE FORMER EXECUTIVE DIRECTOR OF

8    FOOD I.D.

9              SO, THAT INFORMATION IS ON THE TABLE AND AVAILABLE TO ALL

10   PARTIES.

11             THE COURT:  AND  -- AND DOES THAT INFORMATION INCLUDE

12   TESTING DATA TEST RESULTS?

13             MS. TOMASELLI:  IT DOES INCLUDE TESTING DATA AND TEST

14   RESULTS, YES.

15             THE COURT:  OKAY.

16             SO, LET ME ASK MR. ADAMS.  HAVE YOU SEEN THAT?

17             MR. ADAMS:  YES.

18             WE'RE  -- AGAIN, WE'RE NOT LOOKING FOR THAT SECOND

19   BUCKET SHE JUST DESCRIBED.  WE AGREE THAT THIS WAS -- YOU KNOW,

20   PRODUCED BY THE THIRD PARTY TO ALL PARTIES.  AND WE'VE HAD OUR

21   CRACK AT GETTING A DEPOSITION.  AND THAT'S NOT WHAT WE'RE

22   TALKING ABOUT.

23             I'M TALKING ABOUT THE INFORMATION IN PLAINTIFFS'

24   COUNSEL'S POSSESSION THAT THEY RELIED ON THAT THEY  -- THAT WAS

25   COMMISSIONED BY FARM FORWARD, THE FORMER PLAINTIFF IN THIS

1    CASE.  THAT'S WHAT I'M PRIMARILY LOOKING ABOUT.

2              AND, YES.

3              THE COURT  OKAY.  SO, LET ME ASK.

4              AS PART OF THIS ARE YOU  -- DO YOU AGREE THAT YOU HAVEN'T

5    PRODUCED THAT?  OR DO YOU THINK THAT YOU HAVE PRODUCED THAT,

6    THE FARM FORWARD TEST RESULTS?

7              MS. TOMASELLI:  WE PRODUCED THE INFORMATION THAT WE

8    HAD FROM FARM FORWARD SO THAT FARM FORWARD PROVIDED US WITH

9    SPREADSHEET, COLLABORATE  -- A COLLECTION OF INFORMATION, A

10   COMPILATION.  AND WE PRODUCED THAT.

11             WE HAVEN'T PRODUCED THE ACTUAL TESTING DATA.  H.R.I. AND

12   TRILOGY HAVE NOW PRODUCED IT.

13             I WOULD HAVE TO GO BACK TO MY RECORDS AND SEE IF I HAVE

14   THE IDENTICAL DATA OR IF FARM FORWARD HAD PRODUCED TO US JUST

15   THE COMPILATION OF DATA.  AND IF WE HAVEN'T  -- HAVEN'T PRODUCED

16   EVERYTHING THAT WE HAVE IN OUR POSSESSION, THEN, WE'LL OF

17   COURSE PRODUCE THAT.

18             THE COURT:  ALL RIGHT.

19             SO, YOU'RE  -- YOU'RE TAKING THE POSITION THAT THERE'S

20   CERTAIN THINGS THAT FARM FORWARD GAVE YOU AND CERTAIN THINGS

21   THAT THEY DIDN'T.  AND THAT AS TO THINGS THAT THEY DIDN'T GIVE YOU,

22   THEY'RE NOT IN YOUR POSSESSION, CUSTODY OR CONTROL.

23             MS. TOMASELLI:  YES.

24             THE COURT:  MR. ADAMS, DOES THAT SOUND CONSISTENT WITH

25   YOUR UNDERSTANDING?

1          MR. ADAMS:  I -- I DON'T REALLY HAVE AN UNDERSTANDING OF

2    THEIR RELATIONSHIP WITH THEIR CLIENT AND WHAT THEY'VE ASKED FOR

3    AND WHAT THEY HAVEN'T.

4          I -- MY POSITION RIGHT NOW IS THAT FARM FORWARD IS NO

5    LONGER A PARTY IN THIS CASE.  AND WE'LL DEAL WITH THEM

6    SEPARATELY.  WE'RE PROBABLY GOING TO BE BACK HERE ON THAT IS

7    GOING TO BE MY GUESS.

8          BUT IF FARM FORWARD GAVE PLAINTIFFS ANYTHING THAT IS

9    BEING RELIED ON BY THE CURRENT PLAINTIFFS TO SUPPORT THEIR

10   CURRENT ALLEGATIONS IN THIS ACTIVE COMPLAINT, THEN WE ARE

11   ENTITLED TO IT.

12         AND, SO, THAT'S THE INFORMATION I'M LOOKING FOR HERE.

13         THE COURT:  OKAY.

14         I DO AGREE THAT THAT'S SOMETHING THAT SHOULD BE

15   PRODUCED.  AND IT SOUNDS LIKE PLAINTIFFS' COUNSEL ARE GOING TO

16   GO BACK AND LOOK IN THEIR FILES, UPDATE THESE WRITTEN

17   RESPONSES.  AND IF THEY HAVE THAT INFORMATION, THAT THEY'LL

18   PROVIDE IT.

19         MR. ADAMS:  SURE.

20         MS. TOMASELLI:  AND JUST TO BE CLEAR, YOUR HONOR,

21   PLAINTIFF KHAGHANI AND SAFARI ARE NOT RELYING ON FARM

22   FORWARD'S TESTING DATA IN THE ALLEGATIONS IN THE COMPLAINT.

23         AND, SO, YOU KNOW, WE'RE HAPPY TO PRODUCE WHAT WE

24   HAVE.  BUT THEY'RE -- THIS IS – THAT'S NOT THE BASIS FOR OUR

25   COMPLAINT.

1          THE COURT:  WELL, I UNDERSTAND THAT THERE MAY BE

2    MULTIPLE BASES FOR THE COMPLAINT.  BUT WHATEVER THEY ARE, ALL OF

3    THE BASES FOR THE COMPLAINT TO THE EXTENT THAT THEY ARE

4    EVIDENCED BY DOCUMENTS --

5          MS. TOMASELLI:  SURE.

6          THE COURT:  -- NEEDS TO BE PRODUCED.

7          MS. TOMASELLI:  YES, YOUR HONOR.

8          AND WE AGREE – WE AGREE.  WE'LL PRODUCE THAT.

9          THE COURT:  OKAY.

10          SO, I THINK THAT THAT CONCLUDES OUR DISCUSSION OF

11    NUMBER 99.

12          UNLESS YOU HAVE SOMETHING ELSE, MR. ADAMS.

13          MR. ADAMS:  I WOULD JUST LIKE SOME CLARITY FROM THE

14    COURT IS WE ARE GOING TO LIKELY PROPOUND SIMILAR

15    INTERROGATORIES TO MS. SAFARI WHO AT THE TIME WHEN WE

16    PROPOUNDED THIS SET OF REQUESTS FOR PRODUCTION, SHE WAS OUT

17    OF THE CASE.

18          SHE HAS SINCE BACK IN THEY FILED AN AMENDED ANSWER.

19    AND WE'RE – EXCUSE ME, THEY FILED AN AMENDED COMPLAINT.  AND

20    WE'VE RESPONDED.

21          AND I JUST WANT SOME CLARITY FROM THE COURT ABOUT

22    WHETHER OR NOT WHEN WE PROPOUND THESE TO MS. SAFARI THAT THE

23    SAME HOLDINGS ARE GOING TO APPLY TO HER AS WELL.

24          THE COURT:  ASSUMING THAT THE DISCOVERY IS WRITTEN IN

25    THE SAME WAY, THEN  -- THEN IT CERTAINLY SHOULD.

1          MR. ADAMS:  OKAY.  THANK YOU, YOUR HONOR.

2          THE COURT:  AND I DON'T THINK  -- ONE OF THE THINGS WE DID

3   NOT TALK ABOUT ON PLAINTIFFS' SIDE.

4          HOW LONG DO YOU REASONABLY NEED IN ORDER TO PREPARE

5   THE AMENDED RESPONSES?

6          (PAUSE IN PROCEEDINGS.)

7          MS. TOMASELLI:  JUST THE AMENDED WRITTEN RESPONSES OR

8   -- IS THAT  -- SO, ARE WE TALKING ABOUT THE CONTENTION REQUESTS OR

9   THE – THE CREDIT CARDS?

10          THE COURT:  I WAS  --

11          MS. TOMASELLI:   OR BOTH?

12          THE COURT:  I GUESS  -- I GUESS I WAS TALKING ABOUT BOTH.  I

13   WAS TALKING ABOUT THE ITEMS THAT WERE AT ISSUE IN THE MOTION AT

14   DOCKET 99.

15          IF – IF ONE IS EASIER THAN THE OTHER, AND YOU WANT TO GIVE

16   ME DIFFERENT TARGET DATES, THAT'S FINE.

17          MS. TOMASELLI:  YEAH.  I THINK -- AS FAR AS WRITTEN

18   RESPONSES, 30 DAYS.  BUT THE CREDIT CARDS MIGHT TAKE A BIT

19   LONGER AS WE DESCRIBED FOR THE BURDEN OF REDACTING AND THE

20   ENCRYPTION ISSUES THAT WE'VE BEEN HAVING.

21          SO, WE WOULD REQUEST 60 DAYS FOR THAT.

22          THE COURT:  ALL RIGHT.  LET'S DO  -- TODAY I BELIEVE IS

23   DECEMBER 5TH.

24          SO, LET'S DO JANUARY 5TH FOR THE WRITTEN RESPONSES.

25          AND THEN WE'LL DO JANUARY 31ST FOR THE CREDIT CARD

1    STATEMENTS.

2           MS. TOMASELLI:  OKAY.

3           MR. ADAMS:  THANK YOU, YOUR HONOR.

4           THE COURT:  I THINK IT MAY MAKE LOGICAL SENSE TO ADDRESS

5    THE OTHER MOTION THAT WAS FILED BY DEFENDANTS -- EVEN THOUGH

6    IT'S NOT THE NEXT ONE ON THE DOCKET.

7           THE OTHER MOTION FILED BY DEFENDANTS IS AT DOCKET 111.

8           AND I BELIEVE THERE WAS A SUPPLEMENTAL BRIEF FILED AT

9    115.

10          THIS IS A MOTION TO COMPEL PLAINTIFFS TO PROVIDE FURTHER

11   AMENDED RESPONSES TO FOUR DIFFERENT INTERROGATORIES AND TO

12   HAVE PLAINTIFF KHAGHANI VERIFY THE RESPONSES UNDER OATH.

13          MR. ADAMS, CAN YOU REMIND ME.  WHAT IS IT THAT YOU HAVE

14   RECEIVED CURRENTLY?  AND WHAT IS IT THAT YOU ARE ASKING TO

15   RECEIVE IN ADDITION TO WHAT YOU'VE ALREADY RECEIVED?

16          MR. ADAMS:  SO, BACKING UP A LITTLE BIT.

17          IF YOU RECALL, PLAINTIFFS WERE DESCRIBING THE MATERIAL

18   THEY DID PRODUCE REGARDING THEIR TESTING WHICH IS A

19   SPREADSHEET THAT AS THEY SAID SHOWS THE DATE AND LOCATION OF

20   PURCHASE AND UPC NUMBER AND NAME OF ALL THE PRODUCTS THAT

21   FARM FORWARD TESTED WOULD SUPPORT THE VARIOUS ALLEGATIONS IN

22   THEIR COMPLAINT.

23          ALTHOUGH PLAINTIFFS' COUNSEL TO AID DEFENDANTS IN

24   PROVIDING THEIR RESPONSES TO DISCOVERY INFORMALLY TOLD US

25   WHICH OF THESE PRODUCTS APPARENTLY TESTED POSITIVE.

1          AS WE JUST WENT THROUGH, WE DON'T HAVE THE DOCUMENTS

2     SHOWING.  AND, SO, WHAT WE WANTED TO DO WAS TO GET A – YOU

3     KNOW, AN ADMISSIBLE DISCOVERY RESPONSE JUST CONFIRMING THE

4     FACT THAT, OKAY.  HERE ARE THE TWO PRODUCTS ON THIS BIG

5     SPREADSHEET THAT TESTED POSITIVE.

6          SO, THE REQUEST FOR PRODUCTION SAY JUST LET US KNOW.

7     WE'D IDENTIFY THAT SPREADSHEET BY BATES NUMBER.  AND WE'D SAY

8     WHICH OF THESE PRODUCTS TESTED POSITIVE.

9          THE RESPONSES SAY THEY DON'T RESPOND.  THEY STAND ON

10    AN OBJECTION THAT SAYS  -- OR IT'S NOT AN OBJECTION.  IT'S AN EVASION

11    WHERE THEY SAY, WELL, MR. KHAGHANI IS AN INDIVIDUAL.  AND HE DIDN'T

12    CONDUCT THIS TESTING.  FARM FORWARD DID.  AND, SO, WE CAN'T PUT

13    THIS IS A VERIFIED DISCOVERY RESPONSE NOW.  AND FARM FORWARD IS

14    OUT OF THE CASE.  SO, TOUGH LUCK.

15         SO, YOU'RE NOT GOING TO HAVE ANY WAY TO GET THIS

16    INFORMATION YOU WANT IN AN ADMISSIBLE INTERROGATORY RESPONSE.

17         AND MY -- THE WHOLE FOODS' POSITION IS THAT INFORMATION

18    POSSESSED BY A PARTY'S ATTORNEYS IS POSSESSED BY THE PARTY.

19    AND THEY'RE OBLIGATED TO RESPOND WITH THAT INFORMATION IN AN

20    INTERROGATORY RESPONSE.

21         AND WE PROVIDED A FAIR AMOUNT OF AUTHORITY THAT

22    SUPPORTS THAT POSITION.

23         AND I'M HAPPY TO ANSWER ANY PARTICULAR QUESTIONS YOU

24    HAVE REGARDING OUR POSITION HERE.

25         THE COURT:   I'M GOING TO LET PLAINTIFFS RESPOND TO THAT.

1          MS. TOMASELLI:  YES, YOUR HONOR.

2          SO, FIRST OF ALL, AGAIN, PLAINTIFFS' DISCOVERY RESPONSE

3  676 LISTS ALL OF THE ITEMS THAT TESTED POSITIVE.  WE PRODUCED ALL

4  OF THAT INFORMATION.

5          H.R.I. AND TRILOGY, WHICH ARE NOT A PARTY TO THE CASE,

6  HAVE NOW PRODUCED ALL OF THE TESTING DATA THAT LINES UP WITH

7  THOSE ITEMS.

8          MR. KHAGHANI  HIMSELF HAS NEVER SEEN THE TESTING DATA.

9  SO, WHILE WE HAVE PRODUCED THE DOCUMENTS FORMALLY -- NOT JUST

10  INFORMALLY IN AN EMAIL, BUT FORMALLY IN A BATES STAMPED

11  PRODUCTION WE HAVE PRODUCED THE DOCUMENTS.

12          MR. KHAGHANI CANNOT VERIFY INFORMATION THAT HE HAS

13  NEVER SEEN.

14          SO, WHAT THEY'RE ASKING IS FOR AN INTERROGATORY

15  RESPONSE THAT VERIFIED SOMETHING THAT MR. KHAGHANI HASN'T SEEN.

16  AND WE THINK THAT THAT IS IMPROPER.

17          THEY COULD, YOU KNOW, VERY WELL -- AS MR. ADAMS SAID

18  THEY COULD FILE A THIRD-PARTY SUBPOENA AGAINST FARM FORWARD

19  TO VERIFY THIS.  THEY'VE ALREADY SUBPOENAED H.R.I. TO VERIFY THIS.

20          BUT MR. KHAGHANI HIMSELF CAN'T VERIFY SOMETHING HE

21  HASN'T SEEN.

22          THE COURT:  WELL, I DID A LITTLE LOOKING AT THE PARTIES'

23  AUTHORITIES AND A LITTLE RESEARCH ON MY OWN.  AND ALONG WITH MY

24  OWN EXPERIENCE, I THINK THAT CLASS REPRESENTATIVES FREQUENTLY

25  PROVIDE INFORMATION THAT IS NOT INFORMATION THAT THEY HAVE

1      DIRECTLY AND PERSONALLY ACQUIRED THROUGH THEIR OWN

2      EXPERIENCES IN THE WORLD BUT THAT THEY'VE  -- YOU KNOW,

3      INFORMATION THEY'VE OBTAINED THROUGH COUNSEL.

4              AND I DO AGREE THAT -- THAT THAT IS PART OF THE

5      INTERROGATORY RULE 33.  I THINK THE PARTIES HAVE CITED THE

6      HICKMAN CASE WHICH STANDS FOR THAT.  AND THERE ARE MULTIPLE

7      CASES APPLYING HICKMAN IN THE CONTEXT OF DISCOVERY

8      PROPOUNDED TO PUTATIVE CLASS REPRESENTATIVES.

9              I THINK THAT THE WAY THAT MOST OF THOSE PARTIES DEAL

10     WITH THAT IS THEY'LL SIMPLY SAY IN THE INTERROGATORY RESPONSE,

11     YOU KNOW, I RECEIVED THIS DATA.  I CAN'T INDEPENDENTLY VERIFY THAT

12     IT'S ACCURATE.  BUT I CAN TELL YOU I'VE RECEIVED IT.  AND THIS IS WHAT

13     IT SAYS -- OR WHATEVER THE INTERROGATORY CALLS FOR.

14             SO, I THINK THAT THERE IS A WAY TO HAVE MR. KHAGHANI ,YOU

15     KNOW, VERIFY A RESPONSE THAT ALLOWS THAT RESPONSE TO BE USED

16     IN EVIDENCE WITHOUT HIM FEELING LIKE HE IS, YOU KNOW, PUTTING HIS

17     OWN CREDIBILITY BEHIND TEST RESULTS THAT HE DIDN'T -- FOR TESTING

18     HE DIDN'T PERFORM.

19             AGAIN, AS I UNDERSTAND IT NOW FROM READING THE PARTIES'

20     PAPERS, THE ANSWERS TO THESE INTERROGATORIES ARE JUST

21     OBJECTIONS.  AND IT DOES SEEM THAT A SUBSTANTIVE RESPONSE THAT

22     IS VERIFIED BY MR. KHAGHANI BUT, YOU KNOW, CONTAINS

23     QUALIFICATIONS IF COUNSEL THINKS IT'S APPROPRIATE IN ORDER TO

24     MAKE SURE THE VERIFICATION IS ACCURATE AND THAT THE RESPONSE IS

25     ACCURATE, THEN, OF COURSE, THAT CAN BE  -- THAT CAN BE DONE.

1          BUT AN OBJECTION THAT SIMPLY SAYS I DON'T HAVE ANY

2    INFORMATION TO PROVIDE TO YOU BECAUSE IT'S NOT IN MY PERSONAL

3    KNOWLEDGE  -- EVEN IF IT'S MY ATTORNEY'S KNOWLEDGE, THAT THAT'S

4    NOT CONSISTENT WITH  -- WITH RULE 33.

5          MS. TOMASELLI:  OKAY.

6          YOUR HONOR, SINCE MR. KHAGHANI HAS NEVER SEEN THE

7    INFORMATION, WHAT YOU'RE SUGGESTING IS THAT WE PROVIDE HIM THE

8    INFORMATION AND THAT HE SAYS NOW HE'S SEEN IT.

9          THE COURT:  WELL, I MEAN, I GUESS YOU HAVE ANOTHER

10   OPTION WHICH IS THAT IF HE WANTS TO SAY AND VERIFY UNDER OATH I

11   KNOW NOTHING ABOUT THIS, THEN, THAT WOULD BE AN ANSWER.

12         YOU KNOW, THAT MIGHT HAVE RAMIFICATIONS AT THE CLASS

13   CERTIFICATION STAGE, BUT, YOU KNOW, OBVIOUSLY I'M NOT GOING TO

14   TELL ANYBODY TO SAY ANYTHING THAT'S UNTRUTHFUL.

15         MS. TOMASELLI:  RIGHT.

16         THE COURT:  I'LL LET YOU FIGURE OUT HOW IT IS THAT YOU

17   WANT TO PROVIDE THAT INFORMATION IN A WAY THAT'S TRUTHFUL.

18         MS. TOMASELLI:  SURE.

19         AND TO BE CLEAR, MR. KHAGHANI HAS SEEN THE SCIENTIFIC

20   JOURNAL ARTICLES THAT DISCUSS THE BIGGER BUCKET – THE FOOD I.D.

21   TESTING AND ALL OF THAT INFORMATION THAT IS PUBLIC.

22          IT'S JUST THIS VERY SPECIFIC NARROW FARM FORWARD

23   TESTING THAT DEFENDANTS HAVE BEEN TRYING TO GET AT THROUGH

24   MR. KHAGHANI AFTER THEY HAD FARM FORWARD DISMISSED FROM THE

25   CASE THAT'S AT ISSUE HERE.

1          THE COURT:  OKAY.

2          MS. TOMASELLI:  AND SO --

3          THE COURT:  ALL RIGHT.

4          WELL, THEN, YOU KNOW, IT SOUNDS LIKE WHAT -- WHAT THE

5    COURT WILL DO IS ORDER THE PLAINTIFFS TO -- WELL, THE ONE PLAINTIFF

6    TO FILE OR SERVE AN AMENDED RESPONSE TO INTERROGATORIES 8, 9, 10

7    AND 11 THAT -- THAT IS VERIFIED AND PROVIDES INFORMATION THAT IS

8    KNOWN BOTH TO MR. KHAGHANI OR HIS  – HIS COUNSEL.

9          AND WHY DON'T WE USE THE SAME JANUARY 5TH DEADLINE FOR

10   THOSE SINCE THAT IS WRITTEN DISCOVERY RATHER THAN DOCUMENT

11   PRODUCTION.

12          (PAUSE IN PROCEEDINGS.)

13          MR. ADAMS:  THANK YOU, YOUR HONOR.

14          THE COURT:  SO, THEN, THAT BRINGS US TO OUR LAST

15   DISCOVERY MOTION THAT IS MOTION ON THE DOCKET AT 109, THE JOINT

16   STIPS AT 110.  THE SUPPLEMENTAL BRIEFS ARE AT 113 AND 116.

17          THIS IS A MOTION BY PLAINTIFFS.  AND PART OF IT IS

18   ADDRESSED TO DEFENDANT'S RESPONSES TO RFAS.  PART OF IT IS

19   ADDRESSED TO RESPONSES TO RFPS.

20          WITH REGARD TO THE RFAS, MY UNDERSTANDING IS THAT

21   THERE WERE RFAS THAT WENT OUT THAT SAY BASICALLY ADMIT THAT

22   YOU PROVIDED BEEF PRODUCTS FROM CERTAIN SUPPLIERS FOR SALE,

23   AND THAT SOME OF THE DEFENDANTS HAVE SAID, WELL, WE ADMIT THAT

24   WE DO THAT IN BRICK AND MORTAR STORES.  WE DON'T ADMIT THAT WE

25   DO IT ONLINE BECAUSE WE DON'T DO IT ONLINE.

1          AND RATHER THAN ADDING THAT SECOND PART IN THE ACTUAL

2    RESPONSE – AND YOU CAN CORRECT ME IF I'M MISREMEMBERING HOW

3    THE RESPONSE IS ACTUALLY WORDED.  BUT THEY SIMPLY SAID WE

4    ADMITTED IT AS TO  -- AS TO BRICK AND MORTAR STORES.

5          AND THAT THE  -- THEY SUBSEQUENTLY REPRESENTED THAT

6    THEY DON'T PROVIDE PRODUCTS FOR SALE ONLINE.

7          AND THE PLAINTIFFS AS I UNDERSTAND IT ARE ASKING THAT THE

8    COURT COMPEL THEM TO REMOVE THAT QUALIFICATION FROM THEIR --

9    FROM THEIR RESPONSE -- OR MAYBE YOU CAN ARTICULATE YOUR OWN

10   POSITION HERE BETTER THAN I CAN, SO.

11         MS. TOMASELLI:  YEAH.  YEAH, OF COURSE, YOUR HONOR.

12         WHAT WE'RE LOOKING FOR THE COURT TO  -- IS WHAT WE'RE

13   TRYING TO DO IS ADJUST THE SUFFICIENCY OF THE RESPONSE.

14         SO, YOU'RE CORRECT TO SAY THAT THEY ADMITTED THAT THEY

15   PROVIDED CERTAIN PRODUCTS OR PRODUCTS FROM SUPPLIERS AT

16   BRICK AND MORTAR STORES.

17         WHOLE  -- WHOLE FOODS MARKET SERVICES, ONE OF THE

18   THREE DEFENDANTS, HAS DENIED THAT IT EITHER SELLS OR MAKES

19   PRODUCTS AVAILABLE ONLINE.  THEY ACTUALLY DENIED THAT.

20         BUT THE TWO CALIFORNIA ENTITIES, WHOLE FOOD MARKET,

21   CALIFORNIA, INC. AND MRS. GOOCH'S -- THAT'S A FOOD MARKET -- THEY

22   HAVE REFUSED TO EITHER ADMIT OR DENY THAT THEY MAKE PRODUCTS

23   AVAILABLE OR SELL THEM ONLINE.

24         HOWEVER, IF YOU LOOK AT PAGE -- IF YOU LOOK AT PLAINTIFF'S

25   SECOND AMENDED COMPLAINT AT PARAGRAPH 47, IT SPECIFICALLY

1    SHOWS THAT WHEN YOU GO TO PURCHASE THESE PRODUCTS ONLINE, IT

2    SAYS, "SHIPS FROM AND SOLD BY WHOLE FOODS MARKET."

3            AND, SO, PLAINTIFFS ARE ARGUING OR ALLEGING THAT THE  --

4    THE ANSWER IS INSUFFICIENT.

5            FIRST OF ALL, THEY HAVEN'T ADMITTED OR DENIED THAT THEY

6    SELL THE PRODUCTS OR MAKE THEM AVAILABLE ONLINE.

7            BUT THEN RIGHT HERE ON THE WEBSITE IT SPECIFICALLY

8    STATES, "SHIPS FROM AND SOLD BY WHOLE FOODS MARKET."

9            SO, WE'RE JUST TRYING TO GET SOME CLARITY TO THE ANSWER

10   WHICH IS DO THESE ENTITIES MAKE THESE PRODUCTS AVAILABLE OR

11   SELL THEM ONLINE.

12           THE COURT:  WELL, IS THERE A SEPARATE RFA THAT – THAT

13   ASKS THEM TO MAKE A DISTINCTION BETWEEN WHETHER OR NOT THEY

14   SELL ONLINE OR NOT?

15           MS. TOMASELLI:  THERE'S NOT A SEPARATE RFA THAT

16   DISTINGUISHES BETWEEN ONLINE SALES OR BRICK AND  -- BRICK AND

17   MORTAR SALES.

18           IT WAS DEFENDANTS WHO PUT THEM INTO TWO SEPARATE

19   BUCKETS.

20           THE COURT:  OKAY.

21           MS. TOMASELLI:  WE  -- WE ASK GENERALLY DO YOU SELL FROM

22   THE SUPPLIER.

23           AND THE COMPLAINT ALLEGES, YOU KNOW, THAT THE

24   ADVERTISING IS ONLINE AND IN STORE.

25           THE COURT:  AND, SO, WHAT I THINK I'M HEARING YOU SAY IS

1    THEAT THEIR RESPONSE IS INCOMPLETE BECAUSE IT ONLY ADDRESSES

2    PART OF WHAT WE'RE ASKED ABOUT.

3           AND IN ORDER TO HAVE A COMPLETE RESPONSE, THEY WOULD

4    NEED TO INCLUDE IN THEIR VERIFIED RESPONSE WE DON'T MAKE

5    PRODUCTS AVAILABLE FOR SALE ONLINE.

6           MS. TOMASELLI:  RIGHT.  IF IT'S DEFENDANT'S POSITION THAT

7    WHOLE FOODS MARKET CALIFORNIA OR MRS. GOOCH'S -- MRS. GOOCH'S

8    IS A SOUTHERN CALIFORNIA ENTITY.  CALIFORNIA IS THE NORTHERN

9    CALIFORNIA ENTITY.  IF THEY DON'T MAKE PRODUCTS AVAILABLE FOR

10   SALE ONLINE OR SELL THEM ONLINE, THEN, THEY SHOULD DENY THAT

11   PORTION OF THE -- OF THE RFA.

12          AND THEN WE COULD DEAL WITH THAT, YOU KNOW, IF WE – IF

13   WE THINK THAT THAT  -- THAT THAT IS INACCURATE.

14          BUT AS A CONSUMER, IF YOU GO TO THE WHOLE FOODS

15   WEBSITE, AND YOU GO TO DO AN ONLINE ORDER.  AND YOU  -- YOU KNOW,

16   YOU CLICK ONLINE ORDER AND IT BOUNCES YOU OVER TO ANOTHER

17   WEBSITE.  AND THEN YOU CHOOSE WHETHER YOU ARE GOING TO HAVE IT

18   DELIVERED OR PICK IT UP.  AND YOU CHOOSE YOUR STORE.  AND YOU'RE

19   ACTUALLY PURCHASING FROM THAT STORE THAT IS OWNED BY A WHOLE

20   FOODS MARKET CALIFORNIA.

21          THOSE PRODUCTS THAT ARE BEING SOLD ARE MADE AVAILABLE

22   BY THAT ENTITY.  AND WE WANT TO KNOW WHETHER OR NOT THEY AGREE

23   WITH THAT.  AND THAT'S WHAT THE CONSUMER IS SEEING.  OR IF THEY'RE

24   DENYING THAT THEY ARE THE ONES WHO ARE IN CHARGE OF THAT.

25          THE COURT:  SO, THEN, MR. ADAMS, IF YOU WERE ASKED TO

1   AMEND THESE RFA RESPONSES TO NOT ONLY ADMIT THE PART THAT

2   DEALS WITH BRICK AND MORTAR STORES BUT TO DENY AND/OR EXPLAIN

3   WHY THE RESPONDING PARTIES WOULD BE DENYING THE REQUEST TO

4   THE EXTENT IT APPLIES TO ONLINE SALES.

5          I MEAN, IS THAT -- IS THAT SOMETHING THAT YOU WOULD BE

6   ABLE TO DO?

7          MR. ADAMS:  WE'D BE ABLE TO DO IT CERTAINLY IF THAT'S WHAT

8   THIS COURT WANTED.  BUT I DON'T THINK  -- PLAINTIFFS ARE  -- THEY'RE

9   TRYING TO TURN THESE SIMPLE RFAS INTO SOMETHING THAT'S MORE

10  COMPLEX  LIKE GETTING DETAILS ABOUT HOW AN ONLINE SALE IS

11  ROUTED AND WHAT ENTITY CREDITS THE SALE AND WHAT DOES IT MEAN

12  TO CREDIT A SALE TO A CERTAIN ENTITY VERSUS ANOTHER ONE AND

13  WHAT  -- LIKE, HOW THIS IS ALL SET UP.

14         THEY WANT TO TAKE A DEPOSITION, THEY'RE WELCOME TO.

15  WE'RE NOT HIDING THE BALL.  WE'RE NOT SAYING  -- YOU KNOW, ALL WE

16  DID IS  -- ALL DEFENDANTS DID IS THEY WERE PRESENTED WITH AN

17  AMBIGUOUS INTERROGATORY, AND THEY ADMITTED THE PART THAT THEY

18  COULD.  AND THAT'S ALL THEY'RE OBLIGATED TO DO.  WE'RE NOT TRYING

19  TO HIDE THE BALL OR ANYTHING HERE.

20         AND, YOU KNOW, PLAINTIFFS ARE SPECULATING ABOUT, YOU

21  KNOW, OH, WELL, YOU CAN GO TO THE WEBSITE AND EVERYTHING.  WE'VE

22  EXPLAINED THIS IN OUR OBJECTIONS.  AND WE'VE EXPLAINED IT DURING

23  THE MEET AND CONFERS.  AND WE'D LOVE TO PROVIDE MORE

24  INFORMATION PURSUANT TO FURTHER, YOU KNOW, WRITTEN DISCOVERY

25  RESPONSES AND FURTHER DEPOSITIONS.  AND WE CAN MAYBE CLEAR UP

1    A LOT OF THIS CONFUSION.

2              BUT I DON'T THINK PUTTING A SQUARE PEG IN A ROUND HOLE IS

3    THE RIGHT WAY TO DO THAT VIA THESE RFAS.  I MEAN, REQUEST FOR

4    ADMISSION  IT'S  -- YOU KNOW, PART OF DEFENDANTS' ISSUE WITH THIS IS

5    THESE ARE SPECIFIC DISCOVERY DEVICE DESIGNED TO SHORTCUT

6    ISSUES OF PROOF AT TRIAL.  THEY'RE NOT FACT FINDING IN THE SAME

7    WAY THAT OTHER TYPES OF DISCOVERY ARE.

8              AND, SO, WE'RE VERY CAUTIOUS ABOUT PROVIDING AN

9    UNQUALIFIED, YOU KNOW, YES OR NO ADMISSION OR SOMETHING THAT'S

10   EVEN LIKE THAT TO A VAGUE INTERROGATORY -- OR, EXCUSE ME, A

11   VAGUE REQUEST FOR PRODUCTION.

12             AND THAT'S KIND OF WHERE WE ARE.  SO, WE TRIED OUR BEST.

13   IT'S NOT LIKE WE'RE HIDING THE BALL ON SALES.  WE EXPLAINED THAT,

14   YOU KNOW, THE TWO BRICK AND MORTAR ENTITIES.  THEY SELL STUFF AT

15   THE BRICK AND MORTAR STORES AND THEY DON'T DO ONLINE SALES.

16   WE EXPLAINED THAT WHOLE FOODS MARKET SERVICES DOESN'T SELL

17   ANYTHING.  IT JUST MANAGES THE WEBSITE.

18             AND IF THEY WANT MORE INFORMATION, THEY'RE WELCOME TO

19   GO GET IT.  BUT I DON'T THINK THAT FORCING THAT INFORMATION INTO

20   THESE POORLY DRAFTED REQUESTS FOR ADMISSION RESPONSES IS THE

21   RIGHT AVENUE.

22             FOR INSTANCE, THE REQUEST FOR ADMISSIONS SET 2 SEEK AN

23   OPEN-ENDED ADMISSION THAT THE PARTIES MADE AVAILABLE BEEF FROM

24   CERTAIN SUPPLIERS IN THEIR CALIFORNIA STORES.

25             WE DON'T  -- WHOLE FOODS DOESN'T KNOW WHAT THAT MEANS.

1      AND WE'RE CERTAINLY NOT GOING TO PROVIDE A SWORN REQUEST FOR

2      ADMISSION TO SUCH AN OPEN-ENDED THING THAT'S THEN GOING TO GET

3      PASTED ON A GRAPHIC AT TRIAL.  AND WE DON'T KNOW WHAT IT MEANS,

4      AND THE JURY DOESN'T KNOW WHAT IT MEANS.

5            SO, WE TRIED OUR BEST TO ADMIT WHAT WE COULD

6      TRUTHFULLY AND OBJECT TO THE INTERROGATORY BEING VAGUE AS TO

7      THE REST.

8            AND IF THEY  -- AND, SO, THAT'S OUR POSITION IS WE DON'T

9      THINK THAT FURTHER RESPONSES TO THESE INTERROGATORIES IS THE

10     RIGHT WAY TO GET PLAINTIFF THE INFORMATION THEY SEEK.

11           THE COURT:  WELL, FROM THE COURT'S PERSPECTIVE I DO

12     THINK THAT IF AN RFA IS OUT THERE AND PART OF IT IS ADMITTED, AND

13     THEN THERE IS SILENCE AS TO THE OTHER PART, IT DOES CREATE SOME

14     ISSUE AS TO, WELL, IS THAT PART DENIED OR NOT.

15           AND, YOU KNOW, IT'S ONE THING IF A PARTY WANTS TO SAY,

16     YOU KNOW, WE LACK SUFFICIENT INFORMATION TO ADMIT OR DENY, OR

17     WE DON'T UNDERSTAND THE REST OF IT.

18           BUT HERE I DO UNDERSTAND -- YOU KNOW, IF YOU WERE ABLE

19     TO ANSWER ABOUT WHETHER YOU MAKE THEM AVAILABLE ONLINE IT

20     SEEMS LIKE  YOU'D BE ABLE TO ANSWER -- OR WHETHER YOU MAKE THEM

21     AVAILABLE THROUGH BRICK AND MORTAR STORES, YOU'D BE ABLE TO

22     ANSWER WHETHER YOU MAKE THEM AVAILABLE ONLINE.

23           IF YOU WANT TO QUALIFY, YOU KNOW, WHAT YOU UNDERSTOOD

24     MAKE AVAILABLE TO MEAN, YOU CERTAINLY CAN DO THAT AND SAY THAT

25     THAT'S THE PART OF THE PREMISE THAT THE ANSWER IS BASED ON.

1          BUT I DO THINK THAT A SUPPLEMENTAL RESPONSE HERE, THAT

2     THE ANSWER IS THE SECOND PART AND JUST SAYS, YOU KNOW, WE DENY

3     THAT THIS IS WHAT HAPPENS AND HERE'S WHY.  BECAUSE WE

4     UNDERSTAND THIS TERM TO MEAN THIS.  WE UNDERSTAND THIS TERM TO

5     MEAN THIS.  AND HERE'S HOW IT WORKS.

6          IT SOUNDS LIKE THAT'S INFORMATION THAT YOU'VE ALREADY

7     PROVIDED IN THE MEET AND CONFER.  BUT AS WE'VE DISCUSSED THERE'S

8     A DIFFERENCE BETWEEN INFORMATION PROVIDED IN A VERIFIED

9     RESPONSE AND INFORMATION PROVIDED THROUGH THE MEET AND

10    CONFER PROCESS.

11         AND, SO, IT DOES SEEM TO THE COURT THAT IT WOULD BE

12    APPROPRIATE FOR DEFENDANTS TO GO AHEAD AND SUPPLEMENT THOSE

13    RFA RESPONSES.

14         MR. ADAMS:  ALL RIGHT, YOUR HONOR.  THANK YOU.

15         THE COURT:  AND CAN THAT ALSO BE ACCOMPLISHED  BY

16    JANUARY 5TH?

17         MR. ADAMS:  I HOPE SO.  IT'S A VERY HECTIC TIME FOR WHOLE

18    FOODS DURING THE HOLIDAY SEASON.  IT'S HARD TO GET AHOLD OF

19    PEOPLE.

20         IF WE COULD MAYBE GET A LITTLE TIME UNTIL INTO THE NEW

21    YEAR, IT WOULD BE A LITTLE SAFER.

22         THE COURT:  WELL, WHY DON'T WE SAY JANUARY 12TH.  AND

23    THAT GIVES YOU ANOTHER WEEK IN JANUARY.

24         MR. ADAMS:  OKAY.

25         AND, SO, JUST -- JUST SO I'M CLEAR, YOUR HONOR, AND SORRY

1    FOR ASKING A THOUSAND QUESTIONS.

2            SO, WHOLE FOODS WILL PROVIDE AMENDED RESPONSES THAT

3    JUST MAKES CLEAR IN THE VERIFIED PORTION OF THE RESPONSE, NOT

4    THE OBJECTION, THAT WE SELL IT AT THE BRICK AND MORTAR STORES

5    AND WE DON'T SELL IT ONLINE.

6            AND HERE'S HOW WE INTERPRET  "MADE AVAILABLE."

7            ONE QUESTION.  SO, PLAINTIFFS TOOK ISSUE WITH THE FACT

8    THAT WE INTERPRETED THE PHRASE  "MADE AVAILABLE" TO MEAN

9    SPECIFICALLY SALES.  SO, IF WE RESPOND ON BEHALF OF WHOLE FOODS

10   MARKET SERVICES THAT RUNS THE WEBSITE AND SAY, AS WE HAVE

11   ALREADY, THAT WHOLE FOODS MARKET SERVICES DOES NOT SELL THE

12   PRODUCTS, IS THAT SUFFICIENT IF WE STATE THAT'S OUR

13   INTERPRETATION, OR ARE WE REQUIRED TO FURTHER STATE WE ALSO

14   READ THE WEBSITE AND --

15           THE COURT:  YOU KNOW, FROM THE COURT'S POINT OF VIEW,

16   THE POINT OF DISCOVERY IS THE FAIR EXCHANGE OF INFORMATION

17   HERE.

18           AND WHILE I UNDERSTAND THE RFAS AREN'T FACT FINDING, IF

19   THERE'S SOMEONE WHO IS SELLING IT WHO YOU CAN'T DISCERN FROM

20   YOUR RESPONSES FROM LOOKING AT THE WEBSITE, THEN, IT WOULD

21   SEEM LIKE IT WOULD BE FAIR IF YOU KNOW WHO THAT IS, JUST DISCLOSE

22   WHO THAT IS.

23           MR. ADAMS:  WE DID.

24           THE COURT:  OKAY.  FAIR ENOUGH THEN.

25           I MEAN, THAT'S THE SORT OF INFORMATION I'D EXPECT IF

1    YOU'RE GOING TO SAY, LIKE, WE AREN'T THE ONES WHO SELL IT.  SO AND

2    SO ARE THE ONES WHO SELL IT.

3              MR. ADAMS:  OKAY.

4              MS. TOMASELLI:  CAN I RESPOND TO THAT, YOUR HONOR.

5              WE  -- WE SERVED TWO SETS OF RFAS.  ONE THAT ASKED FOR --

6    ONE THAT SPECIFICALLY USED THE WORD "SELL" AND THEN ONE THAT

7    SAID "MADE AVAILABLE FOR SALE."

8              IF THEY'RE INTERPRETING -- IF DEFENDANTS ARE GOING TO

9    INTERPRET MADE AVAILABLE FOR SALE AS SOLD, THEN, IT MAKES

10   THERE'S BASICALLY NO DISTINCTION BETWEEN THE TWO RFAS.

11             THE COURT:  WHAT IS THE DISTINCTION THAT YOU

12   UNDERSTAND?

13             MS. TOMASELLI:  THE DISTINCTION THAT WE UNDERSTAND AS

14   WE DISCUSSED IN OUR MEET AND CONFER EFFORTS IS THAT THEY OFFER

15   THE PRODUCT ONLINE FOR SALE, NOT WHO COLLECTED THE MONEY.

16             SO, WHAT -- DEFENDANTS HAD EXPLAINED THIS THAT AMAZON,

17   THEIR PARENT CORPORATION, COLLECTS THE MONEY.

18             BUT WE'RE NOT -- THIS ISN'T ABOUT WHO COLLECTS THE MONEY

19   NECESSARILY.  IT'S ABOUT WHO'S ADVERTISING AND OFFERING THE

20   PRODUCTS ON THE WEBSITE WHO'S IN CHARGE OF PUTTING THE

21   PRODUCTS UP THERE.  IS IT AMAZON WHO'S MAKING THE DECISION OR IS

22   IT WHOLE FOODS MARKET CALIFORNIA WHERE THE FOOD IS COMING

23   FROM AND GETTING DELIVERED TO SOMEBODY'S HOUSE.

24             THE COURT:  YEAH.  I MEAN, I GUESS TO ME, IF SOMEBODY

25   ASKED ME MAKE AVAILABLE FOR -- TO THE MARKET, TO ME THAT SEEMS

1    TO INDICATE THAT I HAVE POSSESSION OF THE ITEM THAT'S BEING

2    SOLD --

3             MS. TOMASELLI:  RIGHT.

4             THE COURT:  -- AND I PUT IT SOMEPLACE WHERE CONSUMERS

5    CAN SEE IT AND DECIDE WHETHER OR NOT THEY WANT TO BUY IT.

6             AND THEN IF THE CONSUMER BUYS IT, THEY COME AND THEY

7    GET IT.

8             MS. TOMASELLI:  RIGHT, RIGHT.

9             THE COURT:  THAT'S  -- I MEAN, MAYBE I'M -- THAT'S HOW I

10   WOULD SORT OF INTERPRET MAKE AVAILABLE FOR SALE.

11            MR. ADAMS:  YEAH.

12            AND TO BE CLEAR, THE WAY THIS WORKS IS WHOLE FOODS

13   MARKET SERVICES RUNS THE WEBSITE.  AND THEN CUSTOMERS WHO

14   WISH TO MAKE A PURCHASE FROM THE WEBSITE ARE REDIRECTED TO AN

15   EXTERNAL URL AT AMAZON.COM WHERE THEY COMPLETE THEIR

16   PURCHASE USING THEIR PRIME ACCOUNT AND A CREDIT CARD.  THE

17   STORE NAME IS ON .COM.

18            IT'S NOT BEING DONE ON THE WHOLE FOODS MARKET SERVICES

19   WEBSITE.

20            AND IF YOU WANT US TO, YOU KNOW, PUT THAT IN OUR

21   RESPONSE, WE CAN.

22            THE COURT:  AND I WILL SAY, YOU KNOW, BECAUSE I DON'T

23   WANT TO MAKE WORK FOR PEOPLE THAT'S UNNECESSARY.

24            IF YOU PUT IT IN ONE RESPONSE, AND THEN YOU INCORPORATE

25   IT BY REFERENCE IN OTHER RESPONSES BECAUSE IT'S THE SAME

1   INFORMATION, YOU DON'T HAVE TO COPY AND PASTE IT 15 TIMES.  I'M

2   FINE WITH THAT.

3          BUT, AGAIN, THE INFORMATION -- THE IDEA IS THAT AT THE END

4   OF THIS, WE SHOULD HAVE SOME UNDERSTANDING OF WHO IS DOING

5   WHAT.

6          MS. TOMASELLI:  YOUR HONOR, SORRY.  IF I MAY RESPOND TO

7   THAT.

8          MR. ADAMS KEEPS REFERRING TO WHOLE FOODS MARKET

9   SERVICES.  BUT THEY ALREADY DENIED WHOLE FOODS MARKET

10  SERVICES SALES ONLINE.

11         AND, SO, WE'RE NOT TALKING ABOUT WHOLE FOODS MARKET

12  SERVICES, THE COMPANY THAT RUNS THE WEBSITE.  WE'RE TALKING

13  ABOUT WHOLE FOODS MARKET CALIFORNIA AND MRS. GOOCH'S, THE

14  ONES WHERE THE FOOD COMES FROM JUST AS YOU JUST DESCRIBED.

15         WHEN YOU GO ON THE WEBSITE YOU'RE LOOKING AT THE LIST

16  OF FOOD FROM YOUR LOCAL WHOLE FOODS STORE.  FOR MINE, IT'S THE

17  GILLMAN STORE.  I KNOW WHAT THEY'VE GOT.  I ORDER IT.  AND THEN

18  SOMEONE DELIVERS IT TO ME OR I DRIVE TO THE GILLMAN STORE AND I

19  PICK IT UP.

20         FOR US, WE'VE EXPLAINED TO DEFENDANTS, THAT'S WHAT WE

21  INTERPRET MADE AVAILABLE FOR SALE MEANS.  AND THAT'S THE ANSWER

22  WE WANT A RESPONSE TO.

23         AND WE EXPLAINED THAT IN MEET AND CONFER LETTERS AND

24  DISCUSSIONS.

25         SO, YOU KNOW, THAT'S WHAT WE'RE HOPING TO GET AN

1    ANSWER TO.

2         MR. ADAMS:  SO, THE ONLY WAY WE CAN RESPOND TO THAT

3    RFAS THE WAY WE'VE ALREADY DONE IS WE DON'T KNOW WHAT MADE

4    AVAILABLE FOR SALE MEANS.  IT CAN MEAN A LOT OF THINGS THE WAY

5    THAT YOUR HONOR JUST INTERPRETED IT OR THE WAY THAT THEY'RE

6    INTERPRETING IT.  AND WE WOULD STATE HOW WE'RE INTERPRETING IT.

7    AND WE RESPOND SUBJECT TO THAT INTERPRETATION.

8         THAT'S WHAT WE'VE ALREADY DONE.  SO, I'M A LITTLE

9    CONFUSED ON WHAT WE WOULD BE DOING IN OUR AMENDED

10   RESPONSES.

11        THE COURT:  WELL, MY UNDERSTANDING IS THAT, AGAIN, IT

12   ASKS DO YOU MAKE THEM AVAILABLE FOR PURCHASE.  FULL STOP.

13        AND YOU SAID WE MAKE THEM AVAILABLE FOR PURCHASE IN A

14   BRICK AND MORTAR STORE.  AND YOU DIDN'T SAY ANYTHING ABOUT

15   WHETHER YOU DO OR YOU DON'T MAKE THEM AVAILABLE FOR PURCHASE

16   ONLINE.

17        MR. ADAMS:  OKAY.

18        THE COURT:  AND, SO, YOU WOULD NEED TO ADMIT OR DENY

19   THAT.  AND TO THE EXTENT YOU NEED TO QUALIFY IT OR EXPLAIN IT, YOU

20   CAN DO THAT AS WELL.

21        MR. ADAMS:  OKAY.  UNDERSTOOD.

22        THE COURT:  SO THAT BRINGS US TO THE MOTION THAT

23   PLAINTIFFS HAVE FILED WITH REGARD TO DEFENDANT'S RESPONSES TO

24   REQUESTS FOR PRODUCTION.

25        AS I UNDERSTAND IT, THIS IS -- YOU KNOW, PLAINTIFFS HAVE

1    NOT ATTACKED THE SUFFICIENCY OF PARTICULAR RESPONSES TO

2    PARTICULAR RFPS BUT RATHER HAVE ARGUED THAT DEFENDANTS

3    GENERALLY RAISED THREE OBJECTIONS THAT, YOU KNOW, IN PLAINTIFFS'

4    VIEW IMPROPERLY NARROW THEIR DOCUMENT PRODUCTION.

5            AND, SO, DEFENDANTS ARE -- OR PLAINTIFFS, RATHER, ARE

6    SEEKING A JUDICIAL DETERMINATION AS TO THE -- THE APPLICABILITY OF

7    THE PARTICULAR OBJECTIONS.

8            ONE HAS TO DO WITH THE GEOGRAPHY.  ONE HAS TO DO WITH

9    THE TIMEFRAME.  AND ONE HAS TO DO WITH THE DEFINITION OF BEEF

10   PRODUCTS.

11           WITH REGARD TO THE GEOGRAPHY AND THE TIMEFRAME  --

12           AND, MR. ADAMS, YOU CAN  -- YOU CAN CORRECT ME IF I'M

13   WRONG HERE.  BUT MY UNDERSTANDING IS THAT THE DEFENDANTS DID

14   NOT OBJECT UP FRONT AND SAY, LOOK, ONLY NORTHERN CALIFORNIA IS

15   RELEVANT OR ONLY SOUTHERN CALIFORNIA IS RELEVANT.

16           AND, SO, BASED ON SOMETHING ABOUT THE GEOGRAPHY WE'RE

17   LIMITING OUR RESPONSES.

18           SIMILARLY, THEY DIDN'T SAY, YOU KNOW, THESE PARTICULAR

19   YEARS ARE RELEVANT.  THESE PARTICULAR YEARS ARE NOT RELEVANT.

20           BUT, RATHER, THE REASON THAT THEIR DOCUMENT

21   PRODUCTION GOT LIMITED IN GEOGRAPHY AND TIMEFRAME IS BECAUSE

22   OF THE INTERPRETATION OF THE DEFINITION OF BEEF.  AND THAT ONCE

23   YOU LOOKED AT THE WAY THAT THE DEFENDANTS DEFINED BEEF

24   PRODUCTS AS MEANING PRODUCTS THAT WERE PURCHASED BY

25   MR. KHAGHANI OR PRODUCTS THAT HAVE BEEN IDENTIFIED AS TESTING

1    POSITIVE FOR ANTIBIOTICS THROUGH THE INFORMAL DISCOVERY

2    RESPONSES, THAT THAT'S WHAT CAUSES THE PRODUCTION TO BE MORE

3    NARROWED IN TIMING AND IN GEOGRAPHIC SCOPE THAN -- THAN WHAT IS

4    REQUESTED IN THE ACTUAL WRITTEN RFPS.

5            MR. ADAMS:  CLOSE.  ALTHOUGH IN ALL FAIRNESS, THAT -- THAT

6    IS NOT THE DEFINITION OF BEEF THAT WAS IN PLAINTIFFS' REQUEST FOR

7    PRODUCTION.

8            PLAINTIFFS' REQUEST FOR PRODUCTION SAY ALL BEEF SOLD BY

9    WHOLE FOODS ANYWHERE.

10           THE COURT:  RIGHT.

11           MR. ADAMS:  AND --

12           THE COURT:  I UNDERSTAND.  I WAS TRYING TO GIVE WHAT --

13   WHAT DEFENDANTS' --

14           MR. ADAMS:  YES --

15           THE COURT:  -- UNDERSTANDING --

16           MR. ADAMS:  -- EXACTLY.

17           THE COURT:  -- OF THE PRODUCTION  -- OF THE DEFINITION OF

18   BEEF IS.

19           MR. ADAMS:  AND THAT DEFINITION IS BASED ON OUR

20   OBJECTIONS TO OVERBREADTH AND RESPONSIVENESS AND RELEVANCE.

21           AND I -- YOU KNOW, WE -- WE HAD A CALL ON THIS MONTHS AGO

22   WHERE, YOU KNOW, WE KIND OF WENT AROUND AND AROUND ON THE

23   SAME ISSUE.

24           AND, YOU KNOW, WHOLE FOODS WAS TRYING TO THINK OF

25   SOME WAY TO GET ITS HANDS AROUND THE CIRCLE OF RELEVANT

1    PRODUCTS IN THIS CASE.

2            AND WHILE I CERTAINLY UNDERSTAND PLAINTIFFS' DESIRE TO

3    JUST, YOU KNOW, SAY GIVE ME AS MUCH INFORMATION AS POSSIBLE.

4    GIVE ME  -- AND, YOU KNOW, THAT'S THE WAY THESE CASES WORK, THEY

5    HAVEN'T PROVIDED A -- LIKE A CIRCLE TO DRAW AROUND THE RELEVANT

6    BATCH OF PRODUCTS THAT WE'RE DEALING WITH HERE.

7            AND WE TRIED OUR BEST.  AND I THINK WE ARRIVED AT A

8    PRETTY EXPANSIVE DEFINITION.   IT'S THE PRODUCTS THAT THE

9    RELEVANT PLAINTIFF PURCHASED THAT TESTED POSITIVE AND THE

10   PRODUCTS THAT HE PURCHASED AT -- YOU KNOW, DURING THE

11   RELEVANT TIMEFRAME.

12           AND NOW THAT MS. SAFARI IS IN THE CASE, WE WOULD INCLUDE

13   HER IN THAT AS WELL.   AND NOT ONLY THOSE PRODUCTS BUT EVERY

14   PRODUCT SUPPLIED BY THE SUPPLIERS WHO PROVIDED THOSE

15   PRODUCTS.

16           AND THAT BRINGS IN OVER 400 PRODUCTS.

17           AND IF YOU LOOK AT THE, YOU KNOW, SALES INFORMATION WE

18   PRODUCED, IT'S ROW UPON ROW UPON ROW OF SALES INFORMATION.

19   AND THAT'S NOT LIMITED BY TIMEFRAME.  THAT'S DURING THE ENTIRE

20   STATUTORY PERIOD.  AND IT'S NOT LIMITED GEOGRAPHICALLY.  WE

21   INCLUDED ALL THE PRODUCTS PROVIDED BY THOSE SUPPLIERS FROM

22   THE ENTIRE CLASS PERIOD AND IN BOTH NORTHERN AND SOUTHERN

23   CALIFORNIA.

24           AND THIS WAS OUR BEST WAY TO KIND OF STRIKE A BALANCE

25   BETWEEN THE RELEVANCE OF INFORMATION.  AND, YOU KNOW,

1    PLAINTIFFS' BRIEFING TALKS A LOT ABOUT STANDING WHICH WAS KIND OF

2    MORE OF AN ISSUE WHEN WE WERE STILL IN THE THICK OF THE

3    PLEADINGS.

4          BUT NOW THAT WE'RE ON THAT, IT'S MORE ABOUT WHAT'S

5    RELEVANT TO THE PLAINTIFFS' CLAIMS.

6          AND FOR ALL OF THE PLAINTIFFS' CLAIMS, THEY'RE GOING TO

7    NEED TO SHOW THE MATERIALITY AND RELIANCE AND THAT THEY WERE

8    HARMED.  AND ALL OF THAT CENTERS AROUND THE PRODUCTS THEY

9    PURCHASED.

10         AND, SO, WE'RE TRYING TO FIGURE OUT A WAY TO FOCUS ON

11   THAT AND, YOU KNOW, KIND OF DROP A NUMBER AROUND IT OF

12   POTENTIALLY RESPONSIVE AND RELEVANT INFORMATION -- I.E., ALL THE

13   PRODUCTS THAT ARE ALSO PROVIDED BY THE SUPPLIERS AT ISSUE WHILE

14   STILL, YOU KNOW, HAVING SOME WAY TO FIGURE OUT EXACTLY WHAT'S

15   AT ISSUE HERE.

16         BECAUSE IF WE DON'T DO THIS, ALL OF A SUDDEN BEEF TALLOW

17   THAT'S IN LIKE A LITTLE CAN ON THE SHELF AND, YOU KNOW, SLIM JIM

18   STICKS AT THE CHECKOUT -- ALTHOUGH I HIGHLY DOUBT WHOLE FOODS

19   SELLS SLIM JIMS --

20         (LAUGHING.)

21         MR. ADAMS:  BUT YOU KNOW WHAT I MEAN.  IT'S LIKE WE –

22   WE'VE GOT TO FIND SOME WAY TO DO THIS.

23         AND WE'VE BEEN TRYING.  AND I HAVEN'T HEARD ANYTHING

24   FROM PLAINTIFF'S COUNSEL.  ALL THE -- ALL I HEAR IS GIVE US

25   EVERYTHING.

1          AND I DON'T KNOW WHAT  -- WHAT EVERYTHING IS.

2          AND, SO, WE'VE TRIED TO STRIKE THIS BALANCE BETWEEN

3    RELEVANCE AND BETWEEN BURDEN AND OVERBREADTH.  AND THIS IS

4    WHAT WE'VE DONE.

5          AND, YOU KNOW, WE CONDUCTED AN INVESTIGATION TO TRY TO

6    FIND OUT WHO THESE SUPPLIERS WERE.  AND WE FIGURED OUT WHAT

7    PRODUCTS THEY SOLD TO THE BEST OF OUR ABILITY.  AND THAT'S WHAT

8    WE PRODUCED.

9          IF YOU HAVE ANY SPECIFIC QUESTIONS ON THAT, I'M HAPPY TO

10   ANSWER THEM.

11         THE COURT:  WELL, I GUESS LET ME -- LET ME TURN TO THE

12   PLAINTIFFS FOR A MOMENT HERE.

13         I MEAN, YOU KNOW, IN THE COURT'S EXPERIENCE DEALING WITH

14   CLASS ACTIONS, TRYING TO FIGURE OUT WHAT ARE SUBSTANTIALLY

15   SIMILAR PRODUCTS FOR PURPOSES OF DISCOVERY IS OFTEN FACT

16   SPECIFIC.  AND IT MAY DEPEND ON THE KIND OF PROBLEM THAT THE

17   PLAINTIFF IS ALLEGING.  ARE THEY ALLEGING A DESIGN PROBLEM IN

18   WHICH CASE YOU'RE GOING TO LOOK AT THINGS THAT HAVE THE SAME

19   DESIGN FEATURES.

20          ARE THEY LOOKING AT THINGS THAT ARE ADVERTISED -- YOU

21   KNOW, NOT ONLY DO THEY HAVE A PARTICULAR FEATURE, BUT THAT

22   FEATURE IS ADVERTISED IN THE SAME WAY.

23         MAYBE THEY HAVE A -- A MANUFACTURING DEFECT THAT ARISES

24   BECAUSE A PARTICULAR FACTORY MAKING THE PARTICULAR PRODUCT

25   DID SOMETHING THAT THEY SHOULDN'T HAVE DONE.  AND IT AFFECTS

1    THINGS COMING OUT OF FACTORY A.  BUT IT DOESN'T AFFECT THINGS

2    COMING OUT OF FACTORY B.  THAT THE FACTORY ANALOGY SEEMS THE

3    MOST PERSUASIVE TO THE COURT IN TERMS OF HOW IS IT THAT

4    ANTIBIOTICS GET INTO BEEF WHEN THEY'RE NOT SUPPOSED TO -- THAT IT

5    WOULD HAVE TO DO WITH THE PROCESSES THAT ARE BEING

6    UNDERTAKEN BY THE SUPPLIER AND WHAT THEY ARE ADMINISTERING TO

7    THE CATTLE AND WHAT REPRESENTATIONS THEY ARE MAKING ABOUT

8    WHAT THEY HAVE AND HAVEN'T DONE.

9            AND, SO, YOU KNOW, IF – IF THE RELEVANT BEEF PRODUCTS

10   ARE LIMITED TO THOSE THAT THERE'S SOME EVIDENCE THAT ANTIBIOTICS

11   MAY BE FOUND IN SOME OF THEIR PRODUCTS, WHY ISN'T THAT THE

12   APPROPRIATE SCOPE OF DISCOVERY HERE?

13           MS. TOMASELLI:  YES, YOUR HONOR.  YOU RAISE A NUMBER OF

14   IMPORTANT POINTS.

15           FIRST OF ALL, THE PLAINTIFFS AND THE CONSUMERS, THEY

16   DON'T GO TO WHOLE FOODS TO BUY NECESSARILY FROM A SPECIFIC

17   SUPPLIER.  THEY GO TO WHOLE FOODS BECAUSE WHOLE FOODS MAKES A

18   UNIVERSAL PRODUCT  -- PROMISE THAT ALL MEAT HAS NO ANTIBIOTICS

19   EVER.  BUT NOT ONLY DO THEY MAKE THAT PROMISE, THEY ALSO

20   PROMISE THAT THEY VERIFY THAT IT'S NO ANTIBIOTICS EVER.

21           THEY SAY IF IT DOESN'T COMPLY WITH OUR STANDARDS, WE

22   WON'T SELL IT.  AND THEIR BASELINE STANDARDS ARE IN PARAGRAPH 41

23   OF OUR SECOND AMENDED COMPLAINT.

24           IT ALSO SAYS THAT IT'S TRACEABLE FROM THE FARM ALL THE

25   WAY TO THE SUPERMARKET.

1          AND, SO, WHOLE FOODS IS THE ONE WHO IS SUPPOSED TO BE

2    VERIFYING WHETHER OR NOT THEIR MEAT IT COMPLIES WITH THE

3    ANTIBIOTICS USE STANDARD.

4          IN THEIR ANSWER AT PARAGRAPH 32 OF THE ANSWER WHOLE

5    FOODS SAYS THAT THEIR UNDERSTANDINGS OF NO ANTIBIOTICS EVER IS

6    THAT IT'S NEVER USED IN THE PRODUCTION OF THE ANIMAL.

7          SO, IT'S REALLY NOT ABOUT A SINGLE PIECE OF MEAT TESTING

8    POSITIVE THAT MR. KHAGHANI PURCHASED IN SAN FRANCISCO.

9          AND WHEN YOU THINK ABOUT THE ENTIRE ANIMAL, YOU KNOW,

10   AND A COW, A 2,000 POUND COW IS CUT UP INTO DIFFERENT PIECES.

11         MR. KHAGHANI MIGHT PREFER A RIB EYE STEAK.  BUT OTHERS

12   MIGHT PREFER GROUND BEEF.

13         AND JUST BECAUSE HE DIDN'T BUY GROUND BEEF DOESN'T

14   MEAN THAT THAT PRODUCT IS NOT AT ISSUE IN THE CASE.

15         MOREOVER, WHOLE FOODS' PROMISE, IT APPLIES TO ALL MEAT

16   NOT JUST BEEF, RIGHT.  IT SAYS,  "ALL MEAT IN THE STORE" IN THE -- LIKE

17   WE TALKED ABOUT AT THE LAST HEARING  -- IN THE MEAT DEPARTMENT,

18   IN THE PREPARED FOODS SECTION AND WHOLE FOODS NAME BRAND

19   THESE PROMISES APPLY.

20         BUT WE DIDN'T FILE A LAWSUIT ON BEHALF OF ALL MEAT.  WE

21   LIMITED IT  -- WE'VE ALREADY LIMITED IT TO THE BEEF PRODUCTS.  AND

22   WE ALREADY AGREE TO LIMIT IT TO THOSE SECTIONS OF THE STORE FOR

23   DISCOVERY PURPOSES AS WE DISCUSSED LAST TIME.

24         SO, CUTTING IT UP INTO THESE TINY PRODUCTS DOESN'T

25   REALLY GET US WHAT WE'RE AFTER.  WE'RE NOT ASKING ABOUT A

1    SPECIFIC PRODUCT.

2           AND I -- I HONESTLY DON'T THINK THAT WHOLE FOODS DOES

3    CERTAIN TESTING FOR A RIB EYE BUT IT DOESN'T DO THAT SAME TESTING,

4    YOU KNOW, FOR A LOIN.

5           THE COURT:  WELL, AS I UNDERSTAND WHAT MR. ADAMS HAS

6    SAID, HE'S SAYING THEY'RE NOT MAKING THAT DISTINCTION.

7           IF THE SUPPLIER IS A SUPPLIER THAT THERE IS SOME EVIDENCE

8    TO THINK THAT THEY MIGHT HAVE BEEN USING ANTIBIOTICS, THEN,

9    WHETHER THEY SUPPLIED HAMBURGER OR WHETHER THEY SUPPLIED

10   STEAKS, THAT THEY'RE INCLUDED.

11          WHAT I UNDERSTAND THEM TO BE SAYING IS  -- YOU KNOW, SO

12   IMAGINE A CONSUMER WALKS INTO WHOLE FOODS AND THEY BUY A

13   STEAK AT THE MEAT COUNTER.  AND THE STEAK DOESN'T HAVE

14   ANTIBIOTICS IN IT.  HAS WHOLE FOODS INJURED THAT CONSUMER?

15          MS. TOMASELLI:  WELL, WHOLE -- THE COMPLAINT ISN'T JUST

16   ABOUT A PIECE OF MEAT CONTAINING ANTIBIOTICS.

17          FOR EXAMPLE, A FARMER CAN USE ANTIBIOTICS ON THE FARM.

18   AND FEDERAL LAW REQUIRES THAT BY THE TIME THAT MEAT GETS TO THE

19   STORE EVEN IN A REGULAR, YOU KNOW, PIECE OF MEAT, THERE'S NO

20   ANTIBIOTICS IN IT.  THERE CAN'T BE ANY RESIDUES.  THIS IS ABOUT USE

21   ON THE FARM.  AND THAT'S WHY THE FOOD I.D. TESTING IS SO CRITICAL

22   BECAUSE THAT WAS DONE AT THE SLAUGHTERHOUSE.  AND THAT'S NOT A

23   SINGLE SUPPLIER.  THAT'S A SLAUGHTERHOUSE WHERE YOU HAVE ALL

24   KINDS OF PRODUCERS FEEDING INTO THE SLAUGHTERHOUSE.  AND THEN

25   YOU HAVE A SIGNIFICANT PROBLEM WHERE 30 PERCENT OF THOSE

1    ANIMALS ARE TESTING POSITIVE FOR ANTIBIOTICS.

2        SO, THERE'S NO WAY TO KNOW -- FOR US TO KNOW EXACTLY

3    WHICH SUPPLIER IS GOING IN AND OUT OF THAT SLAUGHTERHOUSE, FOR

4    EXAMPLE.

5        THE COURT:  WELL, I GUESS -- AGAIN, I GUESS I COME BACK TO

6    MY QUESTION IS IF -- IF – IF SOMEONE IS PURCHASING BEEF, AND, IN FACT,

7    IT DOESN'T HAVE ANTIBIOTICS – IT HASN'T  -- IT'S NOT PART OF THE

8    SUPPLY CHAIN THAT HAS EVER BEEN USED WITH ANTIBIOTICS, IS THERE

9    SOME -- IS THERE SOME INJURY THERE?

10        MS. TOMASELLI:  WELL, THE INJURY IS BECAUSE THE CONSUMER

11    BELIEVES THAT WHOLE FOODS IS VERIFYING THAT PROMISE FOR THEM.

12    THEY'RE MAKING PROMISES OF VERIFICATION.  AND THEY'RE PAYING A

13    PRICE PREMIUM FOR THAT VERIFICATION FOR THOSE STANDARDS.

14        BUT WHOLE FOODS HAS ADMITTED THAT THEY'RE NOT –

15    THEY'RE NOT VERIFYING THAT PROMISE.

16        AND NOW THERE'S EVIDENCE THAT ALL OF THIS CONTAMINATED

17    PRODUCT IS TRICKLING INTO THEIR STORES.

18        SO, THE INJURY IS THAT THE PROMISE THAT THEY  -- THEY

19    ASSERTED ISN'T BEING SUBSTANTIATED.

20        THE COURT:  SO, I THINK WHAT I HEAR YOU SAYING IS THAT

21    BECAUSE THERE IS ONE OR TWO OR MAYBE MORE SUPPLIERS WHOSE

22    PRODUCTS HAVE TESTED POSITIVE FOR ANTIBIOTICS, AND BECAUSE

23    WHOLE FOODS DOESN'T' HAVE ITS OWN TESTING PROGRAM BUT RELIES

24    ON REPRESENTATIONS FROM THE SUPPLIERS, THAT YOU THINK THAT YOU

25    SHOULD GET DISCOVERY ON ALL THE SUPPLIERS AND TEST THEM

1   YOURSELVES.

2           MS. TOMASELLI:  WELL, WE'RE NOT ASKING FOR DISCOVERY

3   ABOUT SUPPLIERS.  WE'RE ASKING FOR DISCOVERY ABOUT WHOLE

4   FOODS PRACTICES  -- WHAT THEY DO TO VERIFY THEIR PROMISE, WHAT

5   AGREEMENTS THEY HAVE BETWEEN THEIR ENTITIES.

6           WE'RE NOT REALLY TRYING TO GET DOWN TO WHO EXACTLY

7   ARE YOUR SUPPLIERS.  AND THAT'S KIND OF WHERE THERE IS -- WE'RE

8   DIVERGING FROM WHAT DEFENDANTS ARE SAYING.

9           WE'RE TRYING TO GET ANSWERS TO THE DISCOVERY THAT WE

10  SERVED IN FEBRUARY ABOUT GENERAL THINGS ABOUT THEIR

11  ADVERTISING PRACTICES.

12          AND DEFENDANTS ARE KIND OF MAKING THIS ABOUT WELL, IT'S

13  ONE SUPPLIER --

14          THE COURT:  WELL  --

15          MS. TOMASELLI:   -- HERE AND ONE SUPPLIER THERE.

16          THE COURT:  IT'S NOT GENERAL THOUGH, RIGHT.  IT'S

17  ADVERTISING A SPECIFIC PRODUCT.  IT'S GIVE ME ALL YOUR ADVERTISING

18  ABOUT BEEF PRODUCTS.  SO, YOU'VE GOT TO FIGURE OUT WHAT THE

19  BEEF PRODUCTS ARE.

20          MS. TOMASELLI:  RIGHT.  BUT THE ADVERTISING IS  --

21  ADVERTISING IS UNIVERSAL TO ALL OF THE MEAT IN THE STORE.  THESE

22  ARE -- THESE ARE SPECIFIC STATEMENTS THAT APPLY TO ALL MEAT IN

23  THE STORE.

24           SPECIFICALLY ON THEIR WEBSITE THEY SAY,

25              "THESE PROMISES APPLY TO ALL MEAT IN THE MEAT

1    DEPARTMENT, IN THE PREPARED FOOD SECTION AND ALL OF WHOLE

2    FOODS BRAND MEAT."

3            AND I CAN POINT YOU TO THE COMPLAINT WHERE WE SAY THAT.

4    I BELIEVE IT'S AT PARAGRAPH 5 OR 6.

5            BUT THAT'S -- IT APPLIES TO EVERYTHING.  SO, WE'RE NOT

6    TALKING ABOUT, YOU KNOW, A LABELING CASE WHERE LIKE ONE

7    PRODUCER TYSON LABELS NO ANTIBIOTICS EVER.  AND THEN ANOTHER

8    ONE DOESN'T.  IT APPLIES TO EVERY SINGLE PIECE OF MEAT IN THEIR

9    STORE ACCORDING TO WHOLE FOODS.

10           THE COURT:  BUT I GUESS  -- AGAIN, I COME BACK TO THE

11    FACTORY ANALOGY.  AND IF, YOU KNOW, BMW ADVERTISES ITS CARS AND

12    SAYS, YOU KNOW, OUR TIRES HAVE GREAT QUALITY.  THEY'RE GOING TO

13    LAST FOR 20 YEARS.  AND IT TURNS OUT THAT ONE FACTORY IS

14    PRODUCING DEFECTIVE TIRES AND THREE OF THEM AREN'T.

15           THE DISCOVERY ABOUT THE FACTORY THAT'S PRODUCING THE

16    DEFECTIVE TIRES SEEMS ENTIRELY APPROPRIATE.  BUT -- BUT TO JUST

17    GO AND SAY WELL, WE DON'T  -- WE DON'T KNOW ABOUT THESE OTHER

18    FACTORIES.  AND THEN WE'VE GOT TO GET DISCOVERY FROM THEM AND

19    TEST IT SEEMS LIKE THAT WOULD BE BEYOND WHAT THE ALLEGATIONS IN

20    THE COMPLAINT REALLY PUT AT ISSUE.

21           AND, SO, HERE IF THE ISSUE IS YOU'RE SELLING MEAT THAT IS

22    CONTAMINATED WITH ANTIBIOTICS, AND I'M STRUGGLING WHY THE MEAT

23    PRODUCTS SHOULD – SHOULD THEN INCLUDE MEAT PRODUCTS FOR

24    WHICH THERE'S JUST NO EVIDENCE THAT THEY'VE EVER BEEN

25    CONTAMINATED WITH ANTIBIOTICS.

1          MS. TOMASELLI:  YOUR HONOR, THE  -- THE ALLEGATIONS GO

2     FAR BEYOND THAT.

3          WE ARE NOT ALLEGING THAT A  -- THAT MEAT CONTAINS

4     ANTIBIOTICS.  WE'RE ALLEGING THAT IT'S BEING USED --

5          THE COURT:  USED  --

6          MS. TOMASELLI:  -- IN THE PRODUCTION.  AND IT'S BEEN  --

7     THERE WAS WIDESPREAD TESTING DONE OVER A SIX-MONTH PERIOD AT A

8     SLAUGHTERHOUSE WHERE YOU HAVE MANY PRODUCERS COMING IN AND

9     OUT OF THE SLAUGHTERHOUSE.  AND 30 PERCENT OF THAT MEAT WAS

10    TESTING POSITIVE FOR ANTIBIOTICS.  AND THAT --

11         THE COURT:  AND DO YOU HAVE THOSE RESULTS?

12         MS. TOMASELLI:  YEAH  --

13         THE COURT:  AND DO YOU KNOW WHO THE SUPPLIERS ARE?

14         MS. TOMASELLI:  YEAH.  WELL  -- BUT I  -- BUT I  -- MAY I ASK YOU

15    A QUESTION, YOUR HONOR?

16         THE COURT:  YEAH.

17         MS. TOMASELLI:  I DON'T UNDERSTAND WHY THE SUPPLIER IS

18    RELEVANT IF WHOLE FOODS IS MAKING THE PROMISE.

19         THE COURT:  BECAUSE THE PROMISE  -- IT'S RELEVANT AS TO

20    WHETHER THE PROMISE IS ACCURATE OR NOT.

21         MS. TOMASELLI:  BUT WHOLE FOODS MAKES THE PROMISE THAT

22    THEY VERIFY.

23         SO, IF WHOLE FOODS IS SAYING THAT THEY'RE VERIFYING THEIR

24    PROMISE, ISN'T IT THEIR RESPONSIBILITY NOT THE SUPPLIER'S

25    RESPONSIBILITY.

1            I MEAN, IF WHOLE FOODS WANTS TO GO AND FILE A LAWSUIT

2    OR BRING IN A THIRD PARTY, THAT'S THEIR RESPONSIBILITY.

3            BUT THE PROMISE THAT CONSUMERS -- SO, CONSUMERS DON'T

4    WALK INTO THE STORE AND SAY, HEY, WHOLE FOODS, DID YOUR

5    SUPPLIER TYSON MAKE THIS PROMISE?  THEY SAY -- THEY HAVE HUGE

6    GRANDIOSE SIGNS THAT SAY "NO ANTIBIOTICS EVER."  THEY'RE TRUSTING

7    WHOLE FOODS – THE NAME BRAND WHOLE FOODS.

8            THE COURT:  WELL, I UNDERSTAND THAT'S WHO THEY'RE IN

9    PRIVITY WITH.  AND  --

10           MS. TOMASELLI:  YEAH.

11           THE COURT:  -- THAT'S WHO THEY'RE SUING.  BUT THEY'RE

12   SUING FOR AN INJURY.

13           AND ULTIMATELY THE PLAINTIFFS HERE ARE  -- ARE ALLEGING

14   THAT THERE'S AN INJURY.

15           I SEE MR. ADAMS KIND OF THINKING LIKE HE WANTS TO JUMP IN

16   HERE.  SO, I'LL LET YOU RESPOND.

17           MR. ADAMS:  YOU KNOW, I'M GOING TO GET OUT OF MY OWN

18   WAY.

19           (LAUGHTER.)

20           MR. ADAMS:  UNLESS – UNLESS YOU HAVE ANY FURTHER

21   QUESTIONS FOR ME.  I'M HAPPY TO RESPOND, BUT.

22           MS. TOMASELLI:  YOUR HONOR, MAY I SAY --

23           THE COURT:  GO AHEAD.

24           MS. TOMASELLI:  YEAH.

25           SO, IN PARAGRAPH 2 OF THE COMPLAINT, I JUST WANT TO

1    EXPLAIN THAT THIS IS WHAT PLAINTIFFS ARE ALLEGING.

2            THE COURT:  UH-HMM.

3            MS. TOMASELLI:  TESTING HAS SHOWN THAT WHOLE FOODS

4    BEEF SUPPLY CHAIN IS TAINTED BY CATTLE THAT WERE RAISED WITH

5    ANTIBIOTICS.

6            WHOLE FOODS HAS BEEN AWARE OF THIS FACT SINCE AT LEAST

7    2000- -- 2020.

8            UNRECEPTIVE TO TESTING THE SUPPLY CHAIN, WHOLE FOODS

9    KNOWINGLY AND INTENTIONALLY CONCEALED THAT ITS SUPPLY CHAIN

10   WAS TAINTED WHILE CONTINUING TO AFFIRMATIVELY MISREPRESENT ITS

11   BEEF PRODUCTS WERE NO ANTIBIOTICS EVER WHEN IT HAD NOT VERIFIED

12   THAT RAISED WITHOUT ANTIBIOTICS, IT'S RAISED WITHOUT ANTIBIOTICS

13   PROMISE.

14           SO, IT HAS KNOWN SINCE 2020 THAT IT'S GOT THIS HUGE

15   PROBLEM IN ITS SUPPLY CHAIN.  YET, IT'S STILL TO THIS DAY IF YOU WALK

16   INTO A WHOLE FOODS IS SAYING NO ANTIBIOTICS EVER FOR ANY OF ITS

17   MEAT.

18           THE COURT:  WELL, MAYBE THE PROBLEM THAT THE COURT IS

19   HAVING IS THAT THE MOTION WASN'T BROUGHT WITH RESPECT TO

20   PARTICULAR RFPS.  BECAUSE IT DOES SEEM TO ME THAT IF THERE'S AN

21   RFP THAT IS ASKING WHOLE FOODS -- SO, GENERALLY, HOW DO YOU GO

22   ABOUT VERIFYING THE PROMISES MADE BY YOUR MEAT SUPPLIERS.

23           THAT THAT MAY BE  -- THAT MAY BE A FAIR QUESTION.

24           BUT IT DOESN'T  -- THAT PARTICULAR SET OF QUESTION

25   DOESN'T NECESSARILY DEPEND ON THE DEFINITION OF BEEF PRODUCTS.

1    IF THERE'S SOMETHING THAT SAYS GIVE ME ALL YOUR RECEIPTS.  GIVE

2    ME ALL YOUR LABELING.  GIVE ME ALL -- YOU KNOW, THEN THAT -- THAT

3    BECOMES WHAT IS VERY IMPORTANT THEN TO FIGURE OUT WELL, WHAT

4    PRODUCTS ARE WE TALKING ABOUT HERE.

5           AND  -- AND, YOU KNOW, TO BE TALKING ABOUT PRODUCTS FOR

6    WHOM THERE IS NO EVIDENCE THAT – OTHER THAN THE FACT THAT SOME

7    OTHER PRODUCTS HAVE THIS FORM OF CONTAMINATION.  BUT NO

8    EVIDENCE THAT THE PRODUCTS THAT WERE, YOU KNOW, SORT OF

9    PRODUCED IN A DIFFERENT FACTORY SO TO SPEAK HAD THE SAME

10   PROBLEM.  THEN THAT -- THAT SEEMS MORE LIKE THAT'S GOING BEYOND

11   WHAT WOULD BE SUBSTANTIALLY SIMILAR.

12          MR. ADAMS:  MAY -- OH  --

13          THE COURT:  GO AHEAD, MR. ADAMS.

14          MR. ADAMS:  IF I MAY, THAT'S AN EXCELLENT POINT, YOUR

15   HONOR.  AND THAT'S WHAT I WAS GONG TO BRING UP IS THAT THERE

16   WERE GENERAL REQUESTS THAT SAID LIKE EXPLAIN – YOU KNOW,

17   PROVIDE DOCUMENTS REGARDING WHOLE FOODS VERIFICATION

18   PROCEDURES.  AND WE SAID YES, WE'LL PROVIDE THOSE.

19          AND THAT WASN'T LIMITED TO LIKE CERTAIN TYPES OF BEEF

20   PRODUCTS.  BECAUSE AS YOU SAID, THAT'S A GENERAL ISSUE.  AND IT'S

21   GOING TO GET A GENERAL RESPONSE.

22          HOWEVER, LIKE THIS IS ONE OF OUR MAIN PROBLEMS WITH THIS

23   MOTION IS WE DON'T KNOW WHAT THEY'RE TALKING ABOUT.  LIKE, YOU

24   KNOW, I HAVE A VAGUE IDEA BECAUSE THE FIRST MOTION TO COMPEL

25   THAT PLAINTIFFS BROUGHT ON THIS ISSUE DID INVOLVE CERTAIN

1     RESPONSES.  AND IT INVOLVED PRODUCT LABELS, VENDOR AGREEMENTS,

2     SALES DATA, COMPLAINTS ABOUT CERTAIN PRODUCTS AND WEBSITE

3     INFORMATION ABOUT CERTAIN PRODUCTS.

4              AND THAT'S BEEN KIND OF MY GUIDING STAR WHEN I'M

5     THINKING ABOUT THIS SECOND MOTION ON THE ISSUE.

6              AS TO THOSE CERTAIN DOCUMENTS, I THINK THEY ENTIRELY

7     SHOULD BE LIMITED TO THE SUPPLIERS IN QUESTION.

8              AND IF WE WERE -- HAD THE RFPS IN FRONT OF US, AND WE

9     COULD FIND ONE THAT DEALT WITH A MORE GENERAL ISSUE THAT, YOU

10    KNOW, MIGHT BE APPROPRIATE.  AND IT'S  --

11             SO, I THINK YOUR HONOR WAS CORRECT IN KIND OF

12    IDENTIFYING THE PROBLEM WITH THIS PARTICULAR MOTION IS THAT WE

13    DON'T KNOW WHAT'S AT ISSUE.

14             AND  -- BUT I DO STILL THINK THAT IT IS APPROPRIATE TO GET A

15    RULING ON AS TO THESE TYPES OF INFORMATION LIKE PRODUCT LABELS,

16    VENDOR AGREEMENTS, SALES DATA, COMPLAINTS AND WEBSITE

17    INFORMATION AS TO WHAT IS THE SCOPE OF BEEF PRODUCTS IN THIS

18    CASE.

19             MS. TOMASELLI:  YOUR HONOR, IF I MAY.

20             THE COURT:  UH-HMM.

21             MS. TOMASELLI:  IN AUGUST YOU COMPELLED DEFENDANTS TO

22    ANSWER RFPS 1 THROUGH 5.  WE STILL HAVE NOT RECEIVED RESPONSES.

23             WE HAVE RECEIVED 59 DOCUMENTS, 42 OF WHICH ARE

24    SNAPSHOTS FROM THEIR WEBSITE.  ONE OF WHICH IS, YOU KNOW, A FEW

25    PAGES OF COMPLAINTS FROM CONSUMERS.

1          THEY'RE AGREEMENTS BETWEEN WHOLE FOODS AND THE

2    SUPPLIERS THAT WHOLE FOODS HAS HAND PICKED AS RELEVANT TO THIS

3    CASE.  BUT THERE ARE  -- THE REQUESTS FOR PRODUCTION ACTUALLY

4    ASKED FOR AGREEMENTS BETWEEN WHOLE FOODS ENTITIES, OPERATING

5    AGREEMENTS, DISTRIBUTION AGREEMENTS.  AND WE HAVE RECEIVED

6    NONE OF THOSE.

7          SO, WE DID ASK SPECIFICALLY FOR DOCUMENTS THAT HAVE

8    NOTHING TO DO WITH SUPPLIER.  AND TO THIS DAY ALMOST A YEAR

9    AFTER WE SERVED THAT DISCOVERY WE STILL HAVEN'T RECEIVED IT.

10          SO, YOU KNOW, AND THAT -- THAT IS THE  -- THAT IS THE

11    PROBLEM HERE.  WE'RE GOING AROUND IN CIRCLES ABOUT THE SUPPLIER

12    AND, YOU KNOW, CUTTING UP BEEF AND DIFFERENT CUTS.  BUT WE

13    HAVEN'T GOT ANY INFORMATION THAT WE NEED TO BE ABLE TO HELP

14    INFORM THE COURT OR DEFENDANTS WHAT -- YOU KNOW, WHAT THE

15    TOTALITY OF PRODUCTS IS BECAUSE THEY WON'T PROVIDE US THESE

16    AGREEMENTS.  THEY WON'T PROVIDE US THIS DATA.

17          MR. ADAMS:  THAT'S NOT THE PROBLEM HERE BECAUSE THAT'S

18    NOT WHAT THEIR MOTION IS ABOUT.

19          THEY DON'T TALK ABOUT INNER COMPANY AGREEMENTS OR

20    ANYTHING.  THEY MOVED TO COMPEL ON THAT PREVIOUSLY.  AND WE

21    DIDN'T GET A RULING ON IT.

22          AND I DON'T THINK -- ACTUALLY CORRECT ME IF I'M WRONG,

23    YOUR HONOR, BUT I'M PRETTY SURE THAT THIS COURT RULED THAT WE

24    DIDN'T HAVE TO PRODUCE ANYTHING ELSE.

25          SO, I DON'T KNOW WHY THEY'RE BRINGING THAT UP ALL OF A

1    SUDDEN AS AN ISSUE.  IT'S NOT BRIEFED IN THEIR PAPERS.  AND THEY'VE

2    NEVER MENTIONED IT TO US ONCE SINCE THE TIME OF OUR LAST

3    HEARING.

4              SO, THAT'S KIND OF COMING OUT OF NOWHERE.

5              BUT I DO AGREE THAT WE PROBABLY NEED THE COURT TO

6    WEIGH IN ON THE SCOPE OF RELEVANT PRODUCTS.  BECAUSE IF NOT,

7    WE'RE JUST GOING TO KEEP FIGHTING ABOUT THIS BACK AND FORTH.

8              THE COURT:  ALL RIGHT.   WELL, AS I UNDERSTAND IT, THE

9    PLAINTIFFS ARE SAYING THAT THE SCOPE OF RELEVANT BEEF PRODUCTS

10   IS ANY MEAT SOLD AT THE MEAT COUNTER, ANY -- OR, I'M SORRY, ANY

11   BEEF PRODUCTS SOLD AT THE MEAT COUNTER, ANY BEEF PRODUCTS

12   SOLD IN THE PREPARED FOOD BAR, AND ANY BEEF PRODUCTS THAT ARE

13   SOLD UNDER THE WHOLE FOODS BRAND WHETHER THEY BE FRESH,

14   FROZEN OR – OR, AGAIN, SORT OF PRE-PREPARED IN THE DELI AREA  --

15   THAT THAT'S THE PLAINTIFF'S PROPOSAL.

16             MS. TOMASELLI:  CORRECT. THAT – THAT IS WHAT WE

17   DISCUSSED ABOUT LAST HEARING.  AND THAT IS WHAT IT SAYS ON THEIR

18   WEBSITE.  SO, THAT IS OUR PROPOSAL.

19             THE COURT:  ALL RIGHT.

20             AND  -- AND I UNDERSTAND THAT THE DEFENDANTS ARE

21   OBJECTING THAT THAT'S OVERBROAD BECAUSE  THERE IS NO FACTS

22   THAT WOULD SUGGEST THAT THOSE ARE SUBSTANTIALLY SIMILAR IN THE

23   WAYS THAT MATTER.

24              IN OTHER WORDS, THERE'S NO FACTS SUGGESTING THAT  --

25   THAT ALL OF THOSE THINGS COME FROM SUPPLIERS FOR WHOM THERE IS

1    SOME REASON TO THINK THAT THEY MIGHT BE TAINTED WITH

2    ANTIBIOTICS.

3        MR. ADAMS:  YES.  AND TO DO OUR POSITION A LITTLE MORE

4    CREDIT, WE ALSO INCLUDED THE PRODUCTS THAT PLAINTIFFS ALLEGE

5    THEY PURCHASED AND THE PRODUCTS BY -- FROM THOSE SUPPLIERS.

6        THERE'S NO INFORMATION SUGGESTING THAT MOST OF THE

7    PRODUCTS THAT PLAINTIFF KHAGHANI AND SAFARI PURCHASED

8    ACTUALLY HAVE ANTIBIOTICS.  BUT WE INCLUDED THEM ANYWAYS

9    BECAUSE THEY'RE RELEVANT BECAUSE THEY'RE THE ONES THAT THEY

10   PURCHASED.

11       SO, THIS IS AN OVER-INCLUSIVE DEFINITION WE PROVIDED.

12       THE COURT:  ALL RIGHT.

13       SO, HERE – HERE IS WHAT THE COURT IS GOING TO DO.

14       THE COURT'S RULING IS NOT -- IT DOESN'T APPLY TO

15   DISCOVERY THAT ISN'T ABOUT BEEF PRODUCTS AND USING THE TERM

16   BEEF PRODUCTS BECAUSE THAT'S WHAT THE COURT UNDERSTOOD THE

17   MOTION HERE TO BE ABOUT.

18       AND THE COURT IS GOING TO LIMIT FOR PURPOSES OF

19   RELEVANCY BEEF PRODUCTS TO THE DEFINITION THAT HAS BEEN

20   PROPOSED BY DEFENDANT WHICH INCLUDES THE EXPANSION TO THE

21   EXTENT THERE ARE ONE OR MORE NEW PLAINTIFFS THAT BECOME PART

22   OF THE LAWSUIT.

23       AS THE COURT HAS EXPLAINED, THE PRODUCTS ABOUT WHICH

24   PRODUCT SPECIFIC DISCOVERY IS CONDUCTED NEED TO BE

25   SUBSTANTIALLY SIMILAR TO THE PRODUCTS ALLEGED IN THE COMPLAINT

1    TO BE THE PRODUCTS THAT HAVE CAUSED THE INJURY.

2              AND I BELIEVE THAT THE PROPOSAL BY THE DEFENDANTS

3    ACCOMPLISHES THAT BETTER THAN THE PROPOSAL FROM THE

4    PLAINTIFFS WHICH WOULD INCLUDE, YOU KNOW, MANY -- MANY

5    THOUSANDS OF PRODUCTS THAT THERE'S SIMPLY NO REASON TO BE – TO

6    BE SUSPICIOUS OF AT THIS POINT.

7              SO, THAT WOULD BE THE COURT'S RULING THERE.

8              AND I BELIEVE THAT THAT ESSENTIALLY ADDRESSES THE

9    GEOGRAPHIC AND TIMING ARGUMENTS THAT WERE RAISED IN THE

10   MOTION.  BECAUSE, AGAIN, THOSE WERE REALLY JUST A FUNCTION OF

11   THE DEFENDANT APPLYING ITS UNDERSTANDING OF WHAT A

12   REASONABLE SCOPE FOR RELEVANCY WOULD BE.

13             IF – IF THERE ARE OTHER DISCOVERY ABOUT OTHER GENERAL

14   PRACTICES THEN -- THEN THIS DEFINITION OF BEEF PRODUCTS WOULDN'T

15   BE RELEVANT TO LIMITING WHAT THOSE ARE.

16             AND THE STANDARD RULES ABOUT IS IT RELEVANCE TO THE

17   CLAIMS AND THE DEFENSES IN THE LAWSUIT WOULD BE WHAT WOULD

18   CONTROL WHETHER THOSE KINDS OF DISCOVERY DEMANDS WOULD BE

19   RELEVANT.

20             SO, I WILL -- I WILL LEAVE IT AT THAT.

21             IF THERE'S OTHER RESPONSES THAT PLAINTIFF HAS RECEIVED

22   NOW THAT THEY GO BACK AND LOOK AT, AND THEY WANT TO MEET AND

23   CONFER AND POINT OUT SOME DEFICIENCY, WHETHER IT'S ABOUT

24   SUPPLY OR AGREEMENTS AND SO FORTH, THEY CAN CERTAINLY DO THAT.

25             BUT – BUT THOSE PARTICULAR ISSUES I DID NOT READ IN THE

1        PARTIES' PAPERS AS BEING PART OF THIS MOTION.

2              I AM RULING ON THIS MOTION CONSISTENT WITH THE WAY IT

3        WAS PRESENTED WHICH WAS REALLY A DISPUTE OVER THE DEFINITION

4        OF BEEF PRODUCTS.

5              MS. TOMASELLI:  YOUR HONOR, COULD I ASK FOR A COUPLE OF

6        POINTS OF CLARIFICATION.

7              THE COURT:  OF COURSE.

8              MS. TOMASELLI:  SO, FIRST OF ALL, BECAUSE THERE ARE TWO

9        PLAINTIFFS IN THE CASE NOW, IS IT YOUR POSITION THAT THE DEFINITION

10       OF BEEF PRODUCTS SHOULD BE EXPANDED TO ALL OF THE PRODUCTS

11       PURCHASED BY SAFARI AND THEN BOTH REGIONS, NORTHERN AND

12       SOUTHERN, AND THE ENTIRE TIME PERIOD?

13             THE COURT:  MR. ADAMS HAS ALREADY SAID THAT HE'S GOING

14       TO EXPAND IT.

15             AND, SO, AGAIN, IT'S  -- IT'S DRIVEN BY WHAT THE PLAINTIFFS

16       PURCHASED AND THE TEST RESULTS.  IT'S NOT DRIVEN BY THE

17       GEOGRAPHY OR THE TIME.

18             MS. TOMASELLI:  OKAY.

19             AND, SO, WOULD IT BE PERFECTLY ACCEPTABLE THEN FOR

20       PLAINTIFFS TO REQUEST A LIST OF ALL OF THE PRODUCTS THAT

21       DEFENDANTS -- ALL OF THE BEEF PRODUCTS THAT DEFENDANT SELLS SO

22       THAT IN THE FUTURE WE COULD MAKE FURTHER ARGUMENTS REGARDING

23       SUBSTANTIAL SIMILARITY?

24             FOR EXAMPLE, WE  -- THERE'S NO WAY FOR US TO KNOW

25       WHETHER OR NOT THEY'RE BEING TRUTHFUL ABOUT THE PRODUCTS

1       THAT THEY ARE PROVIDING TO US WITHOUT SEEING A LIST, A

2       COMPARISON OF THE OTHER PRODUCTS THAT ARE BEING LEFT OUT.

3               AND WE'RE NOT TALKING  -- JUST  -- JUST TO BE CLEAR, WE'RE

4       NOT TALKING ABOUT THE FROZEN MEATBALLS THAT YOU BUY IN THE

5       FROZEN SECTION OR IN THE CAN OF SOUP  --

6               THE COURT:  EVEN IF THEY'RE UNDER THE WHOLE FOODS LANE?

7               MS. TOMASELLI:  HUH?

8               THE COURT:  I MEAN, I UNDERSTOOD YOU WERE TALKING ABOUT

9       THOSE IF THEY WERE SOLD UNDER THE WHOLE FOODS –

10              MS. TOMASELLI:  NO  -- NO, YOUR HONOR.

11              THE COURT:   -- NAME.

12              MS. TOMASELLI:    NO, YOUR HONOR.

13              AT THE LAST  -- AT THE LAST HEARING WE TALKED SPECIFICALLY

14      ABOUT FRESH AND FROZEN MEAT FROM THE MEAT DEPARTMENT.  AND

15      WE TALKED ABOUT THE PREPARED FOOD SECTION.  AND THEN WE

16      TALKED ABOUT YES, IT INCLUDED ALL OF THE WHOLE FOODS NAME

17      BRAND STUFF.

18              WE'RE NOT TALKING ABOUT CANNED STUFF.  WE'RE NOT

19      TALKING ABOUT BEEF JERKY.  YOU KNOW, BACON BITS.  WHATEVER

20      THOSE THINGS.

21              WE JUST WANT TO KNOW ABOUT THE FRESH AND FROZEN MEAT

22      IN THE MEAT DEPARTMENT AND THE STUFF THAT THEY'RE SELLING THAT

23      YOU CANNOT IDENTIFY IN THE PREPARED FOODS SECTION.

24              THAT'S THE PROPOSAL THAT WE'VE BEEN MAKING TO THE

25      COURT AND THAT WE DISCUSSED AT THE LAST HEARING.

1              SO, I'M SORRY IF THAT WASN'T CLEAR TO YOU.

2              THE COURT:  WELL, I MEAN, WE JUST -- WE  JUST KIND OF WENT

3      OVER IT, THAT IT WAS EVERYTHING UNDER THE WHOLE FOODS BRAND.

4              AND I UNDERSTOOD THAT TO BE, YOU KNOW, FRESH, FROZEN,

5      OR ANYTHING ELSE UNDER THE WHOLE FOODS BRAND.

6              BUT -- BUT PUTTING THAT ASIDE, AGAIN, I DON'T THINK THAT THE

7      -- THE PLAINTIFF DISCOVERY IS TO LEARN INFORMATION THAT IS

8      RELEVANT TO THE CLAIMS.

9              AND, SO, I DON'T WANT TO SIT HERE AND, YOU KNOW, GUESS

10     WHETHER SOME DISCOVERY THAT HAS YET TO BE WRITTEN IS GOING TO

11     BE APPROPRIATE.

12             MS. TOMASELLI:  OKAY.

13             THE COURT:  BUT I'M GOING TO COMMEND IT TO COUNSEL'S

14     UNDERSTANDING GIVEN THE GUIDANCE THAT WAS GIVEN HERE TODAY

15     THAT -- THAT YOU NEED TO BE ABLE TO ARTICULATE WHY IT'S RELEVANT

16     TO THE CLAIMS AND DEFENSES IN THE LAWSUIT IN ORDER TO, YOU KNOW,

17     ENGAGE IN THE MEET AND CONFER WITH COUNSEL AS TO  - AS TO WHY IT

18     IS THAT YOU'RE ASKING FOR THAT INFORMATION.

19             MS. TOMASELLI:  OKAY.

20             AND THEN JUST ONE ADDITIONAL POINT OF CLARIFICATION.

21             AT THE -- AT THE LAST MOTION HEARING, YOU COMPELLED

22     RESPONSES TO INTERROGATORIES 1 AND 2.

23             WE RECEIVED THOSE RESPONSES.  WE STILL DON'T HAVE A

24     FULL LIST OF SUPPLIERS.  SO, WHAT WE KNOW IS WHO THEY'RE

25     INCLUDING IN BUT NOT WHO THEY'RE NOT INCLUDING.

1          WOULD YOU THEN SAY THAT WE NEED TO FILE A FURTHER

2   MOTION FOR THAT, OR?

3          THE COURT:  I WOULD SAY YOU NEED TO MEET AND CONFER.

4          AND THE COURT DOES OFFER THAT INFORMAL DISCOVERY

5   CONFERENCE PROCEDURE IF IT'S SOMETHING AS SIMPLE AS WE WANT A

6   FULL LIST OF THE SUPPLIERS.  OUR INTERROGATORY OR OUR  -- ASKED

7   FOR IT.  YOU'VE OBJECTED.  WE DON'T THINK YOUR OBJECTION IS VALID

8   ON RELEVANCY GROUNDS.

9          THAT SEEMS LIKE THE PERFECT KIND OF ISSUE THAT COULD BE

10   ADDRESSED IN TWO PAGES AND DONE TELEPHONICALLY.

11          SO, I'D EXPECT THE PARTIES TO BE ABLE TO AGREE ON

12   SOMETHING LIKE THAT AND NOT GO THROUGH THE WHOLE LOCAL RULE

13   37-1 PROCESS.

14          MS. TOMASELLI:  OKAY.  GOOD.  THANK YOU.

15          THE COURT:  SPEAKING OF PROCESS, THE WAY THAT THE

16   COURT TYPICALLY CONCLUDES THESE HEARINGS IS TO ENTER MINUTES

17   THAT SIMPLY SAY THAT THE COURT RULED AS STATED ON THE RECORD.

18          IF THERE IS ONE OR BOTH PARTIES WHO WOULD LIKE TO

19   PREPARE A PROPOSED ORDER AND SUBMIT IT TO THE COURT, YOU'RE

20   WELCOME TO DO THAT.  YOU'RE NOT REQUIRED TO DO THAT.

21          IF YOU  -- IF YOU DECIDE THAT YOU DO WANT TO DO IT, I ASK

22   THAT THE -- COUNSEL MEET AND CONFER BEFORE IT'S SUBMITTED TO THE

23   COURT SO I UNDERSTAND THAT EVERYONE AGREES THAT IT'S ACCURATE.

24   OR IF SOMEONE DISAGREES THAT IT'S ACCURATE, THAT THEIR

25   DISAGREEMENT IS NOTED IN SOME WAY, WHETHER IT BE RED LINED OR

1    WHETHER IT BE COMMENT OR SOMETHING SO THAT THE COURT CAN  --

2    CAN CONSIDER THAT AND VERIFY THAT IT'S ACCURATE AND COMPLIES

3    WITH WHAT THE COURT SAID AT THE HEARING AND ENTER IT.

4              AGAIN, SOMETIMES PROPOSED ORDERS ARE MAKE WORK.  AND

5    EVERYONE CAN JUST RELY ON THE TRANSCRIPT.  BUT SOMETIMES FOR

6    PURPOSES OF DISCUSSING THINGS WITH A CLIENT OR WHATNOT, THEY'RE

7    HELPFUL.

8              AND, SO, I LEAVE IT TO COUNSEL'S DISCRETION AS TO HOW

9    THEY WANT TO HANDLE THAT.

10             MR. ADAMS:  THANK YOU, YOUR HONOR.

11             THE COURT:  ALL RIGHT.

12             THANK YOU, COUNSEL.

13             MS. TOMASELLI:  THANK YOU, YOUR HONOR.

14             THE CLERK:  COURT IS NOW ADJOURNED.

15             (PROCEEDINGS ADJOURNED.)

16

17

18

19

20

21

22

23

24

25

TRANSCRIBER'S CERTIFICATE

DISCLAIMER

THE INTEGRITY OF THIS TRANSCRIPT MAY BE ADVERSELY AFFECTED

DUE TO MUFFLED AND UNCLEAR AUDIO TRANSMISSION.

I, Dorothy Babykin, attest that the foregoing proceedings provided to me electronically were transcribed by me to the best of my ability.


     /s/  *Dorothy Babykin*

Dorothy Babykin

Date: 12/7/2023