1  BRIAN R. BLACKMAN (SBN 196996)
   bblackman@blaxterlaw.com
2  J.T. WELLS BLAXTER (SBN 190222)
   wblaxter@blaxterlaw.com
3  DAVID P. ADAMS (SBN 312003)
   dadams@blaxterlaw.com
4  BLAXTER | BLACKMAN LLP
   601 Montgomery Street, Suite 1110
5  San Francisco, California 94111
   Telephone: (415) 500-7700
6

7  Attorneys for defendants WHOLE
   FOODSMARKET SERVICES,
8  INC., WHOLE FOODS
   MARKET CALIFORNIA, INC.,
9  and MRS. GOOCH'S NATURAL
   FOOD MARKETS, INC.

10

11            UNITED STATES DISTRICT COURT

12            CENTRAL DISTRICT OF CALIFORNIA

13  SARA SAFARI, PEYMON              Case No. 8:22-cv-01562-JWH (KESx)
    KHAGHANI, on behalf of themselves
14  and all others similarly situated, and   **DEFENDANT'S OPPOSITION
    FARM FORWARD, on behalf of the   TO PLAINTIFFS' MOTION TO
15  general public,                  CERTIFY CLASS, APPOINT
                                     CLASS REPRESENTATIVE,
16            Plaintiffs,            AND APPOINT CLASS
                                     COUNSEL**
17       v.
                                     Date:    May 6, 2025
18  WHOLE FOODS MARKET              Time:    10:00 AM
    SERVICES, INC., a Delaware       Place:   411 West Fourth Street
19  corporation, WHOLE FOODS                  Courtroom 9D, 9th Floor
    MARKET CALIFORNIA, INC., a                Santa Ana, California 92701
20  California corporation, MRS. GOOCH'S
    NATURAL FOOD MARKETS, INC.,     The Honorable John W. Holcomb
21  doing business as Whole Foods Market,
    a California Corporation,
22
              Defendants.
23

24

25

26       **[REDACTED VERSION PROPOSED TO BE FILED UNDER SEAL]**

27

28

# **TABLE OF CONTENTS**

Page

I.   INTRODUCTION ........................................................................................ 1

II.  FACTUAL BACKGROUND ..................................................................... 2

    A.   Defendants ...................................................................................... 2

    B.   WFM's Beef Supply Chain ............................................................ 2

    C.   WFM Quality Standards and Representations ................................ 3

    D.   WFM Meat Assurance Process ...................................................... 3

        1.   Meat Assurance Program. ..................................................... 4

        2.   GAP Certification. ................................................................ 4

        3.   ABF Testing. ......................................................................... 5

    E.   Plaintiffs and Their Purchases ....................................................... 5

    F.   Plaintiffs' Claims ........................................................................... 6

III. ARGUMENT .............................................................................................. 7

    A.   Legal Standards .............................................................................. 7

    B.   Common Issues Do Not Predominate ............................................ 8

        1.   Plaintiffs' Class Is Grossly Overbroad and Vaguely Defined. ............ 8

            a)   Plaintiffs' Propose Class Includes a Great Number of Uninjured Members .................................................................... 9

            b)   There Is No Objective Method to Ascertain Membership ......................................................................... 12

        2.   Individual Issues of Deception Predominate ...................... 12

        3.   Plaintiffs Fail to Provide a Reliable or Accurate Damage Model ................................................................... 15

            a)   Dr. Riddle's Damage Model Does Not Reliably Demonstrate Class-Wide Damages. ....................................... 16

                (1)   Dr. Riddle's "But-For" World Assumes Class Members Purchased Beef Raised With Antibiotics. ................................................ 16

                (2)   Dr. Riddle's Model Treats All Purchases the Same. ........................................................... 17

-i-

CASE NO. 8:22-cv-01562-JWH (KESx)                    OPPO. TO MTN. FOR CLASS CERT.

            (3)    Dr. Riddle's Damage Model Does Not Account
                   for Supplier's Independent Antibiotic Statements. ...... 17

        b)    Dr. Howlett's Price Premium Will Not Result in
              Economically Reliable Damage Calculations. ....................... 18

C.    A Class Proceeding Is Not Superior Because It Will Not Fairly or
      Efficiently Adjudicate the Dispute ................................................. 19

D.    Plaintiffs' Claims Are Not Typical ................................................. 20

E.    Neither Plaintiffs Nor Their Counsel Are Adequate ..................................... 22

      1.    Plaintiffs Are Inadequate Because They Were Recruited By
            Counsel and Show Little and Conflicting Knowledge of the
            Claims. ................................................................... 22

      2.    Counsels' Experience and History Demonstrate They are Not
            Adequate Representatives. ................................................. 23

F.    Plaintiffs Lack Standing to Seek Injunctive Relief Under Rule
      23(b)(2). ................................................................... 24

G.    The Court Plaintiffs Cannot Certify Their Class Under Rule 23(c)(4). ........ 25

IV.    CONCLUSION ................................................................... 25

1

# <u>TABLE OF AUTHORITIES</u>

2

# <u>FEDERAL CASES</u>

3

Page

4

*Astiana v. Ben & Jerry's Homemade, Inc.*
2014 WL 60097 (N.D. Cal. Jan. 7, 2014) ........................................................20

5

*Bodner v. Oreck Direct, LLC*
2007 WL 1223777 (N.D. Cal. Apr. 25, 2007) ................................................22

6

7

*Comcast Corp. v. Brehend*
569 U.S. 27 (2013) ...................................................................................... 7, 15

8

*DZ Rsrv. v. Meta Platforms, Inc.*
96 F.4th 1223 (9th Cir. 2024) .........................................................................23

9

*Ebner Fresh, Inc.*
838 F.3d 958 (9th Cir. 2016) ..........................................................................14

10

*Ellis v. Costco Wholesale Corp.*
657 F.3d 970 (9th Cir. 2011) ..................................................................... 7, 20

11

12

*Evon v. Law Office of Sidney Mickell*
688 F.3d 1015 (9th Cir. 2012) ........................................................................22

13

*Gen. Elec. Co. v. Joiner*
522 U.S. 136 (1997) ........................................................................................15

14

15

*Halliburton Co. v. Erica P. Johnson Fund, Inc.*
573 U.S. 258 (2014) ..........................................................................................7

16

*Hanan v. Dataproducts Corp.*
976 F.2d 497 (9th Cir. 1993) ..........................................................................21

17

18

*Hanlon v. Chrysler Corp.*
150 F.3d 1011 (9th Cir. 1998) ........................................................................23

19

*In re ConAgra Foods, Inc.*
90 F. Supp. 3d 919 (2015) ........................................................................24, 25

20

21

*In re Hyundai & Kia Fuel Econ. Litig.*
926 F.3d 539 (9th Cir. 2019) ..........................................................................20

22

*Just Film, Inc. v. Buono*
847 F.3d 1108 (9th Cir. 2017) ........................................................................15

23

24

*Kim v. Allison*
87 F.4th 994 (9th Cir. 2023) ...........................................................................23

25

*Lytle v. Nutramax Lab'ys, Inc.*
114 F.4th 1011 (9th Cir. 2024) .................................................................. 7, 15

26

27

*Moheb v. Nutramax Lab'ys, Inc.*
2012 WL 6951904 (C.D. Cal. Sept. 4, 2012) ................................................22

28

-iii-

CASE NO. 8:22-cv-01562-JWH (KESx)                    OPPO. TO MTN. FOR CLASS CERT.

*Moore v. Apple, Inc.*
309 F.R.D. 532 (N.D. Cal. 2015) ...................................................................... 9

*Moore v. Trader Joe's Co.*
4 F.4th 874 (9th Cir. 2021) ......................................................................... 14

*Nevarez v. Costco Wholesale Corp.*
2019 WL 7421960 (C.D. Cal. Dec. 26, 2019) .............................................. 6

*Olean Wholesale Grocery Cooperative, Inc. v. Bumble Bee Foods, LLC*
31 F.4th 651 (9th Cir. 2022)................................................................ 8, 9, 13

*Probe v. State Teachers' Ret. Sys.*
780 F.2d 776 (9th Cir. 1986) ..................................................................... 12

*Ries v. Ariz. Beverages USA LLC*
2013 WL 1287416 (N.D. Cal. Mar. 28, 2013) ............................................ 14

*Rutledge v. Elec. Hose & Rubber Co.*
511 F.2d 668 (9th Cir. 1975) ....................................................................... 7

*Shin v. Sanyo Foods Corp of America*
2025 WL 366116 (C.D. Cal. Jan. 29, 2025) ........................................ 13, 15

*Solis v. American Airlines, Inc.*
2022 WL 4359556 (Sep. 13, 2022) .............................................................. 9

*Stearns v. Select Comfort Retail Corp.*
2009 WL 1635931 (N.D. Cal. Jun. 5, 2009) .............................................. 13

*Stormans, Inc. v. Selecky*
586 F.3d 1109 (9th Cir. 2009) ....................................................................25

*Torres v. Mercer Canyons, Inc.*
835 F.3d 1125 (9th Cir. 2016) ..................................................................... 9

*Tyson Foods, Inc. v. Bouaphakeo*
577 U.S. 442 (2016) ..................................................................................... 8

*Vizcarra v. Unilever U.S., Inc.*
339 F.R.D. 530 (N.D. Cal. 2021) ....................................................7, 14, 15

*Wal-Mart Stores, Inc. v. Dukes*
564 U.S. 338 (2011) ..................................................................................... 7

*Warth v. Seldin*
422 U.S. 490 (1975) ..................................................................................... 9

*Zinser v. Accufix Research Institute, Inc.*
253 F.3d 1180 (2001) ...........................................................................20, 22

-iv-

1

## **RULES**

Page

Fed. R. Civ. P. 23 ................................................................................8, 20, 22

## **OTHER AUTHORITIES**

Page

Rubenstein, William
    Newberg on Class Actions § 4:50 (5th ed. 2012) ............................................ 8

2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## I.    INTRODUCTION

Plaintiffs Sara Safari ("Safari") and Peymon Khaghani ("Khaghani" and collectively "Plaintiffs") seek certification of a single vague class of all purchasers of "beef products" from Whole Foods Market ("WFM") in California between 2018 and the present under six separate claims for relief each premised on the allegation that WFM falsely markets its beef as "No Antibiotics, Ever" ("NAE"). Plaintiffs' motion suffers from many flaws, one of which stands above the rest: they present no evidence showing even one consumer purchased beef from WFM containing antibiotics. Instead, they rely on unsubstantiated allegations from their Second Amended Complaint ("SAC") that one beef product in San Francisco allegedly contained antibiotics and on testing of the national beef supply chain (none of it linked to WFM) indicating that 15-20% of cattle sold as antibiotic-free contained antibiotics. As a result, Plaintiffs fail the "rigorous" analysis required under Rule 23.

For example, Plaintiffs fail to establish that common issues predominate under Rule 23(b)(3) because the truth or falsity of WFM's NAE claim cannot be resolved by common proof. Any given piece of beef sold in WFM's meat departments during the class period is the product of one of hundreds of different supply chains. These supply chains are composed of different types of beef producers with their own policies and procedures ensuring compliance with WFM's NAE requirements. This is not a typical false advertising class action where the Court can simply determine that a product's undisputed ingredients were falsely advertised. Instead, Plaintiffs' evidence fails to establish even a single consumer (including Plaintiffs) was sold tainted beef, and Plaintiffs present no common form of proof by which class members can figure out if the beef in their particular supply chain was tainted without resorting to hundreds of individual inquests into each supply chain. Since Plaintiffs are unable to show common issues apply across any portion of their class, they are likewise unable to show they are typical of the class.

Another glaring dereliction is Plaintiffs' failure to put forward a damage

1  model that reliably calculates class-wide damages. Instead, they propose returning

2  the full "price premium" attributable to NAE marketing claims to every proposed

3  class member, regardless of whether that consumer's beef derived from cattle raised

4  with antibiotics or the supplier separately marketed the product as NAE. Plaintiffs'

5  model is also flawed because it fails to consider how consumers purchasing different

6  types of products at different times with different sets of information may value

7  WFM's NAE claims differently.

8                          **II.    FACTUAL BACKGROUND**

9  **A.    Defendants**

10      Defendants Whole Foods Market California, Inc. ("WFM California") and

11  Mrs. Gooch's Natural Food Markets, Inc. ("Mrs. Gooch's" and collectively with

12  WFM California and Whole Foods Market Services, Inc.[1] referred to as "WFM")

13  are grocery retailers. Declaration of Wes Rose ("Rose Decl."), ¶3. Mrs. Gooch's

14  owns and operates the retail stores in Southern California (generally the stores south

15  of Fresno), including Tustin and Woodland Hills. *Id.* WFM California owns or

16  operates the stores in Northern California, including the Rhode Island, Market

17  Street, and Cupertino stores. *Id.*

18  **B.    WFM's Beef Supply Chain**

19      Mrs. Gooch's and WFM California source beef for their meat departments

20  from different distribution channels. Rose Decl., ¶3. Mrs. Gooch's gets its beef from

21  a Distribution Center ("DC") in Vernon, California. *Id.* WFM California gets its

22  beef from a DC in Richmond, California. *Id.* During the alleged class period,

23  Vernon has not supplied any beef to the stores in Northern California and Richmond

24  has not supplied any beef to the stores in Southern California. *Id.* This is important

25  since Safari only claims to have purchased beef from stores in Southern California,

26  i.e., Mrs. Gooch's.  *See* ECF No. 221, ¶3.

27  ──────────────
[1] WFM Services works as the administrative arm of the WFM family of companies,
28  providing accounting, legal, and other administrative services to the WFM operating
   entities, including WFM California and Mrs. Gooch's.  Rose Decl., ¶1.

1    From August 23, 2018, to the present (the "Class Period"), the Vernon and

2    Richmond DCs have obtained beef from more than ten different suppliers (each a

3    "Beef Supplier"). Rose Decl., ¶7. Each Beef Supplier has a contract with WFM that

4    prohibits the supplier from providing WFM with beef sourced from cattle treated

5    with antibiotics. Rose Decl., ¶4 & Ex. 100. In general terms, the Beef Suppliers

6    source processed cattle from "Slaughter Facilities," who source cattle in a variety of

7    ways – such as from pasture finishers, backgrounders, or feed yards (collectively

8    "Finishers"). Rose Decl., ¶5. Each of these entities source cattle from different

9    ranchers and farmers across the country ("Farms" and collectively with Slaughter

10   Facilities, and Finishers referred to as "Background Producers"). *Id.* Each Beef

11   Supplier will have numerous Background Producers involved in their supply chains

12   that vary over time. *Id.*, ¶¶5-6. For example, in 2022 Country Natural Beef – who

13   supplied both WFM California and Mrs. Gooch's – ███████████████████████

14   ████████████████████████████    Rose Decl., ¶6 & Ex. 101.

15   **C.    WFM Quality Standards and Representations**

16   Quality standards have always been part of WFM's business. Declaration of

17   Brian Blackman ("BB Decl."), Ex. 103 at 4:26-5:2. WFM currently has several

18   different quality standards, including standards that apply to ingredients, sourcing,

19   meat, eggs, seafood, beauty and body care and supplements. *Id.* WFM's statement

20   of "no antibiotics, ever" is one of its quality standards for meat products. *Id.*

21   WFM banned all uses of antibiotics in its meat products in or about 2002. BB

22   Decl., Ex. 103 at 6:3-11. Sick and injured animals could still be treated with

23   antibiotics but, if treated, those animals could not be sold into WFM's meat supply

24   chain. *Id.* Around this time, WFM also began developing and implementing meat

25   standards for its suppliers that addressed, in part, animal-raising practices and

26   restrictions on antibiotic use. *Id.*

27   **D.    WFM Meat Assurance Process**

28   WFM goes beyond the regulatory requirements and industry norms to verify

-3-

its meat supply chain does not contain meat products raised with antibiotics. BB Decl., Ex. 103 at 5:9-14:17. WFM works with its Beef Suppliers to determine whether their meat products have been raised without antibiotics. *Id.* at 6:15-7:2. WFM representatives have visited Background Producers to observe the conditions and the animals and make sure they comply with WFM's standards. *Id.* WFM also enforces and verifies compliance through: 1) its vendor contracts; 2) meat quality assurance program; 3) GAP certification of Farms; and 4) ABF testing. *Id.* at 8:3-8. WFM's private-label meat products, including its 365 meat products, have additional requirements that include additional testing and facility visits. *Id.*

### 1.    Meat Assurance Program.

WFM's efforts to eliminate antibiotic use in its meat supply chain is process driven. BB Decl., Ex. 103 at 7:25-14:17. The process addresses, among other things, animal welfare, food safety and antibiotics. WFM's internal processes focus on its Beef Suppliers and Slaughter Facilities. *Id* at 8:9-11:5. Each goes through an onboarding, renewal and approval process called the Meat Quality Assurance Program in which WFM reviews and approves documentation relating to their raising practices, policies and procedures (including farm plans, management practices, USDA label packets and certification documentation), and discloses all Farms and Finishers in their supply chain. *Id.* at 9:11-12:5; Rose Decl., ¶6.

### 2.    GAP Certification.

WFM also requires third-party animal welfare certification under the Global Animal Partnership's ("GAP") 5-Step Animal Welfare Rating Program (the "GAP Program") for all meat products sold in its meat department. BB Decl., Ex. 103 at 7:10-23. GAP is a third-party standard setting animal welfare organization managed by its Board of Directors that includes representatives from animal welfare organizations, producers, retailers, science and academia. BB Decl., Ex. 107 at 182:9-13 & Ex. 108, at §4.2. GAP's beef cattle standards involve more than 100 welfare standards, including prohibition of antibiotics in meat products certified and

-4-

CASE NO. 8:22-cv-01562-JWH (KESx)                              OPPO. TO MTN. FOR CLASS CERT.

1  sold as GAP certified, and segregation of animals treated with antibiotics. BB Decl.,
2  Ex. 103 at 12:14-13:13. Farms also submit to animal welfare audits by third-party
3  certifiers every fifteen months. *Id.* at 7:10-23, 12:14-13:13.

4  ### 3.  ABF Testing.

5  WFM initiated a pilot testing program in 2020/2021 that tested beef urine
6  extracted during the slaughter process. BB Decl., Ex. 103 at 13:8-14:6. The pilot
7  program took samples from more than 250 cattle in WFM's supply chain and ran
8  them through a multi-step testing protocol. All samples proved negative for
9  antibiotics. *Id.* WFM implemented a permanent testing program in March 2023.
10 Declaration of Roxana Lien ("Lien Decl."), ¶2. To date, all samples have been
11 negative. *Id.*, ¶3; *see also* BB Decl., Ex. 104.

12 **E.  Plaintiffs and Their Purchases**

13 Plaintiff Safari lives in Tustin, California and has been a regular shopper at
14 the WFM store in Tustin and Woodland Hills for many years. ECF No. 221, ¶¶1, 3.
15 Plaintiff Khaghani currently lives in Cupertino but lived with Safari in Tustin for
16 several years. BB Decl., Ex. 106 at 11:5-12:3. He has shopped at the WFM stores in
17 Tustin, Irvine, San Francisco and Cupertino. ECF No. 220, ¶4. Both Plaintiffs
18 purchased beef products from the meat departments, refrigerated meat cases,
19 prepared foods section, pizza stations and deli in their respective WFM stores. ECF
20 No. 220, ¶3 & No. 221, ¶4. Both Plaintiffs made these purchases after reviewing
21 various in-store and online statements that said WFM's meats are "No Antibiotics,
22 Ever", GAP Certified and subject to quality standards. ECF No. 220, ¶¶6-8 & No.
23 221, ¶¶6, 9. Plaintiffs believed these statements meant the beef products were
24 "raised without antibiotics" and applied to every beef product, supplier, brand,
25 certification, department and section of WFM's stores and online marketplace. ECF
26 No. 220, ¶¶9-10 & No. 221, ¶¶6-7. Plaintiffs stopped purchasing beef products from
27 WFM in June or July 2022 after being told by their counsel that WFM's supply

28

1   chain was tainted with antibiotic. BB Decl., Ex. 105 at 46:11-48:17, 219:20-24 &

2   Ex. 106 at 32:14-36:23, 45:2-4.

3   **F.      Plaintiffs' Claims**

4          Plaintiffs wrongly claim that WFM's NAE, GAP certification and quality

5   standards statements are false and misleading because there is a "systemic antibiotic

6   use problem" in WFM's beef supply chain.[2] ECF No. 108, ¶¶1-3, 58-59, 70.

7   Plaintiffs submit two articles to demonstrate that WFM's NAE statements are

8   deceptive based on this supposed "systemic" use problem: 1) an April 2022 *Science*

9   article and supplemental materials (ECF No. 219-9) that discuss antibiotic residue

10  testing conducted by third-party Food In-Depth ("FoodID") at a slaughter facility in

11  Arkansas City, Kansas operated by Creekstone Farms Premium Beef, LLC

12  ("Creekstone") from February through August 2020; and 2) the August 2024 USDA

13  press release (ECF No. 219-10) stating that 20% of samples tested for antibiotic

14  residue from the raised without antibiotics ("RWA") market were positive.[3] *See*

15  ECF No. 223-1 at 10:7-12.

16         These articles do not demonstrate antibiotic use in WFM's beef supply chain

17  – systemic or otherwise – because none of the "evidence" is connected to WFM or

18  its supply chain. None of the beef from the cattle FoodID tested at Creekstone was

19  shipped to either the Vernon or Richmond DCs and none of it was shipped to WFM

20  in California. *See* BB Decl., Ex. 109, ¶¶2-6, Exs. A-B, Ex. 110, ¶¶2-6, Exs. C-E; *see*

21  *also* Rose Decl., ¶10. The USDA article does not state or imply that any of the

---

[2] Plaintiffs' damage model, however, only measures the impact of WFM's NAE statement.
*See* ECF No. 219-16, ¶17-18.  Thus, Plaintiffs have not put forth **any** evidence as to the
alleged impact of WFM's GAP Certified and quality standards statements independent of
WFM's NAE statements. *Id.*

[3] The SAC alleges testing was done in 2021 by Farm Forward. ECF No. 108, ¶¶63-64.
Plaintiffs, however, do not present any evidence to substantiate or establish this allegation.
"A party seeking to certify a class may not merely rest on his pleadings." *Nevarez v.
Costco Wholesale Corp.*, No. 2:19-cv-03454-SVW, 2019 WL 7421960, at *2 (C.D. Cal.
Dec. 26, 2019). Regardless, The SAC only alleges a single beef product from a WFM store
in San Francisco tested positive. *See* ECF No. 108, ¶64. This single alleged test does not
show a "systemic" problem in WFM's supply chain and does not show any antibiotic use
in Mrs. Gooch's supply chain (i.e., sales in Southern California including the Tustin and
Woodland Hills where Safari shopped [*see* ECF No. 221, ¶3]).

tested products were shipped to WFM. The USDA article also only says they tested beef from the RWA market. GAP is a subset of the RWA market and not referenced in the article. *See gen.* ECF No. 219-10. Thus, Plaintiffs have no evidence of antibiotics use in WFM's supply chain beyond the single result *alleged* in the SAC.

### III.    ARGUMENT

**A.    Legal Standards**

The class action is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011) (internal quotations omitted). Plaintiffs bear the heavy burden of affirmatively demonstrating all four requirements of Rule 23(a) and at least one of the grounds set forth in Rule 23(b). *Comcast Corp. v. Brehend*, 569 U.S. 27, 33 (2013) ("[A] party seeking to maintain a class action 'must affirmatively demonstrate his compliance' with Rule 23.") (citation omitted). Certification is proper only if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23 are satisfied. *Lytle v. Nutramax Lab'ys, Inc.*, 114 F.4th 1011, 1023 (9th Cir. 2024) (the court "must conduct a 'rigorous analysis' to determine if the prerequisites of [Rule] 23 have been satisfied.") (citation omitted).

Plaintiffs "must actually *prove*—not simply plead—that their class satisfies each requirement of Rule 23." *Halliburton Co. v. Erica P. Johnson Fund, Inc.*, 573 U.S. 258, 275 (2014); *see also Dukes*, 564 U.S. at 350 ("Rule 23 does not set forth a mere pleading standard."). The Rule 23 analysis "requires 'judging the persuasiveness of the evidence presented' for and against certification and 'resolving any factual disputes necessary to determine whether' the requirements of Rule 23 have been satisfied." *Vizcarra v. Unilever U.S., Inc.*, 339 F.R.D. 530, 539-40 (N.D. Cal. 2021), quoting *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982-82 (9th Cir. 2011). Plaintiffs' failure of proof on any one of the requirements of Rule 23 defeats class certification. *See Rutledge v. Elec. Hose & Rubber Co.*, 511 F.2d 668, 673 (9th Cir. 1975).

**B.     Common Issues Do Not Predominate**

Because Plaintiffs move for certification under Rule 23(b)(3), they must show that "questions of law or fact common to class members predominate over any questions affecting only individual members." *See* Fed. R. Civ. P. 23(b)(3). Predominance involves the "rigorous" and "careful scrutiny" of the common and individual issues in the case and "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016).

"An individual question is one where 'members of a proposed class will need to present evidence that varies from member to member,' while a common question is one where 'the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof.'" *Tyson Foods,* 577 U.S. at 453, quoting 2 W. Rubenstein, Newberg on Class Actions § 4:50 at 196-97 (5th ed. 2012). "This means that the court must make a 'rigorous assessment of the available evidence and the method or methods by which plaintiffs propose to use the [class-wide] evidence to prove' the common question in one stroke." *Olean Wholesale Grocery Cooperative, Inc. v. Bumble Bee Foods, LLC ("Olean")*, 31 F.4th 651, 666 (9th Cir. 2022). The "district court is in the best position to determine whether individualized questions, including those regarding class members' injury, 'will overwhelm common ones and render class certification inappropriate under Rule 23(b)(3).'" *Id.* at 669 (quoting citation omitted).

Plaintiffs fail to establish that common questions predominate for at least three reasons: 1) their class is grossly overbroad and vaguely defined; 2) they failed to present class-wide evidence of deception; and 3) Plaintiffs lack common proof of class-wide damages.

**1.     Plaintiffs' Class Is Grossly Overbroad and Vaguely Defined.**

Plaintiffs seek to certify a single class of "[a]ll persons who purchased any beef product from [WFM] in California from August 23, 2018 to the present." ECF

-8-

No. 223-1 at 8:10-19 & 12:17-20. The only criterion under this definition is whether class members purchased a "beef product" from WFM either in-store or online. *Id.* Plaintiffs' proposed class definition is overly broad and fatally vague.

> **a)    Plaintiffs' Propose Class Includes a Great Number of Uninjured Members.**

"As part of the predominance inquiry, courts 'must ensure that the class is not defined so broadly as to include a great number of members who for some reason could not have been harmed by the defendant's allegedly unlawful conduct.'"[4] *Solis v. American Airlines, Inc.*, No. 19-cv-10181-PSG, 2022 WL 4359556, at *8 (Sep. 13, 2022), quoting *Torres v. Mercer Canyons, Inc.*, 835 F.3d 1125, 1138 (9th Cir. 2016). "[A] court must consider whether the possible presence of uninjured class members means that the class definition is fatally overbroad." *Olean*, 31 F.4th at 669, fn.14. Indeed, "the inclusion of class members whom, by definition, could not have been injured is not only problematic because it demonstrates the overbreadth of the proposed class, it is also indicative of the individualized inquiries that would be necessary to determine whether a class member has suffered any injury in the first place." *Moore v. Apple, Inc.*, 309 F.R.D. 532, 542 (N.D. Cal. 2015). Plaintiffs' class is overly broad because the majority of class members, if not all (including Plaintiffs), have ***not*** suffered any injury.

All of Plaintiffs' claims center on two theories of deception. First, WFM's NAE statements, including the GAP certified and quality standards statements, promise consumers that their beef products were "raised without antibiotics." *See* ECF No. 223-1 at 20:27-21:1 ("The various [NAE] advertisements for [WFM] products all convey to a reasonable consumer the central message that [WFM's] beef is raised without antibiotics."); 23:4-6 (same); 26:12-13 (same); 28:18-21 (same); *see also* ECF No. 221, ¶10 ("I believed the [WFM] beef I purchased was

---

[4] Whether putative class members have been "harmed" (i.e., the fact or existence of an injury) is distinct from the separate element of damages that measures the extent or amount of the injury. *See Warth v. Seldin*, 422 U.S. 490, 515-16 (1975).

1  raised without antibiotics.") & No. 220, ¶¶9-10. Second, these NAE statements

2  promised consumers WFM takes "effective measures to ensure the accuracy of its

3  marketing promise." ECF No. 223-1 at 10:3-6, 17:19-22, 23:4-8, 28:18-22 & 31:8-

4  11 & No. 220, ¶9. Under both theories, Plaintiffs contend class members were

5  injured because they purchased beef products raised **with** antibiotics. *See* ECF No.

6  223-1 at 27:15-17, 28:18-23 & 31:9-11; *see also* ECF No. 221, ¶11 & No. 220, ¶13.

7        Plaintiffs rely on two news articles to show that WFM's beef supply chain

8  contains beef products allegedly raised with antibiotics: 1) the FoodID testing

9  detailed in the *Science* article (ECF No. 219-9) allegedly finding 26% of GAP cattle

10 tested at Creekstone were positive for antibiotic use;[5] and 2) the USDA press release

11 (ECF No. 219-10) stating that 20% of samples tested for antibiotic residue from the

12 RWA market in 2023 were positive. *See* ECF No. 223-1 at 10:7-12. These articles,

13 however, do not demonstrate class-wide injury.

14       *First*, there is no evidence tying any of the tested cattle to WFM or its beef

15 supply chain in California. Creekstone supplies beef to many different customers.

16 BB Decl., Ex. 111 [Schroeder Decl.], ¶4. ███████████████████████████

17 ████████████████████████ *Id.*, ¶¶23-26 & Ex. H. None of the beef from the

18 lots FoodID tested were shipped to WFM or their DCs. *See* BB Decl., Ex. 109, ¶¶2-

19 6, Exs. A & B, Ex. 110, ¶¶2-6, Exs. C-E, Ex. 112 at pp. 11-22 (Datasheet S2_Raw

20 Date); *see also* Rose Decl., ¶10.  As for the USDA article, it says nothing about

21

22 _____
   [5] The "26%" positive argued by Plaintiffs in their Motion is highly deceptive and
   misleading. Neither the *Science* article nor its Supplemental Materials makes any reference
23 to this percentage because the testing focused on Creekstone's Naturals program (i.e.,
   RWA cattle) – only a small subset of which were cattle in the GAP program. *See* BB
24 Decl., Ex. 112 at pp. 11-22 (Datasheet S2_Raw Date). Of that subset, FoodID tested 130
   head of cattle in lots designated GAP/Natural and found 19 positives. *Id.* That means only
25 14.6% [19/130 = .146] of the cattle in the GAP lots FoodID tested were positive. FoodID's
   numbers are also misleading because it did not test all the GAP lots processed at
26 Creekstone during the testing period. BB Decl., Ex. 111, ¶32 & Ex. I thereto. Moreover,
   the positive results only came from 3 out of 13 GAP producers, meaning 10 GAP
27 producers (70%) had no positive tests. *See* BB Decl., Ex. 112 at p. 2 (Table S2). Of those 3
   producers, one had one positive test out of 33 tests performed on its GAP lots. *Id.* at pp.11-
28 22. In short, FoodID's testing confirms antibiotic use must be analyzed producer by
   producer and lot by lot, if not head by head.

-10-

testing GAP cattle or whether any of the cattle it tested were part of WFM's supply chain. S*ee* ECF No. 219-10. WFM requires GAP certification – not simply an RWA designation. BB Decl., Ex. 103 at 7:25-8:8, 12:6-13:6. Thus, there is no basis in this article from which to connect the USDA testing to WFM.

*Second*, even if the FoodID or USDA testing were somehow tied to WFM's supply chain, the tests discussed in these articles are limited in scope and time. FoodID only tested cattle at Creekstone in 2020 and the USDA article does not say whose cattle it tested or when. *See* ECF No. 219-9 & 219-10. WFM's supply chain during the relevant period has changed over time and included numerous different producers and suppliers, each of whom have their own raising practices, policies and procedures. Rose Decl., ¶2, 10, Ex. 101; *see also, e.g.,* BB Decl., Ex. 111, ¶¶7-22 & Exs. F-G thereto. Further, Creekstone has not supplied any beef to WFM in California since early 2020. *Id.* Accordingly, there is no evidence of any antibiotic use in WFM's supply chain in 2018, 2019, 2022, 2024 or 2025, or by any GAP supplier or producer other than the 2 or 3 at Creekstone in 2020 that did not ship to WFM in California. Moreover, the FoodID and USDA tests show that between 80% and 85% of the tested cattle were raised **without** antibiotics. *See* ECF Nos. 219-9 & 2019-10.  Plaintiffs' own evidence, therefore, shows each class member's injury status varies based on time, product and supplier, and a great number of them—if not all—purchased beef products raised **without** antibiotics.

*Third,* as referenced above, Defendants' beef supply chain from 2018 to the present included numerous different Beef Suppliers and Background Producers, each of whom have their own practices, policies and procedures for raising or processing cattle. Rose Decl., ¶10, Ex. 101; *see also,* BB Decl., Ex. 111, ¶¶7-22 & Exs. F-G. Further, WFM's meat assurance reviews and approvals and GAP certifications would be different for each Beef Supplier and Farm based on their unique practices, policies and procedures. *See e.g.,* Rose Decl., ¶6 & Ex. 101; BB Decl., Ex. 103 at 7:25-1127.

-11-

CASE NO. 8:22-cv-01562-JWH (KESx)                OPPO. TO MTN. FOR CLASS CERT.

1    *Finally*, Plaintiffs have not presented any evidence or expert testimony that

2    shows the FoodID and/or USDA testing is representative of or can be extrapolated

3    out to all Beef Suppliers and Background Producers in WFM's beef supply chain

4    from 2018 to the present. Thus, determining who in the class is injured, and also if

5    the class contains a great number of uninjured members, requires individual

6    inquiries into: what beef product(s) each class member purchased; when they made

7    their purchases; who supplied the purchased products; who raised the cattle used in

8    those products; whether antibiotics were ever administered; what the antibiotic

9    practices, policies and procedures were for the given Beef Supplier or Background

10   Producer at the time; and whether WFM's verification processes were somehow

11   insufficient as to that specific Beef Supplier or Background Producer.

12           **b)      There Is No Objective Method to Ascertain Membership.**

13          District courts decline to certify classes when they are so vaguely defined that

14   there are no objective and verifiable criteria for determining membership. *See*

15   *Probe v. State Teachers' Ret. Sys.*, 780 F.2d 776, 780 (9th Cir. 1986) (recognizing

16   class must not be vaguely defined and must be "sufficiently definite to conform to

17   Rule 23"). Plaintiffs contend they have sufficiently defined their class by basing it

18   on objective criteria that allow potential class members to identify their membership

19   in the class. ECF No. 223-1 at 32:14-21. The primary objective criteria for

20   membership in this case turns on whether the consumer purchased a "beef product"

21   from WFM in California. *See* ECF No. 223-1 at 8:10-19, 12:17-20. Plaintiffs,

22   however, do not define "beef product." Does it mean the raw beef products in the

23   meat department or something else? Does it include products from the deli,

24   prepared foods, pizza station or branded products that have beef as an ingredient?

25   Thus, the class definition is vague, leaving consumers unsure as to whether their

26   purchases qualify as "beef products."

27           **2.      Individual Issues of Deception Predominate.**

28          "In order for the plaintiffs to carry their burden of proving that a common

-12-

question predominates, they must show that the common question relates to a central issue in the plaintiffs' claims." *Olean*, 31 F.4th at 664. "[T]o prove there is a common question of law or fact that relates to a central issue in [a case], plaintiffs must establish that essential elements of the cause of action … are capable of being established through a common body of evidence, applicable to the whole class." *Id.* Plaintiffs pursue a claim of literal falsity and deception on their statutory claims (CLRA, UCL and FAL). Their breach of warranty, unjust enrichment and intentional misrepresentation claims all require literal falsity. *See Shin v. Sanyo Foods Corp of America*, 23-cv-10485-SVW, 2025 WL 366116, at *7 (C.D. Cal. Jan. 29, 2025) (breach of express warranty under California law requires affirmation of fact or description of the goods and breach); *Stearns v. Select Comfort Retail Corp.*, No. 08-2746, 2009 WL 1635931, at *10 (N.D. Cal. Jun. 5, 2009) (intentional misrepresentation requires that "representation was false").

Common questions do not predominate because the central question to each of Plaintiffs' claims – whether WFM's NAE statements were false or misleading – is impossible to resolve through common proof. The truth or falsity of the NAE advertising – i.e., whether a particular beef product was "raised without antibiotics" and/or whether WFM's verification process was sufficient – will vary product by product and supplier by supplier, requiring individual inquiries to determine: 1) what each class member bought, when and where in order to determine the Beef Supplier and Background Producer(s) at issue for that product; 2) whether that supplier or producer used antibiotics in raising the animal; 3) what that supplier's and/or producer's animal raising policies, practices and procedures relating to antibiotics were at that time; and 4) whether WFM's assessment of that supplier or producer and its products and practices was sufficient. These individual inquiries will predominate across Plaintiffs' class and claims.

Rather than proffer common evidence of deception, Plaintiffs simply repeat the refrain that because the UCL, CLRA and FAL are "judged by objective

-13-

standards" they will be proven or disproven by common evidence.  *See* ECF No. 223-1 at 19:14-26, 21:19-22:21. This argument misses the mark for two reasons.

First, "contrary to what [Plaintiffs] suggest[], the fact that the question of likelihood of deception under the UCL and FAL is subject to the reasonable consumer standards does not necessarily mean that evidence is not required to establish the likelihood of deception." *Vizcarra*, 339 F.R.D. at 548 (denying certification); *see also Ries v. Ariz. Beverages USA LLC*, No. 10-cv-01139, 2013 WL 1287416, at *7 (N.D. Cal. Mar. 28, 2013) (decertifying class because plaintiffs failed to meet their "evidentiary burden" to prove reasonable consumers would be deceived). Plaintiffs' conclusory argument that they can simply rely on the "objectively reasonable consumer" to obtain certification ignores the actual standard: "the reasonable consumer standard requires a probability that a significant portion of the general consuming public or of targeted consumers, acting reasonably under the circumstances, could be misled." *Moore v. Trader Joe's Co.*, 4 F.4th 874, 882 (9th Cir. 2021), citing *Ebner Fresh, Inc.*, 838 F.3d 958, 965 (9th Cir. 2016). Plaintiffs make no showing that a "significant portion" of consumers would find WFM's NAE statements false or misleading, nor could they given the complete lack of any evidence that WFM's beef supply chain or specific beef products were actually raised with antibiotics or contained antibiotic residue.

Second, Plaintiffs' reliance on their expert Silverman (to establish that the NAE statements are important and believable to consumers and the statements convey the "central message that [WFM's] beef is raised without antibiotics") does not demonstrate that the NAE statements are actually false or misleading. *See* ECF No. 223-1 at 20:17-21:4, 22:24-23:8. Indeed, Silverman bases this opinion on the ***assumption*** that consumers purchased beef tainted by antibiotics. *See* ECF No. 223-7, ¶6(d), ¶38. Thus, Silverman's opinions are not capable of answering the question of whether a reasonable consumer would find the NAE statements deceptive because there is no evidence to support his foundational assumption about the

-14-

1  presence of antibiotics in WFM's beef supply chain. *See Gen. Elec. Co. v. Joiner*,

2  522 U.S. 136, 146 (1997) (expert opinion afforded no weight when connected to

3  underlying data "only by the *ipse dixit* of the expert").

4      WFM is not arguing that Plaintiffs have failed to prove the likelihood of

5  deception. Rather, WFM contends that Plaintiffs failed to put forth any common

6  evidence that is ***capable*** of answering that question on a class-wide basis.  *See*

7  *Vizcarra*, 339 F.R.D. at 552 (predominance not shown based on "finding that

8  [plaintiff] has failed to point to common proof that is capable of answering

9  [likelihood of deception or materiality] questions on a classwide basis.").

10      **3.     Plaintiffs Fail to Provide a Reliable or Accurate Damage Model.**

11      "To satisfy [the predominance] requirement, plaintiffs must [also] show that

12  'damages are capable of measurement on a classwide basis,' in the sense that the

13  whole class suffered damages traceable to the same injurious course of conduct

14  underlying the plaintiffs' legal theory.'" *Just Film, Inc. v. Buono*, 847 F.3d 1108,

15  1120 (9th Cir. 2017), quoting *Comcast,* 569 U.S. at 34. Plaintiffs "may rely on a

16  ***reliable*** though not-yet-executed damages model to demonstrate that damages are

17  susceptible to common proof ***so long as*** the district court finds that the model is

18  ***reliable*** and, if applied to the proposed class, will be able to calculate damages in a

19  manner common to the class at trial." *Lytle*, 114 F.4th at 1019 (emphasis added).

20      Plaintiffs propose to calculate class-wide damages through a two-step price

21  premium analysis.[6] First, Plaintiffs' expert, Dr. Howlett will use a choice-based

22  conjoint ("CBC") analysis to measure the value (in the form of a percentage)

23  consumers place on WFM's beef products marketed as NAE. *See* ECF No. 219-16,

24  ¶¶17-20. Retained expert, Dr. Riddle will then take that percentage and apply it to

25  prices or expenditures to calculate his estimate of damages. *See* ECF No. 237-1,

26

27  [6] Misrepresentation "'damages are ordinarily measured by the difference between the value parted with and the actual value received.'" *Shin*, 2025 WL 366116, at *5 (quoting citation omitted). "For warranty claims, damages are traditionally 'the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted.'" *Id.* (citation omitted),

28

¶¶24-25, 28-31. This damage model fails because it neither reliably nor accurately calculates damages attributable to Plaintiffs' theory (i.e., restitution or actual damage) on a class-wide basis.

### a)    Dr. Riddle's Damage Model Does Not Reliably Demonstrate Class-Wide Damages.

Dr. Riddle's proposed damage model does not reliably demonstrate class-wide damage because his method will consistently result in incorrect and overstated damages for many class members, including those members who suffered no injury or damage, for three reasons: 1) his "but for world" assumes all class members purchased beef products raised with antibiotics (which they did not); 2) his model treats all beef products the same (which they are not); and 3) his model fails to account for the impact of any individual supplier's antibiotic statements.  BB Decl., Ex. 114, ¶¶45-48, 63-81. Dr. Riddle's model separately fails because he relies on Dr. Howlett providing a statistically reliable and economically meaningful price premium percentage (which she does not). *Id.*, ¶¶48, 82-124.

### (1)    Dr. Riddle's "But-For" World Assumes Class Members Purchased Beef Raised With Antibiotics.

Dr. Riddle's bases his damage model on "but for prices" that he will calculate using the price premium percentage provided to him through Dr. Howlett's CBC analysis. *See* ECF No. 237-1, ¶¶30-31. In calculating his "but for prices," Dr. Riddle defines his "but for world" as one where consumers knew they were purchasing beef products raised with antibiotics. *See* BB Decl., Ex. 114, ¶63-66, 69. This, he contends, allows him to calculate damages across the class by simply subtracting the calculated "but for prices" (i.e., prices or expenditures for beef products raised with antibiotics) from what customers actually paid for their beef products at WFM (i.e., beef products raised without antibiotics). ECF No. 237-1, ¶31.

This damage model is unreliable, inaccurate and will systematically overstate damages because, as detailed in Section III.B.1(a) above, the majority of class

-16-

1  members actually purchased beef products raised without antibiotics. Plaintiffs' own

2  evidence demonstrates that 80% to 85% of beef in the tested markets were raised

3  without antibiotics and they have provided no evidence to show Mrs. Gooch's stores

4  ever received beef raised with antibiotics. *See* ECF No. 219-9 & 219-10. Dr.

5  Riddle's damages model does not account for, identify or exclude consumer

6  purchased products raised without antibiotics. He simply proceeds as though they

7  purchased beef products raised *with* antibiotics so he can apply his damage model

8  across the entire class.

9  **(2)  Dr. Riddle's Model Treats All Purchases the Same.**

10  Dr. Riddle's model is also unreliable and inaccurate because it treats all beef

11  purchases the same. Plaintiffs' damages calculation would be the same whether

12  100%, 1% or a single beef product sold by WFM tested positive. BB Decl., Ex. 114,

13  ¶¶53-55. The model does not depend on when a product tested positive. For

14  example, if a single product tested positive in 2020, then the price premium would

15  apply to all purchases before and after the positive result. *Id.*, ¶56. It does not

16  differentiate between where the beef products were sold (despite a complete lack of

17  evidence showing defendant Mrs. Gooch's ever sold any tainted beef). *Id*., ¶57. It

18  does not matter if the consumer knew of Plaintiffs' allegations or alleged testing

19  results but purchased beef from WFM anyway. *Id.*, ¶62. It also does not depend on

20  who supplied or produced the beef. If one supplier's beef tested positive, then the

21  proposed premium would apply to every supplier of beef to WFM regardless of

22  whether they ever used antibiotics in their raising practices. *Id.*, ¶60. Thus,

23  Plaintiffs' damage model is unreliable because it conflicts with Dr. Riddle's "but for

24  world" and attributes damages to millions of sales of antibiotic-free beef products.

25  **(3)  Dr. Riddle's Damage Model Does Not Account for**

26  **Supplier's Independent Antibiotic Statements.**

27  Plaintiffs define their class as all "beef products" sold by WFM in California,

28  which includes a variety of third-party branded, packaged and labeled beef products

-17-

such as ground beef or beef hot dogs. Many of these third-party suppliers make their own statements about the raising conditions and lack of antibiotic use on their product packaging and labels and their websites, including the statement "No Antibiotics Ever." BB Decl., Ex. 114, ¶¶72-74. These statements, packaging and product labels are not at issue in this litigation and will continue to exist in the marketplace regardless of the outcome here. These third-party statements, however, contribute to the consumer's understanding of antibiotic use in the products they purchase. *Id.*, ¶71. WFM's NAE statements are incremental to what the product suppliers are already saying about their beef products. *Id.*, ¶¶75-76. Dr. Riddle's damage model, however, calculates a price premium that includes both WFM's and the suppliers' antibiotic statements. *Id.*, ¶¶76-78. Thus, the proposed damages model is unreliable and inaccurate because it systematically overstates damages by including those portions of any price premium attributable to suppliers' antibiotic statements. *Id*, ¶¶79-81.

> **b)      Dr. Howlett's Price Premium Will Not Result in Economically Reliable Damage Calculations.**

Dr. Howlett has said very little about what she will actually do to determine the price premium associated with WFM's NAE marketing statements and admits one may not even exist. BB Decl., Ex. 116 at 32:2-21. While she generally describes the steps used in a CBC analysis, she will not know the precise information and inputs until she actually performs *her* analysis. ECF No. 219-16 at ¶¶33-36. Plaintiffs contend Dr. Howlett's general description is sufficient for class certification because CBC analyses are "commonly used" and the price premium theory "readily acceptable" in consumer fraud cases. *See* ECF No. 223-1 at 27:15-28:2. This, however, does not show they can be reliably used in this case.

Dr. Howlett's proposed CBC analysis will attempt to measure the price of beef products sold with the NAE attribute versus the price of beef products sold without the NAE attribute. *See* ECF No. 219-16, ¶33; BB Decl., Ex. 116 at 48:7-13

-18-

& Ex. 114, ¶¶82-83. The resulting price premium estimate is foundational to Dr.
Riddle's faulty damage model. ECF No. 237-1, ¶7. As such, Dr. Howlett's price
premium estimate will result in overstated and incorrect damages when applied
class-wide for the same reasons discussed in Section III.B.3(a) above. BB Decl., Ex.
114, ¶¶83-84.

Dr. Howlett's price premium estimate is separately unreliable for two
additional reasons. First, her proposed CBC analysis only estimates a single price
premium that she claims will apply across all types and varieties of beef products.
BB Decl., Ex. 116 at 48:7-49:19 & Ex. 114, ¶86. Economic research and Plaintiffs'
own expert disagree. BB Decl., Ex. 114, ¶¶87-88. Dr. Riddle testified it is entirely
possible that multiple price premiums would exist across the variety of products at
issue in this case. BB Decl., Ex. 115 at 116:23-117:10, 122:23-123:8. Economic
research independently shows that a price premium for product attributes like NAE
vary according to market conditions like product type and time.  BB. Decl., Ex. 114,
¶¶87-103. The price premium for raw beef products that are 100% beef should not
be the same as the premium for prepared food products or processed meat products
where beef is only one of many ingredients. *Id*., ¶¶90-92.

Second, Dr. Howlett's price premium estimate is unreliable because her
proposed CBC analysis only considers consumer demand factors without any
consideration of supply side factors. BB Decl., Ex. 114, ¶¶104-124. Although both
Drs. Howlett and Riddle acknowledge the supply side, neither of them actually
factors any supply side considerations into their analyses. *Id.*, ¶¶117, 116-121. This
is contrary to fundamental economic principles for determining market prices and
renders Plaintiffs' damage model unreliable. *Id.*, ¶¶108-114, 123-124.

## C.   A Class Proceeding Is Not Superior Because It Will Not Fairly or Efficiently Adjudicate the Dispute

Plaintiffs have not shown "that a class action is superior to other available
methods for fairly and efficiently adjudicating the controversy," Fed. R. Civ. P.

-19-

23(b)(3), because they fail to "demonstrat[e] a suitable and realistic plan for trial of the class claims" and do not explain how this case would not require mini-trials for each of the tens of thousands of consumers to determine each of individualized Beef Supplier and/or Background Producer and WFM's verification process inquiries detailed above. *See Zinser v. Accufix Research Institute, Inc.*, 253 F.3d 1180, 1189 (2001) ("If each class member has to litigate numerous and substantial separate issues to establish his or her right to recover individually a class action is not superior."); *see also In re Hyundai & Kia Fuel Econ. Litig.*, 926 F.3d 539, 556 (9th Cir. 2019) ("[A] district court must be concerned with manageability at trial.").

## D.     Plaintiffs' Claims Are Not Typical

The class representatives' claims and defenses must be typical of those of the class. Fed. R. Civ. P. 23(a)(3). "[R]epresentative claims are 'typical' if they are reasonably co-extensive with those of absent class members"—that is, "they need not be substantially identical." *Astiana v. Ben & Jerry's Homemade, Inc.*, No. 10-cv-4387 PJH, 2014 WL 60097, at *7 (N.D. Cal. Jan. 7, 2014). Class-wide exposure to the same advertising statements alone, however, "is not sufficient to establish that plaintiff's claims of having been deceived are typical of the claims of the class[.]" *Ibid.* Instead, "[t]he test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Ellis*, 657 F.3d at 984. A proposed representative fails to satisfy Rule 23(a)(3) if his or her "unique background and factual situation imposes atypical defense preparations on the named plaintiff...." *Id.*

Neither Safari nor Khaghani's claims are typical of the proposed class because the beef products they purchased, when and where they made those purchases, who supplied the beef in those purchases, and the raising practices of those suppliers will differ from those of the proposed class in material ways affecting both liability and damages. Safari and Khaghani allege they purchased a

discrete set of beef products (ground beef, steak meat balls, roast beef sandwiches, etc.) from specific stores in Northern and Southern California during a specific time period (2010-June 2020). ECF No. 220, ¶3 & No. 221, ¶3. By contrast, Plaintiffs' proposed class is an amalgamation of *all* purchases of *all* beef products during *all* times in the class period at *all* California stores. ECF No. 223-1 at 8:10-11. These differences make Plaintiffs' claims atypical of their class in several important ways.

**Supply Chain.** The supply chain for beef products purchased at WFM during the class period is composed of many different combinations of Beef Suppliers and Background Producers. The issues affecting liability for each particular product (such as testing, verification, etc.) will be different for each supply chain. Thus, Plaintiffs' claims will depend on a-typical sets of evidence and theories of liability specific to the supply chains of the products they purchased.

**Evolving Consumer Understanding Over Time.** Plaintiffs made the majority of their purchases before the publication of the *Science* article and the commencement of this action, each of which introduced information into the marketplace that may have changed consumer perception. BB Decl., Ex. 114, ¶¶101-103. Further, purchasers in 2020/2021 and after March 2023 were made when WFM was testing for antibiotics in its supply chain, distinguishing them from Plaintiffs. BB Decl., Ex. 103 at 13:8-14:17; Ex. 104; *see also* Lien Decl., ¶¶2-3.

**Geographic Location and Standing.** Safari only purchased beef products in Southern California. ECF No. 221, ¶3. Those stores are owned by Mrs. Gooch's and have a different supply chain from the stores in Northern California. Rose Decl., ¶¶2-3. There is no evidence of any antibiotic use in the supply chain serving Mrs. Gooch's stores. Thus, Safari has suffered no injury and will be subject to unique standing defenses. *See Hanan v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1993) ("[C]lass certification is inappropriate where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation.").

-21-

CASE NO. 8:22-cv-01562-JWH (KESx)                    OPPO. TO MTN. FOR CLASS CERT.

In fact, there is no evidence here that Khaghani purchased beef products raised with antibiotics so he too would lack standing and be subject to unique defenses.

**E.    Neither Plaintiffs Nor Their Counsel Are Adequate**

Plaintiff's Motion should be denied because Plaintiffs have not, as they must, satisfied Rule 23(a)(4), which requires they demonstrate that they and their counsel "will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). Adequacy is not presumed. Rather, Plaintiff must establish that the requirement has been satisfied. *Zinser*, 253 F.3d at 1186. This means demonstrating that "the named plaintiffs and their counsel will prosecute the action vigorously on behalf of the class…." *Evon v. Law Office of Sidney Mickell*, 688 F.3d 1015, 1031 (9th Cir. 2012).

**1.    Plaintiffs Are Inadequate Because They Were Recruited By Counsel and Show Little and Conflicting Knowledge of the Claims.**

Certification of an attorney-driven class action is improper. *See, e.g., Bodner v. Oreck Direct, LLC*, 2007 WL 1223777, *3 (N.D. Cal. Apr. 25, 2007) (denying class certification where counsel admitted he researched the claim at issue then went in search of a plaintiff, holding "[t]o grant class certification in such circumstances would be to place this court's imprimatur on litigation practices which it finds abhorrent and inconsistent with the standards of federal class action suits"); *see also Moheb v. Nutramax Lab'ys, Inc.*, 2012 WL 6951904, at *5 (C.D. Cal. Sept. 4, 2012) (denying certification, finding adequacy not met where counsel had been researching the possibility of a class action prior to plaintiff becoming a client).

Here, both Plaintiffs knew their attorney, Dylan Grimes (through his service on the Board of their charity), who recruited them to act as plaintiffs by introducing them to his co-counsel, Gretchen Elsner. BB Decl., Ex. 105 at 44:20-53:9 & Ex. 106 at 32:12-39:16. Plaintiffs' counsel had already developed the claims and then provided Plaintiffs cherry-picked evidence to convince them WFM's statements were deceptive. *Ibid*. Plaintiffs' belief that WFM's NAE statements are false is

-22-

based on the material provided by counsel. *Ibid.* As a result, Plaintiffs were each surprised to hear that their counsel only has a single alleged positive test result of a beef product purchased from WFM. BB Decl., Ex. 105 at 170:8-17 & Ex. 106 at 193:7-16. This action is plainly driven by Plaintiffs' attorneys, and Plaintiffs are themselves not adequate representatives of the class.

### 2.    Counsels' Experience and History Demonstrate They are Not Adequate Representatives.

"Although there are no fixed standards by which 'vigor' can be assayed [for purposes of assessing the adequacy of class counsel under Rule 23(a)(4)], considerations include competency of counsel..." *Kim v. Allison*, 87 F.4th 994, 1002 (9th Cir. 2023), quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1021 (9th Cir. 1998), overruled on other grounds as stated in *DZ Rsrv. v. Meta Platforms, Inc.*, 96 F.4th 1223, 1238 (9th Cir. 2024). The Court must scrutinize the qualifications of counsel to assure that the interests of absent class members will be adequately represented. *Hanlon,* 150 F.3d at 1021.

Robbins Geller has the most experience of Plaintiffs' counsel but came late to this case after several sets of proposed class counsel have withdrawn from representation. *See, e.g.,* ECF No. 28 & 140. Thus, they have done little to no work in identifying and investigating Plaintiffs' claim.

Neither Paige Tomaselli of Grime Law, LLP nor Gretchen Elsner of Elsner Law & Policy, LLC submitted declarations as to their experience. Based on the statements of Robbins Geller's attorneys, Ms. Tomaselli has never served as class counsel and does not regularly practice in the area of consumer fraud class actions. Rather, she focuses her work on challenging federal agency actions and representing non-profit advocacy groups.  *See* ECF No. 219, ¶4.

It is also unclear if Ms. Elsner has ever served as class counsel before. She claims to have been lead counsel in a UCL food fraud trial. *Id.* She, however, represented an animal rights organization in that case (*DxE v. Diestel Turkey Ranch,*

1   Alameda Superior Court, Case No. RG17847475), where class claims were stricken
2   on demurrer and plaintiff lost after trial.[7] BB Decl., ¶18 & Ex. 118. Ms. Elsner was
3   separately sanctioned in a case in the Northern District (where she again represented
4   a non-profit organization) by Magistrate Judge Kim and ordered to read the local
5   rules and FRCP 26-27. BB Decl., Ex. 119. Most recently, a court denied
6   certification of a putative class that Ms. Elsner sought to represent, holding that the
7   plaintiffs failed to establish adequacy and noting that simple errors in the scope of
8   the plaintiffs' class definition raised questions regarding counsel's competency. *Id.*,
9   Ex. 120 at p. 9-10. Notably, this case suffers similar issues.

10      Plaintiffs' counsel's collective failure to vigorously prosecute this case is
11  generally illustrated by the procedural history of this matter.  They delayed retaining
12  experts necessitating multiple continuances of the class certification schedule and
13  have not deposed any WFM witnesses nor anyone from Creekstone. BB Decl., ¶17,
14  Ex. 117 at 72:6-15, Ex. 115 at 54:3-22 & Ex. 116 at 20:16- 22:2; *see also* ECF No.
15  153 & No. 232 at 5:18-6:5.

16  **F.    Plaintiffs Lack Standing to Seek Injunctive Relief Under Rule 23(b)(2).**

17      Plaintiffs seek certification of an injunction class that requires Defendants
18  cease use of the NAE statements storewide or additional verification of their
19  accuracy going forward. *See* ECF No. 223-1 at 18:14-18. Plaintiffs, however, lack
20  standing to seek injunctive relief and have not met their evidentiary burden for
21  certification of such a class under Rule 23(b)(2).

22      Plaintiffs lack standing because there is no clear, admissible evidence that
23  they will purchase WFM beef products in the future. *See In re ConAgra Foods, Inc.*,
24  90 F. Supp. 3d 919, (2015) (plaintiff lacks Article III standing to represent
25  injunction class "if he has not express[ed] an intent to purchase the products in the
26  future.") (internal citation omitted). Plaintiffs admit they stopped purchasing WFM

27  ───────────────
28  [7]  Her clients in-turn were found liable for trespass and unfair business practices based on their actions of repeatedly breaking into farms at night to steal livestock. BB Decl., ¶18 & Ex. 118.

beef products in July 2022 and do not express an intent to purchase those products again in the future.[8] ECF No. 220, ¶14 & No. 221, ¶11; BB Decl., Ex. 105 at 152:19-153:17. Plaintiffs statements they might or would like to purchase WFM's beef products again do not demonstrate a real and immediate threat of future injury. *See, In re ConAgra,* 90 F. Supp. 3d at 980-81 ("speculative assertions that they 'may consider' or 'will consider' purchasing Wesson Oils in the future if they are not mislabeled does not satisfy this standard.").

Finally, Plaintiffs' requested injunctive relief is overly broad and unworkable, rendering them inadequate. *See Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1140 (9th Cir. 2009) (court must "tailor the injunction to remedy the specific harm alleged.") Plaintiffs want to preclude WFM from using the NAE marketing even though the vast majority, if not all, of the beef products are raised without antibiotics and many of the Beef Suppliers use the NAE statement on their own labels and website.

**G.     The Court Plaintiffs Cannot Certify Their Class Under Rule 23(c)(4).**

Plaintiffs passingly ask the court to certify common issues under Rule 23(c)(4). ECF No. 223-1 at 32:23-33:2. Plaintiffs, however, do not identify any specific issues that are appropriate for certification under Rule 23(c)(4) or explain how those issues might advance the resolution of class member claims. *Id.*

**IV.     CONCLUSION**

Defendants respectfully request that the Court deny Plaintiffs' Motion.

Dated:  February 14, 2025             BLAXTER | BLACKMAN LLP

By:     _____/s/ Brian R. Blackman_____

BRIAN R. BLACKMAN
DAVID P. ADAMS
Attorneys for Defendants
WHOLE FOODS MARKET SERVICES,
INC., WHOLE FOODS MARKET
CALIFORNIA, INC., and MRS. GOOCH'S
NATURAL FOOD MARKETS, INC.

---

[8] Plaintiffs also admit they currently buy beef from others without knowing if the beef is NAE. BB Decl., Ex. 105 at 166:1-169:9 & Ex. 106 at 60:2-66:19.

-25-